# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA
# CASE NO. 12-CV-60706-MIDDLEBROOKS/BRANNON

APOTEX, INC., et al.,

        Plaintiffs,

v.

UCB, INC., et al.,

        Defendants.

_____/

**PLAINTIFFS' REPLY BRIEF REGARDING CLAIM CONSTRUCTION ISSUES**

The scope of the asserted claims of the '556 patent is understandable to a person of ordinary skill in the art ("POSA") of pharmaceutical formulation: they cover a method of manufacturing a pharmaceutical composition with at least 80% moexipril magnesium. This scope is distinguishable from the prior art, which only disclosed at most some accidental, uncontrolled conversion. Similarly, these claims give clear objective guidance to avoid infringement – do not have a process that uses a sufficient amount of solvent in the time it takes to run the process to give the claimed 80% conversion as determined by known analytical techniques. As such, they can be and should be construed as Apotex proposed in its opening brief.

Basing the construction of the three disputed claim terms – "sufficient amount of solvent," "predetermined amount of time" and "in a controlled manner" – on the 80% conversion limitation is not "entirely circular" as UCB contends (D.E. 158 at 1). It is proper claim construction - "[c]ourts can look to other clauses in the claims in question to inform their construction of the claim element and 'further define the functions attributed to it by the patentee.'" *Capital Bridge Co. v. IVL Techs. Ltd.*, No. 04-Cv-4002 (KMK), 2006 WL 2585529, *4 (S.D.N.Y. Aug. 30, 2006), quoting *Phonometrics, Inc. v. Northern Telecom, Inc.*, 133 F.3d 1459, 1465 (Fed. Cir. 1998) (finding the meaning of term to be clear "when the claim itself is considered in its entirety").

All of UCB's arguments need be taken with a grain of salt because it is telling the Court that the claims are indefinite while simultaneously arguing they are anticipated. But that is impossible because the law is clear that "a claim cannot be both indefinite and anticipated." *Enzo Biochem, Inc. v. Applera Corp.*, 599 F.3d 1325, 1332 (Fed. Cir. 2010). By necessity, UCB's arguments contain fatal factual and legal flaws.

UCB's indefiniteness argument boils down to the specification does not 1) define the terms or at least set out the minimum amounts needed and/or 2) does not provide a method to determine infringement. In truth, UCB is "really talking about the difficulty of avoiding infringement, not indefiniteness of the claim." *Invitrogen Corp. v. Biocrest Mfg., L.P.*, 424 F.3d 1374, 1384 (Fed. Cir. 2005). However, "[t]he test for indefiniteness <u>does not depend on a potential infringer's ability to ascertain the nature of its own accused product to determine infringement</u>, but instead on whether the claim delineates to a skilled artisan the bounds of the invention." *SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1340 (Fed. Cir. 2005) (emphasis added). UCB did not even attempt to distinguish the Federal Circuit's decision in the largely analogous *Exxon* case. 265 F.3d 1371,

1378-79 (Fed. Cir. 2001).[1]  In light of this precedent, UCB's indefiniteness arguments should be rejected.

For the reasons stated below, UCB's alternative claim construction arguments and newly disclosed theories are meritless and should be rejected.  Instead, the Court should adopt Apotex's proposed constructions that are supported by the intrinsic and extrinsic evidence.

## I.  THE '556 PATENT CLAIMS ARE NOT INDEFINITE.

The inventions in the '556 patent are methods of making pharmaceutical products (e.g. tablets) where substantial conversion of moexipril to moexipril magnesium occurs.  The specification and the prosecution history demonstrate that this invention is mainly about achieving a substantial reaction in these processes.[2]  For instance, the Examples in the specification show varying sets of conditions in how to practice the invention. Even UCB admits these examples are "objective information" regarding the disputed limitations.  D.E. 158 at 18.[3]  Thus, the proper context for determining the meaning of "sufficient amount of solvent," "predetermined amount of time" and "in a controlled manner" is in conjunction with the objectively defined conversion of at least "80%" and in light of the specific examples of the patent that define exemplar amounts of water and time.  *See Capital Bridge*, 2006 WL 2585529 at *4; *Phonometrics*, 133 F.3d at 1465. When considered through that prism, the proper meaning of the disputed claim terms becomes apparent – they have their ordinary meaning as described in Apotex's brief.  *See* D.E. 146 at 8--15.

