# **EXHIBIT E**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 12-60706–CIV–MIDDLEBROOKS/BRANNON
(as consolidated with Case No. 12-60707-CIV)

APOTEX, INC. et al.,
                Plaintiffs,

v.

UCB, INC., et al.,
                Defendants.
_____/

## REBUTTAL EXPERT REPORT OF R. CHRISTIAN MORETON, PH.D

### HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
### SUBJECT TO PROTECTIVE ORDER

I declare under penalty of perjury that the following is true and correct.
Executed on March 6, 2013 in Waltham, Massachusetts.

_____
R. Christian Moreton, Ph.D.

SUBJECT TO PROTECTIVE ORDER
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

enough solvent) for long enough (i.e. it is dried too quickly) or if there is not enough alkaline magnesium compound to react with the moexipril (i.e. the stoichiometry is wrong). However, the '556 patent specification states that the amount of unreacted/unconverted moexipril or acid addition salt thereof must be small enough so as to not significantly alter the stability profile of the resulting composition. *Id.* at col. 2:47-65.

59. Accordingly, one of ordinary skill in the art would understand that the invention described in the '556 patent is not directed to processes wherein a nominal amount of conversion to moexipril magnesium occurs. Such a minimal reaction would not convert enough of the moexipril or acid addition salt thereof to moexipril magnesium, thus resulting in a composition that is not stable.

60. During prosecution of the '556 patent the US Patent Office (PTO) initially rejected the claims over certain prior art references. However, these rejections were overcome, and the claims were ultimately allowed. Dr. Cima's report accurately sets forth the '556 patent file history as I understand it. Cima Op. ¶¶ 39-52. The PTO indicated in a Notice of Allowance that the prior art did not disclose the claimed processes wherein a reaction was carried out to convert greater than 80% of moexipril or an acid addition salt thereof to moexipril magnesium. See AI-MOEX0000654-57 at 656; Cima Op. ¶¶ 51-52.

## VII. PERSON OF ORDINARY SKILL IN THE ART

61. I understand Dr. Chyall's opinion regarding one of skill in the art is expressed in paragraph 15 of his report.

62. I do not agree with Dr. Chyall's opinion as to one of ordinary skill in the art because it is vague and does not properly contemplate the teachings of the '556 patent, particularly, the nature of the problem solved by Dr. Sherman. For example, Dr. Chyall's definition uses the term "industry experience," which is unclear and unnecessarily broad. Based on my review of the '556 patent, it is my opinion that "industry experience" would require conducting or designing processes of making solid pharmaceutical compositions, and not simply any experience in the pharmaceutical industry.

63. I agree with the definition proposed in Dr. Michael J. Cima's Opening Report, namely, that a person of ordinary skill in the art ("POSA") seeking to develop such a process would be a pharmaceutical formulator, that is a person having a working knowledge of drug development

10

SUBJECT TO PROTECTIVE ORDER
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

and formulation, who has either an advanced degree in pharmaceutics, chemistry or related science with one or more years of experience in drug development and formulation related to industrial application or a bachelor's degree in pharmaceutics, chemistry or a related science and five or more years of experience in drug development and formulation related to industrial application. *See* Cima Op. ¶ 54. The POSA's industrial experience would specifically include working with wet granulation processes. Such a person would also possess or have access to the expertise, skills and knowledge of an analytical chemist.

64. However, my ultimate opinions in this report would not be different if the Court adopted Dr. Chyall's definition.

## VIII. WET GRANULATION

65. Dr. Cima sets forth a concise and accurate analysis of pharmaceutical formulation, particularly wet granulation, in his opening report. *See* Cima Op. ¶¶ 61-71. I generally agree with Dr. Cima's opinions on wet granulation as they are consistent with my understanding.

