# **EXHIBIT J**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 12-60706-CIV-MIDDLEBROOKS/BRANNON
(as consolidated with Case No. 12-60707-CIV)

APOTEX, INC. et al.,
          Plaintiffs,

v.

UCB, INC., et al.,
          Defendants.
_____/

## REBUTTAL EXPERT REPORT OF MICHAEL J. CIMA, PH.D

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

I declare under penalty of perjury that the following is true and correct.

Executed on March 6, 2013

_____
Michael J. Cima, Ph.D.

**SUBJECT TO PROTECTIVE ORDER**
**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

quinapril examples. *See* AI-MOEX0006831-32. In fact, the amount of water to be used in such a process is not disclosed. *Id.*

74. A POSA reading "wet granulation" in the '450 patent would not think that this meant to do a reaction between moexipril and any excipient. The POSA would want to avoid a reaction – the hydrolysis reaction disclosed in the '450 patent for these ACE inhibitors. To the extent the POSA chose to do a wet granulation following the '450 patent, they would have chosen limited amounts of water, and short wet granulation times to avoid the hydrolysis degradation reaction. Choosing these parameters would lead to less than complete reaction, and thus would not result in the '556 patent's claimed limitations.

75. Dr. Chyall selectively chooses different, unrelated parts of the '450 patent (and '949 patent) to opine that it anticipates the '556 patent. Chyall Op. at ¶¶ 70-72. I understand that this does not show anticipation, which requires that the prior art reference disclose each element of a claims as arranged in the claims. Further, there is no disclosure of (a) a reaction; (b) a composition made by contacting moexipril with a magnesium salt; (c) a wet granulation involving moexipril and a magnesium salt; or (d) a wet granulation involving moexipril and a magnesium salt in a controlled manner for a predetermined amount of time with an amount of solvent sufficient to result in 80% or 90% conversion of moexipril to moexipril magnesium in either the '949 or '450 patents.

76. Dr. Chyall has not provided any experimental evidence that a POSA following the '450 patent would inevitably and necessarily obtain the methods claimed in the '556 patent. As discussed above, if anything, the POSA reading the '450 patent would choose parameters that would <u>not</u> cause reaction to a significant extent to avoid the hydrolysis reaction. Dr. Chyall has not opined or proven otherwise.

77. I disagree with Dr. Chyall's opinion that the '450 patent must inherently anticipate the 80% conversion limitation because it "teaches the resulting [quinapril] compositions of the wet granulation process disclosed therein are stable." Chyall Op. ¶ 72. Dr. Chyall's opinion assumes all stable compositions of moexipril are made according to methods claimed in the '556 patent. But this assumption is not supported by any citations and also is contrary to UCB's position that their method of making stable moexipril products does not infringe the '556 patent.

78. Also Dr. Chyall mischaracterizes Dr. Sherman's testimony to try to bolster his speculation on inherency. Dr. Sherman was clearly discussing how his patented invention

**SUBJECT TO PROTECTIVE ORDER**
**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

processing products which are appropriate can be employed." '450 patent at 4:26-28; AI-MOEX0006831. Thus, just because the examples (which involve quinapril, not moexipril) disclosed in the '450 patent involve wet granulation it would not be clear from the Orange Book that the process used for Univasc® and Uniretic® is wet granulation. In fact, Kremers' VP of Manufacturing admitted without hesitation that their process is not disclosed in any patent, which includes the '450. Siefert Dep. at 331:9-14. A POSA would only conclude from the Orange Book listing of the '450 patent that an alkaline stabilizer was being used as a separate, unreacted ingredient. Looking at the prior art, publicly available Monograph (AI-MOEX0000449-459) and/or the PDR (UCB0038568-75), the POSA would conclude that magnesium oxide was that separate stabilizer.

92. This is exactly what Dr. Sherman wrote in the '556 patent application in 2000. '556 patent at col. 2:16-22. This is also what the patent agent, Mr. Hughes, and the declarant, Dr. Lipp, stated to the PTO during prosecution of the patent. *See e.g.,* AI-MOEX0000423 ("For the composition to contain a stabilizer, clearly it must not have reacted with the drug, suitable saccharides or suitable excipients."); Lipp Decl. at AI-MOEX0000548-49.