In response, UCB mischaracterizes certain selected testimony of the inventor Dr. Sherman, but fails to provide any evidence in support of its arguments, not even its own expert opinion.  For that reason alone, UCB's indefiniteness argument is not supported by clear and convincing evidence, and should be denied.  *See, e.g., Envt'l Mfg. Sol'ns, LLC v. Peach State Labs*, 2011 WL 1262659, *9-10 (M.D. Fla. Mar. 31, 2011).  Even if considered, UCB's bare attorney argument does not establish indefiniteness.

---

[1] Other courts have rejected arguments similar to UCB's.  *See, e.g., PPG Indus., Inc. v. Guardian Indus. Corp.*, 75 F.3d 1558, 1563 (Fed. Cir. 1996); *Talecris Biotherapeutics, Inc. v. Baxter Int'l Inc.*, 510 F. Supp. 2d 356, 362-63 (D. Del. 2007); *In re Gabapentin Patent Litigation*, 395 F. Supp. 2d 164, 171-73 (D.N.J. 2005).

[2] UCB's "statement of facts" (D.E. 158 at 2-7) contains attorney argument, mischaracterizations, and irrelevant facts that are too numerous to fully address herein.  Apotex's silence should not be construed as acceding to UCB's erroneous statements.

[3] It is irrelevant that these examples were prophetic because inventors are not required to actually perform their invention prior to filing their patent.  *Eli Lilly & Co. v. Actavis Elizabeth LLC*, 435 Fed. Appx. 917, 924-25 (Fed. Cir. 2010) (unpublished); *Astra Aktiebolag v. Andrx Pharms., Inc.*, 222 F. Supp. 2d 423, 569 (S.D.N.Y. 2002).

### A. UCB HAS NOT AND CANNOT PROVE THE THREE CLAIM TERMS IN DISPUTE ARE INDEFINITE BY CLEAR AND CONVINCING EVIDENCE.

In UCB's view, the specification must 1) define the terms or at least set out the minimum amounts needed and/or 2) provide a method to determine infringement for a claim term to be valid under §112, ¶2. However, the indefiniteness case law does not support such a rigid view.

#### 1. Functional Claim Terms Do Not Require Specific Definitions or Minimum Amounts to Be Definite.

UCB argues the three terms are indefinite because there is no fixed definition or minimum amounts provided for these claim terms. D.E. 158 at 9, 13, 18-19. UCB's argument is misguided on several levels. First, UCB's argument looks at those three claim terms in isolation from the intrinsic evidence. As described above, these terms are defined functionally so the specific amounts are relative and defined by the rest of the claim language, including the 80% conversion limitation.

Second, UCB's argument is based on the faulty "presumption, not required by law or logic, that th[ese] phrase[s] must have some express definition or be supported by specific, numerical tests." *See, e.g.*, *Astra Aktiebolag*, 222 F. Supp. 2d at 570 (emphasis added). "The law imposes no obligation on a patent applicant to ... set the claim limits at the precise technological edge of the invention. A claim is not fatally indefinite for failing specifically to delineate the point at which the change in physical phenomenon occurs." *Andrew Corp. v. Gabriel Elecs., Inc.,* 847 F.2d 819, 823 (Fed. Cir. 1988); *see also Talecris*, 510 F. Supp. 2d at 361 (patentee "argues that it is not necessary for Claim 1 to recite numeric limits of acceptability based on a particular test for a particular product as it would unfairly and unnecessarily limit Claim 1. The Court agrees. ").