66. Wet granulation is a process in which powder particles are made to adhere to one another to form larger, multiparticle entities called granules. Wet granulation is particularly useful when ingredients of the composition cannot be compacted in the dry state. *See, e.g.*, King et al., "Oral Solid Dosage Forms," In: Gennaro A.R. (ed.), "Remington's Pharmaceutical Sciences," 17th ed., Chapter 90, 1603-32, Mack Publishing, Easton, PA, 1985 (AI-MOEX0197000-31).

67. On a high level, wet granulation comprises a process wherein dry materials are mixed, then wetted to form a wet mass. The wet mass is created by adhering the powder particles together by the addition of a granulation liquid (e.g., water) onto a mixture of powders (often called the powder bed) that is being mixed (e.g., by an impeller or air). On occasion, the resultant wet mass is not of uniform size and may be more properly characterized as lumps, rather than granules. Depending on the composition of the powders, the granulation liquid can include a binder, which serves as a "pharmaceutical glue" to better adhere the mixture, such as polyvinyl pyrrolidone (PVP or Povidone). The resulting wet mass can be further processed to form more uniformly sized granules by sieving or milling. These granules are then dried and processed into solid pharmaceutical compositions (e.g., tablets).

**SUBJECT TO PROTECTIVE ORDER**
**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

68. Wet granulation is a processing technique that is characterized as a physical process used in the making of solid pharmaceutical dosage forms, such as tablets or capsules. *See* Cima Op.¶ 63-64. The focus of any wet granulation process is the physical interaction of the components, with the ultimate goal of achieving a solid dosage form having the required physical integrity needed for a pharmaceutical product, e.g., hardness, flowability, friability, etc. *See id.* at ¶65; Chyall Op. ¶ 40 ("Typically granules provide solid particles with the appropriate characteristics such as flow and compressibility to facilitate further processing into tablets. The granules obtained from wet granulation processes also facilitate content uniformity of the tablets ...."); Lipp Decl. at ¶¶ 11, 26-29(AI-MOEX0000526-643); Pharmaceutical Dosage Forms, (Lieberman & Lachman 1980), p. 114-115 (AI-MOEX0000565-642 at 572-73).

69. While there are typical steps in a wet granulation (see ¶ 66 above), there is no standard set of conditions for each of those steps that would constitute a "standard wet granulation" process. The specific conditions (such as amount and type of tablet ingredients, volumes of solvents, stirring times, granulating equipment used, drying equipment used, drying times, etc.) vary from product to product. These steps have a number of parameters that can be varied depending on the components used in the granulation. For example, the '556 patent provides examples of various wet granulation methods wherein moexipril or an acid addition salt thereof is reacted with an alkaline magnesium compound to form moexipril magnesium. *See* the '556 patent at col. 4:22-64; 5:1-6:16.

70. Ordinarily, wet granulation is not used to cause a reaction, rather it is typically used to prevent segregation of the ingredients in the powder mix, to improve flow properties of the mix, or to improve compression characteristics of the mix. *See* M.P. Summers, Ch. 37 Granulation, in Aulton's Pharmaceutics at 616-18 (AI-MOEX0007350-63 at 351-53). In fact, wet granulation is not readily suitable for hydrolysable or thermolabile drugs. *See* M.H. Rubinstein, Ch. 18 Tablets, in Michael E. Aulton, Pharmaceutics at 309 (AI-MOEX0007175-95 at 183).

71. While the basic premise of wet granulation techniques are known to those skilled in the art, the application of these principles to a particular formulation requires careful consideration of a number of factors. *See, e.g.*, Cima Op. ¶ 66. As discussed above, the focus of a wet granulation is physical interactions, as opposed to chemical interactions. In my experience, the conventional wisdom applied by pharmaceutical formulators looking to carry out a wet granulation process is to avoid or reduce chemical interactions between the components,

SUBJECT TO PROTECTIVE ORDER
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

particularly reactions involving the active pharmaceutical ingredient (API). This precaution serves to reduce and/or eliminate any adverse impacts on the safety and/or efficacy of the ultimate finished product. *See, e.g.*, Cima Op. ¶¶ 69-70. Indeed, there are a number of API's are ill-suited for wet granulation because of their sensitivity to degradation. For example, because wet granulations necessarily require a solvent (e.g., water) and heat (i.e., drying), they are poorly suited for hydrolysable or thermolabile active pharmaceutical ingredients. *See* Cima Op. ¶¶ 69, 124; M.H. Rubinstein, Ch. 18 Tablets, in Michael E. Aulton, Pharmaceutics at 309 (AI-MOEX0196592-612).