93. I agree with Dr. Chyall that typically wet granulation is used in pharmaceutical manufacturing to improve "flow and compressibility to facilitate further processing into tablets" and "content uniformity" of the tablets. Chyall Op. ¶ 40. Importantly, neither Dr. Chyall nor any of the references he cites in Paragraphs 40-45 disclose, suggest, or teach the use of wet granulation to perform a chemical reaction.

94. I agree with Dr. Chyall that "[t]he extent to which a reaction occurs between a particular acid and a base depends on factors such as the relative strengths of the corresponding acids and bases, the amount of solvent used, the reaction temperature, and the length of time that the compounds are mixed together." Chyall Op. ¶ 47. Additionally, other factors can play a role in the extent of the reaction including, but not limited to, stoichiometry of the reactants, presence of other excipients, and the scale of the reaction.

## VIII.   THE '556 PATENT CLAIMS ARE NOT OBVIOUS

95. The prior art does not disclose, teach, suggest, or motivate the POSA to a cause a reaction between moexipril and an alkaline magnesium compound in presence of a sufficient amount of solvent for a predetermined amount of time to convert moexipril in a controlled manner to moexipril magnesium. At most, the prior art taught that the unstable drug (moexipril

16

**SUBJECT TO PROTECTIVE ORDER**
**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

conditions of *high shear and attrition* at relatively low temperatures and in which external cooling can be provided whenever necessary to maintain the temperature of the reaction mixture in the desired range." Col. 2:22-28 (italics added for emphasis). This is not a description of a granulation process. Particle attrition is the action of reducing particle size. Granulation is used to aggregate the constituents of the formulation into larger granules. The '535 patent also does not contemplate the addition of excipients or even the presence of inert ingredients to the reaction mixture. Finally, the '535 patent is not directed toward making pharmaceutical formulations.

105. I also agree with Dr. Moreton's opinions on this patent. Moreton Reb. Op. at ¶¶ 176-177.

    **4.**  **Dependent Claims**

106. I cannot rebut Dr. Chyall's opinions about the dependent claims 8-12 because Dr. Chyall puts forth conclusory opinions (Op. ¶¶ 84-89) with no support. In general, Dr. Chyall appears to pick and choose the additional claim limitations from the prior art based on hindsight and without any motivation or expectation of success of making the choices he opines are obvious. If Dr. Chyall supplements his opinions, I reserve the right to respond more fully.

  **C.** **The POSA Would Not Have Been Motivated to Combine the Teachings of the Prior Art as Dr. Chyall Suggests**

107. There was no motivation taught in the prior art cited by Dr. Chyall or known to the POSA in April 2000 to combine the formulation technique of wet granulation with the pre-formulation technique of chemical reactions of moexipril and magnesium compounds. The '450 patent and Gu disclosed ways to get stable compositions without doing such a reaction. Thus, the POSA would not have had a desire to alter what was already working.

108. I disagree with Dr. Chyall's opinion (Op. ¶ 83) that "a POSA would have been motivated to do so based on the disclosure in Gu, which teaches that wet granulation compositions are more stable than dry compositions of moexipril due to the conversion of moexipril hydrochloride to cation salts of moexipril ...." Not only is this opinion contradicted by Dr. Chyall's own statements in Paragraph 61, this is not how a POSA would understand the teachings of Gu. Gu "proposed" that the stability involves a neutralization effect. AI-MOEX0000464 ("Supported by the product distribution studies, the stabilization is proposed to involve the neutralization of the acidic drug by the basic excipients."); *see also* Lipp Decl. at ¶¶

19

SUBJECT TO PROTECTIVE ORDER
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

what is claimed in the '556 patent. Thus, if anything, this art would teach away from Dr. Sherman's invention and the examples in the '556 patent, where 30% solvent by weight was used to do the granulations.