The Federal Circuit's *Exxon* case is squarely on point. There, the Court reversed the district court's finding of indefiniteness of the term "for a period sufficient" because the claim limitation was "expressed in terms that are reasonably precise in light of the subject matter," despite (a) the specification's lack of specific examples of a sufficient period of time, (b) the inventive methods' variability with changes to conditions in which the process runs, and (c) it would take experimentation to determine if the period was sufficient. 265 F.3d at 1378-79; *see also Talecris*, 510 F. Supp. 2d at 361 ("the [disputed] phrase has meaning to those of ordinary skill in the art, albeit the determination of that meaning may depend on a number of variables...."). UCB did not even attempt to distinguish *Exxon* or *Talecris*, despite Apotex's reliance on them.

Finally, UCB has not met its clear and convincing factual burden because all the people skilled in the relevant art (i.e. formulators) who reviewed these claims *were* able to determine their meaning. Specifically, the PTO examiners, Dr. Sherman, as well as Drs. Lipp, Cima, and Moreton,

3

all understand these claims. UCB's "expert," who is a chemist, not a formulator, is the only one that has issues understanding these terms. To bolster the dearth of evidence, UCB mischaracterizes Dr. Sherman's testimony. UCB argues "[Dr.] Sherman testified that there is actually no minimum amount of solvent because, 'if you wait for infinity, for example, you would need almost none.'" D.E. 158 at 9 (quoting Ex. G,[4] Sherman Dep. 78:15-79:3). But Dr. Sherman was plainly talking about an "[im]practical" hypothetical situation:

> [T]here's no minimum … unless you give me specific other factors … you have the reactants, you have … other excipients, you have equipment, you have all kinds of conditions. And so the amount … would be different for each, and I'm not sure you can put an exact minimum on it. If you want to wait for infinity, for example, you would need almost none. But that's not practical.

*Id.* at 78:15-79:3; *see also id.* at 84:16-86:2.[5] Further, an endless amount of time (i.e. infinity) by definition is not a "predetermined amount of time." Thus, "almost no solvent for infinite time" would not fall within the scope of the '556 patent claims. In the real world, applicable time and amount of solvent could be readily determined. *See, e.g.,* Ex. E, Moreton Reb. ¶¶ 89-92. Likewise, the intrinsic evidence shows that the patent methods are "controlling" the conditions to ensure one gets substantial (e.g., over 80%) or complete conversion to moexipril magnesium. The specific steps to do so are making sure the moexipril and the magnesium salt are wet enough in the given amount of time. The claims require as much, the specification says the same, and the arguments in the prosecution history emphasize this. Thus, the patent does explain what 'specific steps' avoid the risks of 'unknown side reactions' and how it differs from the prior art.

2. **The '556 Patent Provides a Measurable Objective Standard.**

UCB argues that the terms are invalid because there is no objective standard for a POSA to determine if they infringe or not. *See, e.g.*, D.E. 158 at 11. This argument is factually incorrect because there is a clear, objective standard applicable to determine infringement – whether there was the 80% conversion required by the claims. Thus, UCB's argument fails right out of the box.

Claims are not indefinite because the patent does not disclose a specific analytical method to determine infringement. UCB's argument to the contrary (D.E. 158 at 11) is legally unsound. *See, e.g., PPG*, 75 F.3d at 1563 ("the patent is not rendered invalid on the ground that the inventors

---

[4] To avoid unnecessarily duplicative filings, Apotex refers to Exhibits A-J filed with its Opening Brief (D.E. 146) and Exhibits 1-12 filed with UCB's Opposition Brief (D.E. 158) when possible.

[5] Other courts have found claims definite despite similar inventor testimony. *See, e.g., Talecris*, 510 F. Supp. 2d at 360 (inventor's "reluctance to assign any specific definition of 'acceptable level' of ACA" was due to acceptability being "dependent upon a number of variables ….").