## IX.   THE CLAIM TERMS ARE NOT INDEFINITE

72. I understand that Dr. Chyall asserts a number of claim terms are indefinite. As explained herein, it is my opinion that the claim terms addressed by Dr. Chyall are not indefinite because one of skill in the art would readily understand the meanings of the these terms in view of the disclosure in the '556 patent, the file history, and their knowledge and experience.

### A.   "controlled manner"

73. Dr. Chyall asserts that term "controlled manner" as used in the '556 patent is indefinite. Chyall Op. ¶ 92. I disagree.

74. Claim 1 of the '556 patent recites the step of "reacting moexipril or an acid addition salt thereof with an alkaline magnesium compound in a controlled manner." It is my opinion that the phrase "controlled manner" as used in the '556 patent is sufficiently clear and readily understood by those of skill in the art.

75. The phrase "controlled manner" was added to the claims during prosecution to further clarify that the claimed invention was directed to the conversion of a significant amount of moexipril or acid addition salt thereof to moexipril magnesium. AI-MOEX0000506; Cima Op. ¶ 112. Furthermore, the definition of "controlled manner" proposed by Dr. Cima, i.e., "in a way that results in a significant amount of conversion" is reasonable and entirely consistent with the disclosure of the '556 patent as viewed by one of ordinary skill in the art. Cima Op. ¶ 113.

76. The '556 patent specifically states that the "purpose of the present invention is to eliminate the unstable moexipril or acid addition salt thereof and replace it with stable moexipril magnesium." '556 patent, col. 2:57-59. The specification further states that, "it will be understood that it is desirable that the preparation of the moexipril or acid addition salt converted

13

SUBJECT TO PROTECTIVE ORDER
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

and moexipril magnesium be as high as possible." *Id.* at col. 2:59-63. It also states the prior art methods were "difficult to precisely control the exact final ingredients in the composition" and to "completely avoid an acid-base reaction in the making of the composition." '556 patent, Col. 2:31-39; *see also id.* at col. 2:4-11. Thus, I disagree with Dr. Chyall's opinion (Op. ¶ 92) that this term is "ambiguous." One of ordinary skill in the art would understand that the claimed invention achieves a certain level of conversion through a chemical reaction by controlling various parameters relating to the reaction.

77. For example, the '556 patent provides additional guidance by (1) identifying the contemplated reaction to be carried out (col. 3:7-21); (2) providing the amount of reactants needed to ensure the reaction goes to completion (col. 3:21-38); and (3) describing reaction conditions that facilitate the reaction (col. 3:29-4:64). As to item (3), the specification is explicit in stating that the amount of solvent and time for reaction are important factors to allow the reaction to go to completion. *See, e.g.*, col. 3:40-47; 3:61:66; col.4:27-33; 4:41-47; col. 4:55-61.

78. Dr. Chyall opines that the '556 patent does not "describe any manner of control that improves on the prior art processes." I disagree. The '556 patent describes that the conditions and parameters of the method of making the pharmaceutical compositions must be such so that the reaction between moexipril and the magnesium compound goes to substantial completion or 100% completion. The prior art methods did not disclose, teach, suggest, or motivate a POSA to even do a reaction, let alone a substantially complete reaction.

79. It is my opinion that these disclosures provide a POSA with sufficient guidance as to the meaning of a "controlled manner" as used in the '556 patent. A person of ordinary skill in the art would understand the term "in a controlled manner" to mean "in a way that results in a significant amount of conversion." Accordingly, this term is not indefinite.