112. Dr. Chyall's opinions are based on hindsight and information taught solely in the '556 patent. A POSA would have no reason to combine any of these references to arrive at the presently claimed invention because no reaction was desired, until it was taught in the '556 patent. Without motivation to do a reaction, it is irrelevant that the POSA in April 2000 would know that an acid base reaction would occur if you had enough solvent for enough time. Chyall Op. 82.

113. Dr. Sherman did not admit that the POSA "would have been able to adjust the amount of solvent and time needed to achieve the claimed reaction with little difficulty," based on the prior art, as Dr. Chyall contends (Op. ¶ 82). Instead, Dr. Sherman was explaining how a POSA would take the teachings of the '556 patent and be able to vary conditions to ensure reaction (i.e. the patent was enabling one of skill to practice the invention). Sherman Dep. at 87:25-88:11. Dr. Sherman did not say, and I do not think it could be said, that a POSA without the '556 patent teachings, could only make routine adjustments without undue experimentation because they would have had no motivation to so.

114. Furthermore, any modification of these references to encourage the presently claimed reaction would have been contrary to the accepted wisdom known to one of skill in the art at the time of the invention of the '556 patent. It is my opinion that the lack of disclosure regarding any significant reaction in these references, combined with the potential for adverse impacts on the safety and/or efficacy of the API would not have provided one of skill in the art with the necessary motivation to combine or modify the teachings in these references to arrive at the presently claimed invention.

115. Also, the POSA would not look to create a new salt, which might unpredictably have negative properties given the prior art teaching that the HCl was stable, safe, and effective.

### D. POSA Would Not Have a Reasonable Expectation of Success from the Prior Art

116. Adding more water and longer time did not sound like a winning combination for a hydrolytically unstable drug, so that means there was no reasonable expectation of success.

21

SUBJECT TO PROTECTIVE ORDER
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

117. The POSA would not have had no reasonable expectation that any reaction that did occur would result in a safe and effective pharmaceutical composition. A POSA would know that properties of salts can be unpredictable. *See, e.g.*, Advanced Drug Deliv. Revs., Vol. 56(3), 275-300; Berge et al, Pharmaceutical Salts, J. Pharm. Sci., 66:1-19 (1977) ("Berge"); Gould P.L., Salt selection for basic drugs, *Int. J. Pharm.*, 33, 201-17 (1986) ("Gould"); Bighley L.D., Berge S.M., Monkhouse D.C., Salt forms of drug and absorption, in: Swarbrick J. and Boylan J.C. (Eds.), Encyclopedia of Pharmaceutical Technology 13, Marcel Dekker, 1995. ("Bighley"); Davies, G. (2001) Changing the salt, changing the drug, The Pharm. J. Vol. 266, 322-323 ("Davies") ("There is yet. no reliable way of predicting exactly what effect changing the salt form ... will have on its biological activity ...."); Verbeek RK, Kanfer I, Walker RB. 2006. Generic substitution: The use of medicinal products containing different salts and implications for safety and efficacy. Eur. J. Pharm. Sci. 28:1–6 ("Verbeek") ("Unfortunately, there is no reliable way of predicting the influence of a particular salt species on the behavior of the parent compound."); Black SN, Collier EA, Davey RJ, Roberts RJ. 2007. Structure, solubility, screening and synthesis of molecular salts. J. Pharm. Sci. 96:1053–1068 ("Black") ("[T]he ability to predict which salt forms will have desirable properties is essentially nonexistent.").)

118. Berge et al. (p. 186) states: "The chemical, biological, physical, and economic characteristics of medicinal agents can be manipulated and, hence, often optimized by conversion to a salt form. Choosing the appropriate salt, however, can be a very difficult task, since each salt imparts unique properties to the parent compound. Salt-forming agents are often chosen empirically. Of the many salts synthesized, the preferred form is selected by pharmaceutical chemists primarily on a practical basis: costs of raw materials, ease of crystallization, and percent yield. Other basic considerations include stability, hygroscopicity, and flowability of the resulting bulk drug. Unfortunately, there is no reliable way of predicting the influence of a particular salt species on the behaviour of the parent compound. Furthermore, even after many salts of the same basic agent have been prepared, no efficient screening techniques exist to facilitate selection of the salt most likely to exhibit the desired pharmacokinetic, solubility, and formulation profiles."