4

failed to specify the method to be used in measuring the" claimed feature). A claim is not indefinite even if it might be difficult to determine infringement. *Id.*; *Gabapentin*, 395 F. Supp. 2d at 171 (term not indefinite "simply because it is difficult to ascertain the level of [chemical] for purposes of infringement."). In *PPG*, it was proper for the jury to decide whether the amount of iron sulfide in the patented glass had a "material effect" on the glass, despite the patent being silent about what constituted a "material effect" on the properties of the glass. 75 F.3d at 1354-55. Likewise, Apotex's proposed constructions would allow the jury to make similar determinations about "sufficient amount of solvent," "predetermined amount of time," and "controlled manner."

UCB's argument is factually off-base too. There is ample evidence that a POSA could determine whether a process would fall within the scope of the claims without undue experimentation. For example, Dr. Cima opined and testified that a POSA could routinely develop and use methods known in the pharmaceutical industry for the determination of moexipril magnesium. *See* D.E. 146 at 11. In fact, Chemir Analytical Services developed and used such methods to determine that UCB's products contained moexipril magnesium.[6] Without clear and convincing evidence to rebut these facts, UCB's indefiniteness argument fails. *See Gabapentin*, 395 F. Supp. 2d at 173; *Merial Ltd. v. Velcera Inc.*, 877 F. Supp. 2d 1348, 1360 (M.D. Ga. 2012) (expert testimony demonstrated that POSA would know how to conduct tests to determine if it met limitation); *Wyeth v. Abbott Labs.*, Civ. No. 08-230 (JAP), et al., 2010 WL 3001913, *6 (D.N.J. July 28, 2010) ("Defendants simply have not shown by clear and convincing evidence that a [POSA] would be unable to determine the specific amounts without undue experimentation.").[7]

### 3. *Halliburton* and UCB's Other Cases Are Distinguishable.

UCB erroneously contends that *Halliburton* is on point (D.E. 158 at 9), but it is easily distinguishable. Unlike the "fragile gel" term in *Halliburton*, the terms in the '556 patent are not subjective when taken in context of the rest of the claims. As described above, a POSA can

---

[6] UCB states that Apotex contends these tests are proprietary and confidential. *See, e.g.,* D.E. 158 at 11, 13. While true, it is irrelevant to any question the Court has to decide on claim construction. The question is whether a POSA could make the determination without undue experimentation, not whether it is publicly available.

[7] *Advanced Display,* cited by UCB, (D.E. 158 at 11-12), does not compel a different conclusion. There, "highly modulated surface" was indefinite because the patent provided conflicting descriptions of what a "highly modulated surface" was and there was no way to tell the difference between "a mere modulated surface and a *highly* modulated surface." 2012 WL 2872121 at * 12 (emphasis in original). Here, the claims lay out the objective standard for differentiating between a method that produces insignificant reaction and one that falls within the claim scope – the 80% conversion limitation.

5

routinely determine if there was more than 80% conversion in a predetermined amount of time. If there is more than 80% conversion in that time, then there was "a sufficient amount of solvent" as required by the '556 patent claims. *See, e.g., Exxon Res.*, 265 F.3d at 1378-79; *Talecris*, 510 F. Supp. 2d at 361. "Here the claim itself imposes parameters on the scope of the phrase 'sufficient amount' with reference to what it does [("so as to convert greater than 80%")]." *Vikase Cos., Inc. v. World Pac Int'l AG*, 714 F. Supp. 2d 878, 887 (N. D. Ill. 2010) (distinguishing *Halliburton*).