B.   "sufficient amount of solvent"

80. Dr. Chyall contends that phrase "sufficient amount of solvent" as used in claim 1 is ambiguous. Chyall ¶ 93. Dr. Chyall asserts that the specification of the '556 patent fails to provide any guidance as to the meaning of this term. *Id.* I disagree.

81. As discussed above, the '556 patent identifies a number of exemplary processes for carrying out the claimed reaction. *Id.* at col. 3:52-6:15. One of ordinary skill in the art would understand that each of these examples requires a "sufficient amount of solvent" to permit the reaction to occur. While the amount of solvent required by each of these examples would vary

14

**SUBJECT TO PROTECTIVE ORDER**
**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

depending on the particulars of the process, the existence of this variability does not render the claim term indefinite. Rather, it is my opinion that one of skill in the art would be able to readily identify the meaning of these terms based on the disclosure of the '556 patent.

82. Dr. Chyall opines that "the '556 patent specification and claims do not disclose the minimum amount of solvent that must be used to practice the claimed process." (Op. ¶ 93) First, I disagree because the patent provides examples with 30% (w/w) solvent. '556 patent at col.5:1-6:16, Examples 1-4. Thus, one of skill would know that 30% (w/w) would work. *See also* Sherman Dep. at 85:5-86:2 ("It's going to be more than 10 percent, it's going to be less than 70 or 80 percent, because that's likely to give him a mess."). Second, even if there was no minimum disclosed, this does not make the patent indefinite. The patent term "sufficient amount of solvent" is as accurate as the subject matter permits, given the variables and particulars of the processes that can be used to make pharmaceutical compositions in the presence of a solvent. Once motivated by the '556 patent to do the reaction, those of ordinary skill in the art would have realized that the sufficient amount of solvent could be easily obtained by minimal and routine experimentation.

83. I have reviewed the Dr. Sherman's deposition testimony cited by Dr. Chyall. I respectfully disagree with Dr. Chyall's characterization of Dr. Sherman's testimony. Dr. Sherman testified that "the person would … simply pick an amount … of water from those trials, based on whatever particular ingredients he wants to use and equipment he wants to use, to ensure that the amount of water used and the time used is enough to get the most stable product, without using so much as to complicate the process." Sherman Dep. at 69:14-71:2. This is consistent with my experience and the POSA's understanding in the early 2000s.

84. Also, Dr. Sherman did not say there was no minimum. Rather, he correctly opined that the questioner did not provide enough information to answer:

> [T]here's no minimum … unless you give me specific other factors … you have the reactants, you have … other excipients, you have equipment, you have all kinds of conditions. And so the amount … would be different for each, and I'm not sure you can put an exact minimum on it. If you want to wait for infinity, for example, you would need almost none. But that's not practical.

*Id.* at 78:15-79:3; *see also id.* at 84:16-86:2.

85. I also disagree with Dr. Chyall's mischaracterization (Op. ¶ 93) of Dr. Sherman's testimony regarding guidance in the specification. Contrary to Dr. Chyall's opinion, Dr.

15

SUBJECT TO PROTECTIVE ORDER
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Sherman did not testify that the '556 patent contains no guidance or that the amount of solvent and time were "arbitrary." Instead Dr. Sherman testified:

> Q. Well, does your patent contain guidance like: If these are the quantity of starting materials and these are the excipients, and this is the relevant humidity and temperature in which you're conducting the experiment, use this much water?
>
> A. No, it does not -- it doesn't do it in those terms. It's -- it's not that explicit, but it's implicit. It says you want at least 70 percent converted. And you -- you therefore are going to try different amounts of water, perhaps, and you're -- along with whatever other parameters you're going to choose, many of which are arbitrary. And then you're going to check to make sure you've got the conversion.