119. On p. 187 of Berge the following passage appears: "The number of salt forms available to a chemist is large; surveys of patent literature show numerous new salts being synthesized annually. Various salts of the same compound often behave quite differently because of the

**SUBJECT TO PROTECTIVE ORDER**
**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

physical, chemical, and thermodynamic properties they impart to the parent compound. For example, a salt's hydrophobicity and high crystal lattice energy can affect dissolution rate and, hence, bioavailability. Ideally, it would be desirable if one could predict how a pharmaceutical agent's properties would be affected by salt formation."

120. Berge on p. 201 states: "Salt formation is a means of altering the physical, chemical, and biological characteristics of a drug without modifying its chemical structure. Clearly, the salt form can have a dramatic influence on the overall properties of the parent compound. At present, selecting a salt form that exhibits the desired combination of properties is a difficult semiempirical choice. Pharmaceutical scientists now recognize these facts and are beginning to study the effects of different salt forms on the physicochemical properties, bioavailability, and toxicity of drug substances."

121. Gould states "Salt formation provides a means of altering the physicochemical and resultant biological characteristics of a drug without modifying its chemical structure. The importance of choosing the 'correct' salt form of a drug is well outlined in a published review (Berge et al., 1977) but, although salt form can have a dramatic influence on the overall properties of a drug, the selection of the salt form that exhibits the desired combination of properties remain a difficult semi-empirical choice. In making the selection of a range of potential salts, a chemical process group considers issues on the basis of yield, rate and quality of the crystallisation as well as cost and availability of the conjugate acid. The formulation and analytical groups are, on the other hand, concerned with the hygroscopicity, stability, solubility and processability profile of the salt form, while the drug metabolism group is concerned with the pharmacokinetic aspects and the safety evaluation group on the toxicological effects of chronic and acute dosing of the drug and its conjugate acid. Thus, a clear compromise of properties for the salt form is required, but the difficulty remains of assessing which salt forms are best to screen for a particular drug candidate."

E. **Objective Indicia of Non-Obviousness**

122. Practicing the '556 patent leads to the unexpected results of being able to produce a stable product made from a water-sensitive drug by keeping it wetter for longer than taught in the prior art. Apotex's testing in preparing its ANDA formulations demonstrates that the '556 patent method worked as Dr. Sherman suggested in the specification. AI-MOEX0005102-03 (formulation trials #1001-1002 for moexipril with no magnesium salt); 5071 (stability testing

**SUBJECT TO PROTECTIVE ORDER**
**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

reasons below, the terms "in a controlled manner," "a sufficient amount of solvent," "predetermined amount of time" and "so as to convert greater than 80% of the moexipril ... to moexipril magnesium" were and are not indefinite to a POSA.

127. A POSA would understand the term "in a controlled manner" to mean "in a way that results in a significant amount of conversion." Thus, this term is not indefinite.

128. A POSA would understand the term "sufficient amount of solvent" as used in the claims of the '556 patent to mean "a sufficient amount of a liquid to at least moisten the moexipril or acid addition salt thereof and the alkaline magnesium compound to permit the reaction to occur." Thus, this term is not indefinite.

129. A POSA would understand the term "predetermined amount of time" to mean "a minimum amount of time chosen before the process of making a solid pharmaceutical composition begins and is sufficient to permit the reaction to occur."

130. A POSA would understand the term "reacting ... so as to convert ... to moexipril magnesium" to mean "chemically changing the moexipril or acid addition salt thereof to moexipril magnesium."