UCB contends that the '556 patent claims are indefinite because they do not distinguish the amount of solvent in the invention from the amount of solvent in the prior art. D.E. 158 at 10 (relying on *Halliburton*). UCB misapplies *Halliburton*. There, "the specification [did] not distinguish how the 'fragile gels' claimed in the '832 patent performed differently than the disclosed prior art …." 514 F.3d at 1253. In contrast, the '556 patent clearly indicates that the prior art resulted in no or insignificant conversion while the claimed methods require at least 80%.[8] Also, the *Halliburton* panel took issue with the fact that the claims may require an entirely different material depending on the variables. In contrast, UCB complains of having to use different amounts of the same material. The difference in kind was problematic in *Halliburton*, not the difference in degree here. *See Mannatech, Inc. v. Techmedia Health, Inc.*, No. 3:06-CV-00813-P, 2009 WL 3614359, *4 (N. D. Tex. Oct. 29, 2009) (*Halliburton* is "highly distinguishable" on this ground).

The *Halliburton* panel also stated that if a construction makes an artisan conduct a separate infringement determination for each circumstance that a compound could be used <u>and</u> the determination result in differing infringement outcomes, the construction is likely indefinite. *Id.* at 1255. UCB presented no evidence that both conditions are met in this case, despite their burden to do so. For example, there is absolutely no evidence that testing a process using different analytical methods would result in different answers on infringement. Thus, *Halliburton* is again inapt.[9]

    4.    **UCB Has Not Distinguished the Cases Cited by Apotex.**

---

[8] UCB's reliance on *Amgen* is similarly misplaced. D.E. 158 at 10. There is no evidence that the '450 patent and Gu reference resulted in anywhere near 80% conversion. Thus, the prior art is not extremely close to the invention as it was in *Amgen*, *Halliburton*, and *Hamilton*. *See* 927 F.2d 1200, 1217-18 (Fed. Cir. 1991).

[9] UCB's reliance on *Geneva* is inapt. D.E. 158 at 8. There, the proposed construction required a "synergistic effect" against bacteria that the patent did not identify. 349 F.3d 1373, 1384 (Fed. Cir. 2003). Here, the amount of solvent, predetermined time, and controlled manner are all done for one stated purpose – achieving substantial conversion (e.g. over 80%). *Hamilton* is also off-base because the invention was a "male" portion of a seat belt that was universal for all "female" buckles in any car. 492. F. Supp.2d 1328, 1340 (M.D. Fla. 2007). Here, the claimed methods are <u>not limited</u> to a single universal method.

UCB attempts to distinguish cases cited by Apotex because the limitations in those cases were "irrelevant to patentability" while here the limitations are allegedly "critical to both validity and infringement." *See, e.g.*, D.E. 158 at 13-14 (discussing *Orlaford* and *Aguayo*). However, UCB argument is legally and factually incorrect. First, whether a term is "irrelevant" or "critical" does not matter. *See, e.g.*, *Randall May Int'l, Inc. v. DEF Music Prods., Inc.*, 378 F. App'x 989, 998 (Fed. Cir. 2010) ("all the limitations in a claim must be considered meaningful"). Second, this argument is factually incorrect because the over 80% conversion is the important feature, not the amount of solvent or time (or other conditions) to achieve such a reaction.[10]

Despite UCB's arguments (D.E. 158 at 16), *Star Scientific* is directly on point. 655 F.3d 1364 (Fed. Cir. 2011). There, the Court found that tobacco curing variables were known in the tobacco industry. *Id.* at 1374. Here, the broad steps and variables (time, solvent, equipment) of wet granulation are known. There, the defendant argued a POSA "would be unable to determine the difference between 'conventional processes' and the 'controlled environment' required by the" patents. *Id.* at 1370-71. Here, UCB contends the same can be said about conventional wet granulation and the invention. There, the POSA in tobacco curing "would possess adequate understanding to manipulate these variables to create a controlled environment." *Id.* at 1374. Here, an ordinary formulator would possess adequate understanding to manipulate the wet granulation variables to create a controlled reaction where at least 80% of moexipril magnesium is formed. *See, e.g.*, Ex. J, Cima Reb. Rept. at ¶¶ 131-139.[11]

**B.     UCB'S NEW INDEFINITENESS ARGUMENT IS UNTIMELY AND INCORRECT.**

UCB's argument that Claims 8-12 are indefinite because they contain four steps, whereas Claim 1 only contains a single step is both untimely and wrong. *See* D.E. 146 at 19-20. UCB did not address Apotex's arguments or case law. Also, UCB's single unpublished case from outside

---

[10] UCB contends that Apotex "clearly took the position that the prior art did not contain sufficient solvent." D.E. 158 at 12. This is not correct - the argument in prosecution was the prior art did not result in significant conversion. The two cited references (the '450 patent and Gu) do not disclose full sets of conditions. So, Apotex was not taking a position on how much solvent or time was sufficient or not. Thus, UCB's attempt to distinguish *Abbott Labs.* fails.