Sherman Dep. at 130:13-131:1. Dr. Sherman is saying that the '556 patent provides enough information to guide the person of ordinary skill for the certain explicit conditions he or she would be operating under. Also, he states that the "other parameters" besides solvent and time, can be arbitrary. Again, Dr. Sherman's testimony is an accurate description of what a POSA would understand, Dr. Chyall's opinion is not.

86. The above disclosures in the '556 patent further support the definition of this term proposed by Dr. Cima, i.e., "a sufficient amount of a liquid to at least moisten the moexipril or acid addition salt thereof and the alkaline magnesium compound to permit the reaction to occur." *See* Cima Op. ¶¶ 114-117. Dr. Cima's proposed definition comports with my definition of this term and the knowledge and skill of those of ordinary skill in the art.

87. Accordingly, it is my opinion that the phrase "sufficient amount of solvent" as used in the claims of the '556 patent is not indefinite because its meaning would be readily understood to those of skill in the art in view of the disclosures contained in the '556 patent. This term would be understood to mean "a sufficient amount of a liquid to at least moisten the moexipril or acid addition salt thereof and the alkaline magnesium compound to permit the reaction to occur."

### C. "predetermined amount of time"

88. Similar to the terms above, Dr. Chyall contends that phrase "predetermined amount of time" as used in claim 1 is ambiguous and the specification of the '556 patent fails to provide any guidance as to the meaning of this term. Chyall Op. ¶ 93. I disagree.

89. As discussed above, the '556 patent is explicit in describing that timing is an important factor to allow the reaction to go to completion. *See, e.g.*, col. 3:40-47; 3:61:66; col.4:27-33; 4:41-47; col. 4:55-61. As is customary in pharmaceutical processing, such a timing variable would necessarily be predetermined, i.e., set in advance of conducting the process. The primary

**SUBJECT TO PROTECTIVE ORDER**
**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

purpose of setting the time in advance is to ensure that reproducible results can be obtained. Dr. Cima's proposed definition, i.e., "a minimum amount of time chosen before the process of making a solid pharmaceutical composition begins and is sufficient to permit the reaction to occur" is supported by the above disclosures and consistent with a POSA's understanding of this phrase. Cima Op. ¶118-120.

90. Dr. Chyall opines that there is not "any information concerning the amount of time necessary to achieve the invention." (Op. ¶ 93.) First, I disagree with this statement because the patent gives examples that show that 30 minutes is sufficient time under some conditions. Thus, the POSA would know that at a minimum 30 minutes would be sufficient in similar conditions. Second, even if there were no information, this does not make the patent indefinite. The patent term "predetermined amount of time" is as accurate as the subject matter permits, given the variables and particulars of the processes that can be used to make pharmaceutical compositions in the presence of a solvent. Once motivated by the '556 patent to do the reaction, those of ordinary skill in the art would have realized that the predetermined amount of time could be easily obtained by minimal and routine experimentation. From Dr. Cima's report (e.g., Op. ¶ 200), I understand that UCB did just that.

91. I have reviewed Dr. Sherman's deposition testimony cited by Dr. Chyall. I respectfully disagree with Dr. Chyall's characterization of Dr. Sherman's testimony. Dr. Sherman testified that he thought 30 minutes would be long enough to cause the reaction because of his previous experience with quinapril. Sherman Dep. at 66:18-676. He also stated:

> There will be, certainly, ... a range of things that will be too little, and wide range of things that will be sufficient. And there's not exact line in between. And again, it depends on how much conversion you want to get. But a person of art, certainly, reading this would understand what to do, and would make sure that ... they make the material wet enough for long enough and work it well enough to get the completeness of the reaction. And if there were ... any uncertainty, they would do their tests, to see if they'd gotten the result adequately. If not they would increase the water or increase the time until they get the result they're looking for.

Id. at 66:18-67-25; *see also* ¶ 85 above. This is entirely consistent with my opinion.