131. Dr. Chyall asserts that the '556 patent lacks guidance regarding the "greater than 80%" claim term, and is therefore, indefinite. Chyall Op. ¶ 94. He bases this opinion on (1) the patent "do[es] not teach how to measure or calculate whether there has been conversion to 80%"; (2) Dr. Sherman's testimony; and (3) a POSA would not know how to determine the amount of moexipril magnesium because Dr. Chyall is unaware of "any published methods for quantitatively" making the determination. I disagree with Dr. Chyall's opinions.

132. First, I understand that the indefiniteness inquiry is whether the claims reasonably apprise those skilled in the art of the scope of the invention. "So as to convert greater than 80% of the moexipril ... to moexipril magnesium" is clear on its face in my opinion.

133. Second, Dr. Chyall states "the specification does not indicate whether any tests were performed or could be performed to confirm" the presence of moexipril magnesium in the tablets. Chyall Op. ¶¶ 65, 94. While I agree there are no analytical tests specifically named in the patent, a POSA would know how to do such tests. Indeed, a POSA would ask him or herself to find the sufficient quantity of suitable solvent and sufficient time to enable the acid-base reaction when seeking to practice the '556 patent. Specifically, the POSA would read the disclosure "a sufficient quantity of suitable solvent must be used and the mass must be left wet

**SUBJECT TO PROTECTIVE ORDER**
**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

enough for sufficient time to enable the reaction between the moexipril or acid addition salt and the alkaline magnesium compound to be complete or substantially complete, before the solvent is removed by drying." '556 patent, col. 4:55-61. and understand how to develop a method to characterize when the reaction is complete.

134. Pharmaceutical companies are accustomed to performing chemical and materials characterization of their products. *See, e.g.,* M.E. Swartz, I.S. Krull, Analytical Method Development Validation, (Marcel Dekker, Inc. 1997) at 17 ("Methods of analysis are routinely developed, improved, validated, collaboratively studies, and applied."). In fact, the website for Aptuit, a company Dr. Chyall had connections to states "We have extensive experience in developing test methods for the pharmaceutical industry (including comparator products) and can provide a structured, focused, step-wise approach to the process. We can develop new test methods or improve existing methods." http://www.aptuit.com/Services/Physical-and-Analytical-Chemistry/Analytical-Method-Development.aspx; see also http://www.pharmacompare.com/Contract-Services/703-Analytical-Method-Development-Services/ ("When developing a new drug, there is a good chance there won't be a well-established method in place for analytically testing the physical and chemical properties of a potential API. Also, when existing compounds are used together in a new formulation, analytical method development might be necessary in order to test the drugs' interactions with each other, the formulation excipients or biological fluids. Whether you need help with dissolution method development or for analytical testing using HPLC, LCMS or any number of immunoassays, there are many companies that provide analytical method development services. In addition to method development and validation services, many of these companies have qualified scientific staff to perform analytical tests once the methods have been developed and validated."). When faced with a new compounds or mixtures, these developers are skilled at designing and validating chemical/physical methods to characterize these compounds and mixtures. *See, e.g., id.;* Bugay, 48 Adv. Drug Deliv. Revs. 43-65 (2001) and references cited therein; Van Vaeck, et al., Mass Spec Revs., 1999, 18, 1-47 and 48-81. Among the relevant characterization tasks are the quantity of active ingredient and the amounts and identity of contaminants. Quantitative NMR in solution was used in pharmaceutical applications around the time the patent was filed where the assay or content determinations of substances are the key issues. *See, e.g.,* U. Holzgrabe, et al., J. Pharm. Biomed. Anal. 29 (2002) 495-505 and references

**SUBJECT TO PROTECTIVE ORDER**
**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

cited therein. Often pharmaceutical companies have an analytical group that is responsible for developing methods to analyze new chemical compounds in formulations, Schwarz Pharma being no different. *See* Siefert Dep. Tr. at 251:16-18.