[11] A claim is not indefinite "even though the task [of construing the claim] may be formidable and the conclusion may be one over which reasonable persons will disagree." *Exxon Res.*, 265 F.3d at 1375. Thus, while Dr. Lipp used "controlled amounts" in a declaration he drafted nearly a decade ago in a allegedly different manner from the way Apotex and its expert witnesses currently interpret "in a controlled manner" in the patent claim, this is of no moment. Also, Dr. Lipp's complete testimony on this topic (Ex. 12 at 164:4-166:2) is consistent with Apotex's other experts and its proposed construction, contrary to UCB's assertion (D.E. 158 at 15).

this Circuit is neither precedential nor on point. *See* D.E. 158 at 16. There, the claims were deemed "arguably indefinite" because Step 5 had to occur both before and after Step 4. *Acacia Media Techs. Corp. v. New Destiny Internet Grp.*, No. C 05-01114, 2007 WL 678317, *3 (N.D. Cal. Mar. 2, 2007). In other words, the Court did not even definitively find these claims indefinite despite the fact that it found the claim impossible to practice as it understood it. Here, both independent claim 1 and dependent claims 8-12 of the '556 patent allow for reaction during any of the steps in the process. Thus, unlike *Acacia*, there is no inherent incompatibility between these claims to render it even "arguably indefinite." UCB's untimely argument to the contrary has no merit.

## II.   UCB'S CLAIM CONSTRUCTION POSITIONS ARE INCORRECT.

UCB does not whole-heartedly contend the claims are not amenable to construction because it has proposed definitions for the exact terms that it says are indefinite. D.E. 158 at 18-19. Even so, UCB's proposals are incorrect because a) there was no clear disavowal of claim scope or b) they violate black-letter patent law by incorporating limitations from the expressly non-limiting examples into the claims. *See* D.E. 146 at 10-12.

### A.   UCB'S NEW DISCLAIMER ARGUMENT IS UNTIMELY AND INCORRECT BECAUSE "CONVENTIONAL" WET GRANULATION WAS NOT DISCLAIMED.[12]

UCB raised a new disclaimer argument for the first time in its Opposition Brief (D.E. 158 at 17-18), despite having the patent and file history (the only evidence UCB's relies on) for over a year and discovery being closed for over two months.[13] Even if it is considered, UCB's argument is wrong. Put simply, there is no clear statement to support UCB's argument that "conventional wet granulation" was disclaimed from the scope of the '556 patent claims. In order to constitute a disavowal, an applicant's statements during prosecution must be "both clear and unmistakable." *See, e.g., Purdue Pharma L.P. v. Endo Pharms., Inc.,* 438 F.3d 1123, 1136 (Fed. Cir. 2006).

The Federal Circuit has also recognized an important distinction between statements that describe the prior art, which are not a disavowal, and statements that describe the claimed invention, which can result in a disavowal. *See Northern Telecom Ltd. v. Samsung Elecs. Co., Ltd.*, 215 F.3d 1281, 1293-1294 (Fed. Cir. 2000); *Computer Docking Station Corp. v. Dell, Inc.,* 519 F.3d 1366, 1375. ("Prosecution disclaimer does not apply, for example, if the applicant simply describes features of the prior art and does not distinguish the claimed invention based on those features.").