92. Accordingly, it is my opinion that the phrase "predetermined amount of time" as used in the claims of the '556 patent is not indefinite because its meaning would be readily understood to those of skill in the art to mean "a minimum amount of time chosen before the process of making a solid pharmaceutical composition begins and is sufficient to permit the reaction to occur."

17

SUBJECT TO PROTECTIVE ORDER
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

120. Apotex overcame the PTO examiner's rejections based on the '450 patent during the prosecution of the '556 patent. *See, e.g.*, Notice of Allowability, AI-MOEX0000654-57. I note that the Examiner never rejected the claims for anticipation by the '450 patent despite relying on it for obviousness rejections. In fact, the examiner did not state that the '450 patent disclosed moexipril, but did disclose enalapril, quinapril and indopril. *See, e.g.*, Office Action, AI-MOEX0000493-502 at 496. Thus, Dr. Chyall's opinion seems to be different than the examiner.

121. The '450 patent does not disclose, suggest, teach, or otherwise mention a reaction. *See also* Lipp Decl. ¶¶ 38-39 (AI-MOEX0000546-47). The '450 patent teaches a different method of stabilizing a number of ACE inhibitors (but moexipril was not a preferred compound) by contacting (i.e. mixing) a number of alkaline metal salts (not just magnesium salts).

122. As an initial matter, the '556 patent claims a process of making a solid composition comprising moexipril magnesium. Moexipril is not explicitly named, disclosed or even mentioned in the '450 patent. *See also* Siefert Dep. at 332:9-19.

123. Furthermore, there are no examples of even contacting moexipril with an alkaline magnesium compound in the '450 patent. The only four examples in the '450 patent describe compositions comprising quinapril. '450 patent at col. 4:56-5:40; Siefert Dep. at 33:21-333:9 Outside of identifying "wet granulation" as a technique used for processing during the manufacture of a pharmaceutical product, the '450 patent does not disclose, suggest, or describe any process for making its claimed compositions. In fact, it does not even give amounts of water to be used in the "wet granulation." Thus, it is my opinion that the '450 patent does not expressly disclose each and every element of the asserted claims of the '556 patent.

124. Wet granulation is a physical process. As discussed above, a POSA would not typically associate "wet granulation" with an in situ reaction. A POSA reading "wet granulation" in the '450 patent would not understand that to mean a wet granulation to do a reaction. In fact, the '450 patent discloses that these ACE inhibitors are water-sensitive. Thus, one of ordinary skill would have read "wet granulation" to mean limited amounts of water, and short wet granulation times to avoid the hydrolysis degradation reaction.

125. Furthermore, I agree with Dr. Lipp that the term "stabilizer" in the '450 patent as used by a formulator in April 2000 would have been understood to mean an additive that inhibits reactions, not causes them. Lipp Decl. at AI-MOEX0000534; AI-MOEX0000544-45 (¶¶ 36-37).

**SUBJECT TO PROTECTIVE ORDER**
**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

occur within the predetermined time of the wet granulation. Thus, I disagree with Dr. Chyall's claim construction and opinion on anticipation for this reason as well.

130. Dr. Chyall combines the teachings of the '450 patent and Gu in his anticipation analysis. I understand that this is improper. Even if I did consider it, this, at most, it teaches a small amount of conversion at the outer surface of the granule as described in the '556 patent. *See* '556 patent at col. 1:56-2:15; Gu at 383 (AI-MOEX0000464-68 at 468; Lipp Decl. at ¶¶ 21-25 (AI-MOEX0000536-38). Gu teaches stable compositions comprising an unstable drug (moexipril HCl) stabilized by the presence of an alkaline compound in the final composition. *Id.*

131. It is also my opinion that the '450 patent does not inherently disclose each and every element of the claimed invention. I understand that in order for a reference to inherently disclose a particular element of a claim, it must be the inevitable result of an express disclosure in the prior art reference. Thus, I understand that if the element claimed to be "inherently taught" by the reference is only a possibility or probability, this is insufficient to render a claim invalid.