135. The '556 patent is the first disclosure of moexipril magnesium. That disclosure would prompt a POSA to develop an analytical method for moexipril magnesium when making a product containing this compound. The '556 patent discloses examples where moexipril magnesium can be produced from moexipril hydrochloride and an alkaline magnesium compound during wet granulation. *See* AI-MOEX0006578. The POSA would have understood the '556 patent when it says that sufficient quantities of suitable solvent and sufficient time are required to form the product in high yield. The POSA would know that to mean the conditions of the wet granulation process can affect the yield of the reaction. Thus, the POSA would seek to develop analytical methods to determine how much moexipril magnesium is produced in the presence of reactants and all excipients to be used in the wet granulation process. Such a method would allow the POSA to determine the best granulation conditions for a given set of materials and equipment.

136. As described in my opening report (¶¶ 72-86), the analytical tools available to a POSA are many. Broadly speaking these tools can be categorized into solid-state methods and solution methods. Solid-state methods include infrared spectroscopy, Raman spectroscopy, solid-state NMR, X-ray diffraction, TOF mass spectroscopy, and many others. Solution methods include infrared spectroscopy, solution NMR, high pressure liquid chromatography, and many others.

137. As I described in my opening report (¶¶ 175-181), solution methods can be validated to determine the amount of moexipril magnesium in the presence of moexipril hydrochloride, excipients, and alkaline magnesium compound as detailed in my opening report. Briefly, moexipril magnesium and unreacted moexipril hydrochloride can be extracted from a formulation containing alkaline magnesium stabilizer. A solution NMR method can then be used selectively detect moexipril magnesium and moexipril hydrochloride. Validation of the procedure includes extraction of a sample containing only moexipril hydrochloride and the alkaline in order to check that no moexipril magnesium is detected. The methods of analysis that I relied on for determination of infringement in my opening report were developed and validated by Chemir and samples were run in triplicate in about two months. The techniques used by Chemir are commonly analytical methods of NMR, IR, and TOF-SIMS. Also, less rigorous tests

**SUBJECT TO PROTECTIVE ORDER**
**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

could have been developed and conducted in less time. Thus, it would not take undue experimentation to develop these techniques.

138. Third, I understand that inventor testimony should not be used to invalidate issued claims for indefiniteness. Thus, Dr. Chyall's heavy reliance on Dr. Sherman's testimony is improper. Even considering the testimony, it does not support Dr. Chyall's position. Dr. Sherman stated while there is no analytical methods explicitly disclosed in the patent, one could determine the 80% limitation "by any of the three methods that [he had] suggested [and he doesn't] think it is difficult. A chemist can do it." He then said he didn't think the lack of explicit disclosure is "a problem. Anyone wants to determine the percentage, they can do it ... that doesn't need an invention. It doesn't need ... my explaining how to do it." Sherman Dep. at 101:14-104:4. I agree with Dr. Sherman.[2]

139. Accordingly, in view of the above, it is my opinion that the meaning of the phrase, "so as to convert greater than 80% of the moexipril ... to moexipril magnesium" as used in the '556 patent would be readily understood by a POSA, and it is therefore not indefinite.

### X. THE '556 PATENT CLAIMS ARE ENABLED BY THE SPECIFICATION

140. The '556 patent provides enough guidance and detail for a POSA to practice the full scope of the claimed invention. The '556 patent teaches a POSA five ways of how to carry out the claimed invention. '556 patent, Col.3:52-4:64. The '556 patent also contains written examples which provide additional details regarding the conditions for the reaction to occur. Examples 1-4.

141. It is irrelevant to my opinion that Dr. Sherman did not carry out the Examples 1-4 before filing his patent. The examples provide sufficient detail such that one of skill in the art could follow the protocol provided. The teachings to the POSA are the same whether they examples were done or not. Also, the POSA would not believe what Dr. Sherman asserted was incorrect.

---

[2] The testimony of Dr. Sherman, who is a formulator and not a chemist, that states he did not know what tests to do, or did not do them before filing the patent (Chyall Op. ¶ 94, citing Sherman Dep. 92:25-93:15) is irrelevant to whether the POSA, who even Dr. Chyall agrees would know analytical chemistry, would understand the term at issue. Likewise, it is irrelevant whether Dr. Sherman was trying to tell someone whether they infringed or not (Sherman Dep. 102:18-103:3), because the POSA would know how to make such a determination.