---

[12] UCB's Univasc® Disclaimer argument (D.E. 158 at 17) has been adequately addressed in other briefing. *See* D.E. 33, D.E. 97 at 33-38, D.E. 122 at 1-6, D.E. 135 at 1-3, D.E. 143 at 3.

[13] Apotex should not have to face new arguments at this juncture and is prejudiced by UCB's unjustifiably late disclosure, thus it should be excluded. *See* D.E. 146 at 16-17; D.E. 90; D.E. 115.

In *Northern Telecom*, the patentee made statements during prosecution that described the teachings of a prior art reference as, *inter alia*, "concerned with a totally different process." *Id.* The Court ultimately found that statements did not contain the "clarity and deliberateness" required to raise to the level of express disavowal. *Id.*

*Northern Telecom* is on point and demonstrates that Apotex did not clearly and deliberately exclude "conventional wet granulation" processes from the claimed invention during prosecution.[14] Neil Hughes, the patent agent who prosecuted the '556 patent, repeatedly emphasized that there is no description of a wet granulation process that causes a significant reaction in the prior art. For instance, he stated "[c]learly, there can be no reacting with this ['450] process but merely combining of ingredients." *See* Ex. 7 AI-MOEX0000481; *see also* Ex. F at AI-MOEX0000656 (Examiner's Reasons for Allowance). Thus, Claims 8-12 require processes where the reaction occurs to form a significant amount of quinapril magnesium when following steps i)-iv) set forth in those claims, regardless if it is a "standard wet granulation" or not.

The statement cited by UCB (D.E. 158 at 18) regarding "standard wet granulation" was made in response to the Examiner rejecting the '556 patent as obvious in light of the Gu article and the '450 patent. *See* Ex. 7 at AI-MOEX0000480. Mr. Hughes stated that the '450 patent "is silent in relation to anything but the use of a more or less standard wet granulation process." *Id.* at AI-MOEX000482. Understood in context, all this statement means is that the reaction does not inherently and inevitably result from any and all standard wet granulation processes. Thus, it was the significant "reaction" to form moexipril magnesium that distinguished the claims, not whether the wet granulation was standard or not. UCB's citation to Dr. Lipp's declaration is similarly misleading. D.E. 158 at 18. Dr. Lipp clearly states that the tablet formulation textbooks and references he was referring to "would not teach a skilled formulator that a wet granulation process can allow for significant amount of reaction to occur …." Ex.10 at ¶ 28.

In short, Mr. Hughes and Dr. Lipp distinguished Dr. Sherman's invention based on the "reaction" to form moexipril magnesium, not on whether the wet granulation was standard or not. Thus, the "more or less standard wet granulation" statement and Dr. Lipp's declaration are merely a description of the features of the prior art and not an express disavowal of the scope of the claims. At the very least, the meaning of the statements UCB cites are ambiguous and thus do not rise to the level of "clear and unmistakable" disclaimer.

---

[14] UCB did not argue that the claim language itself or the specification excludes "conventional wet granulation. Nor could it, because there is no clear indication that the claims should be so limited.

9

### B.   UCB'S PROPOSED CONSTRUCTIONS SHOULD BE REJECTED BECAUSE THEY IMPROPERLY IMPORT LIMITATIONS FROM THE SPECIFICATION INTO THE CLAIMS.

UCB does not attempt to distinguish the case law that Apotex cited in its brief regarding its constructions that flaunt the established patent law principle that one should not incorporate limitations from the specification into the claims.  D.E. 146 at 10-12.  Instead, UCB cites *Athletic Alternatives,* without further explanation.  D.E. 158 at 19.  However, the Court there faced a choice between two reasonable constructions.  73 F.3d 1573, 1581 (Fed. Cir. 1996).  Here, it is not an "equal choice between a broader and narrower meaning of a claim" as in *Athletic Alternatives* because 1) the intrinsic and extrinsic evidence support only support Apotex's proposal and 2) UCB's proposal would require the court to commit a cardinal sin.