132. The '450 patent cannot inherently disclose the claims of the '556 patent because there is a) no disclosure of a reaction; (b) no disclosure of a composition made by contacting moexipril with a magnesium salt; or (c) no disclosure of a wet granulation involving moexipril and a magnesium salt in either the '949 or '450 patents.

133. Also, the '450 does not disclose any meaningful description regarding the process used to manufacture the disclosed dosage forms. The '450 patent merely discloses "wet granulation" as a processing technique. As discussed in section VIII, the goal in conducting a wet granulation is to achieve the desired physical integrity of a finished pharmaceutical dosage such as a tablet. A secondary goal in wet granulation is to avoid or reduce chemical interactions between the components to abate any potential impact on the safety and/or efficacy of the API.

134. The '556 patent specifically states that the "purpose of the present invention is to eliminate the unstable moexipril or acid addition salt thereof and replace it with stable moexipril magnesium." Col. 2:57-59. The specification further states that, "it will be understood that it is desirable that the preparation of the moexipril or acid addition salt converted and moexipril magnesium be as high as possible." *Id.* at col. 2:59-63. The disclosure provides additional guidance by (1) identifying the contemplated reaction (col. 3:7-21); (2) providing guidance regarding the amount of reactants needed to ensure the reaction goes to completion (col. 3:21-38); and (3) describing reaction conditions that facilitate the reaction (col. 3:29-4:64). As to item

SUBJECT TO PROTECTIVE ORDER
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

is oversimplified. The '535 patent discloses a method of making a number of metal salts (not simply magnesium) of organic acids (not just stearic acid) that requires equipment that "continually" grinds or subdivides the material (i.e. reduces the particle size). *See, e.g.,* '535 patent at col. 1:62-2:7; 2:22-30. The examples show very high agitation speeds (e.g. 3600 rpm) that are on the order of 10 to 30 times the speed of a typical wet granulator apparatus. In my experience, the process described in the '535 patent is nothing like wet granulation.

177. Furthermore, the '535 patent teaches away from using too much water and states "[t]he addition of larger amount of water [i.e. greater than 8.0%] is usually disadvantageous because the increased time and expense required to dry the product offset the shorter reaction time." '535 patent, col. 3:16-19. Thus, if anything, this patent would teach away from Dr. Sherman's invention and the examples in the '556 patent, where 30% solvent by weight was used to do the granulations.

178. Finally, a POSA would have no reason or desire or motivation to combine these references to arrive at the presently claimed invention, without using the '556 patent as a blueprint. I understand that such hindsight analysis is improper in an obviousness determination. Yet Dr. Chyall's opinion often relies on hindsight. First and foremost, the '556 patent is the only place that teaches a reaction is desired or wanted. Without the '556 patent, the POSA would have practiced what is taught in the prior art, stabilization by contacting an alkaline metal salt with no or insignificant amounts of reaction occurring at the outer edge of the granules. This is not what the '556 patent claims. Without motivation to do a reaction in the prior art, it is irrelevant that the POSA in April 2000 would know that an acid base reaction would occur if you had enough solvent for enough time. Dr. Chyall's citation of this fact (Op. ¶ 82) is hindsight.

179. Dr. Chyall misleadingly quotes Dr. Sherman out of context to insinuate that Dr. Sherman admitted that the POSA "would have been able to adjust the amount of solvent and time needed to achieve the claimed reaction with little difficulty." (Op. ¶ 82). Dr. Sherman was clearly discussing how the '556 patent specification enabled one of skill to practice the invention. Sherman Dep. at 87:25-88-11. In other words, only with the '556 patent teachings could one make routine adjustments without undue experimentation.

180. I disagree with Dr. Chyall's conclusory opinions (Op. ¶¶ 84-89) about the dependent claims 8-12. He largely provides no bases for his opinions, thus I have nothing to provide rebuttal opinions at this time. In general, Dr. Chyall appears to pick and choose the additional

36