UCB asserts that Claim 8 "must be construed" as requiring the reaction to take place before the drying step.  D.E. 158 at 19-20.  In addition to being untimely, this argument is wrong.  UCB's proposal requires importing limitations from the non-limiting examples in the specification into the claims.  UCB's only basis for limiting the claims is from sections of the patent that say "[t]he process may be carried out in any of several ways, as follows:" (Ex. A, Col. 3:53-54, emphasis added) and "the following examples … are intended to be illustrative but not limiting of the invention" (*id.* at col. 4:65-67, emphasis added).  Earlier, UCB argued that these same Examples are not limiting of the invention.  D.E. 158 at 10.  Apotex agrees with this earlier statement.[15]  Because UCB has no legal or factual basis for its claim construction proposals, they should be rejected.

### III.   CONCLUSION

For the reasons stated above and its opening brief (D.E. 145), Apotex respectfully requests that this Court construe the three disputed terms to have their plain and ordinary meaning.  Further, Apotex respectfully requests that the Court to grant summary judgment in Apotex's favor on UCB's disclaimer defenses and to preclude UCB from arguing the issues first raised in the pre-trial stipulation or its Brief (D.E. 158).

---

[15] UCB appears to ask this Court to limit the claims to exclude 7% by weight of solvent based on its disclosure in Gu.  But the conditions in Gu are nothing like actual wet granulation processes. Due to the multiple variables described above, it is wrong to conclude that all commercial methods that use 7% water will not infringe because insignificant reaction occurred with 7% water in the small scale experiments done in a mortar-and-pestle as in Gu.  UCB's argument is akin to equating mixing cement in a pail to doing it in a cement mixing truck.

Dated: June 17, 2013          Respectfully submitted,

  /s/ Brian J. Sodikoff
Matthew S. Nelles
Fla. Bar. No. 009245
mnelles@broadandcassel.com
Broad and Cassel
One Financial Plaza
100 S.E. Third Avenue, Suite 2700
Fort Lauderdale, Florida 33394
Telephone: (954) 764–7060
Facsimile: (954) 761–8135

KATTEN MUCHIN ROSENMAN LLP
Robert B. Breisblatt (Fla. Bar No. 145928)
robert.breisblatt@kattenlaw.com
Brian J. Sodikoff (admitted *pro hac vice*)
brian.sodikoff@kattenlaw.com
Martin S. Masar III (admitted *pro hac vice*)
martin.masar@kattenlaw.com
Elese E. Hanson (admitted *pro hac vice*)
elese.hanson@kattenlaw.com
525 W. Monroe Street
Chicago, Illinois 60607
Telephone: (312) 902-5200
Facsimile: (312)-902-1061

*Attorneys for Plaintiffs Apotex, Inc. and Apotex Corp.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on this 17th day of June 2013, I electronically filed the foregoing PLAINTIFFS' REPLY BRIEF REGARDING CLAIM CONSTRUCTION ISSUES with exhibits using CM/ECF. I also certify the foregoing document is being served this day on all counsel of record on the attached service list via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

    /s/ Robert B. Breisblatt
Robert B. Breisblatt

## SERVICE LIST

Maria J. Beguiristain
White & Case LLP
Southeast Financial Center
200 South Biscayne Boulevard, Suite 4900
Miami, Florida 33131
Telephone: (305) 371-2700
Facsimile: (305) 358-5744
mbeguiristain@whitecase.com

*Attorneys for Defendants*
*UCB, Inc. and Kremers*
*Urban Pharmaceuticals, Inc.*

Dimitrios T. Drivas (*pro hac vice*)
Adam Gahtan (*pro hac vice*)
Amit H. Thakore (*pro hac vice*)
White & Case LLP
1155 Avenue of the Americas
New York, New York 10036
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
ddrivas@whitecase.com
agahtan@whitecase.com
athakore@whitecase.com

*Attorneys for Defendants*
*UCB, Inc. and Kremers*
*Urban Pharmaceuticals, Inc.*