# EXHIBIT D

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 12-60706–CIV–MIDDLEBROOKS/BRANNON**
**(as consolidated with Case No. 12-60707-CIV)**

APOTEX, INC. et al.,

               Plaintiffs,

v.

UCB, INC., et al.,

               Defendants.

_____/

## REBUTTAL EXPERT REPORT OF R. CHRISTIAN MORETON, PH.D

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

I declare under penalty of perjury that the following is true and correct.
Executed on March 6, 2013 in Waltham, Massachusetts.

_____
R. Christian Moreton, Ph.D.

SUBJECT TO PROTECTIVE ORDER
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

68. Wet granulation is a processing technique that is characterized as a physical process used in the making of solid pharmaceutical dosage forms, such as tablets or capsules. *See* Cima Op.¶ 63-64. The focus of any wet granulation process is the physical interaction of the components, with the ultimate goal of achieving a solid dosage form having the required physical integrity needed for a pharmaceutical product, e.g., hardness, flowability, friability, etc. *See id.* at ¶65; Chyall Op. ¶ 40 ("Typically granules provide solid particles with the appropriate characteristics such as flow and compressibility to facilitate further processing into tablets. The granules obtained from wet granulation processes also facilitate content uniformity of the tablets ...."); Lipp Decl. at ¶¶ 11, 26-29(AI-MOEX0000526-643); Pharmaceutical Dosage Forms, (Lieberman & Lachman 1980), p. 114-115 (AI-MOEX0000565-642 at 572-73).

69. While there are typical steps in a wet granulation (see ¶ 66 above), there is no standard set of conditions for each of those steps that would constitute a "standard wet granulation" process. The specific conditions (such as amount and type of tablet ingredients, volumes of solvents, stirring times, granulating equipment used, drying equipment used, drying times, etc.) vary from product to product. These steps have a number of parameters that can be varied depending on the components used in the granulation. For example, the '556 patent provides examples of various wet granulation methods wherein moexipril or an acid addition salt thereof is reacted with an alkaline magnesium compound to form moexipril magnesium. *See* the '556 patent at col. 4:22-64; 5:1-6:16.

70. Ordinarily, wet granulation is not used to cause a reaction, rather it is typically used to prevent segregation of the ingredients in the powder mix, to improve flow properties of the mix, or to improve compression characteristics of the mix. *See* M.P. Summers, Ch. 37 Granulation, in Aulton's Pharmaceutics at 616-18 (AI-MOEX0007350-63 at 351-53). In fact, wet granulation is not readily suitable for hydrolysable or thermolabile drugs. *See* M.H. Rubinstein, Ch. 18 Tablets, in Michael E. Aulton, Pharmaceutics at 309 (AI-MOEX0007175-95 at 183).

71. While the basic premise of wet granulation techniques are known to those skilled in the art, the application of these principles to a particular formulation requires careful consideration of a number of factors. *See, e.g.,* Cima Op. ¶ 66. As discussed above, the focus of a wet granulation is physical interactions, as opposed to chemical interactions. In my experience, the conventional wisdom applied by pharmaceutical formulators looking to carry out a wet granulation process is to avoid or reduce chemical interactions between the components,

SUBJECT TO PROTECTIVE ORDER
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

particularly reactions involving the active pharmaceutical ingredient (API). This precaution serves to reduce and/or eliminate any adverse impacts on the safety and/or efficacy of the ultimate finished product. *See, e.g.,* Cima Op. ¶¶ 69-70. Indeed, there are a number of API's are ill-suited for wet granulation because of their sensitivity to degradation. For example, because wet granulations necessarily require a solvent (e.g., water) and heat (i.e., drying), they are poorly suited for hydrolysable or thermolabile active pharmaceutical ingredients. *See* Cima Op. ¶¶ 69, 124; M.H. Rubinstein, Ch. 18 Tablets, in Michael E. Aulton, Pharmaceutics at 309 (AI-MOEX0196592-612).

## IX.   THE CLAIM TERMS ARE NOT INDEFINITE

72. I understand that Dr. Chyall asserts a number of claim terms are indefinite. As explained herein, it is my opinion that the claim terms addressed by Dr. Chyall are not indefinite because one of skill in the art would readily understand the meanings of the these terms in view of the disclosure in the '556 patent, the file history, and their knowledge and experience.

### A.   "controlled manner"

73. Dr. Chyall asserts that term "controlled manner" as used in the '556 patent is indefinite. Chyall Op. ¶ 92. I disagree.

74. Claim 1 of the '556 patent recites the step of "reacting moexipril or an acid addition salt thereof with an alkaline magnesium compound in a controlled manner." It is my opinion that the phrase "controlled manner" as used in the '556 patent is sufficiently clear and readily understood by those of skill in the art.

75. The phrase "controlled manner" was added to the claims during prosecution to further clarify that the claimed invention was directed to the conversion of a significant amount of moexipril or acid addition salt thereof to moexipril magnesium. AI-MOEX0000506; Cima Op. ¶ 112. Furthermore, the definition of "controlled manner" proposed by Dr. Cima, i.e., "in a way that results in a significant amount of conversion" is reasonable and entirely consistent with the disclosure of the '556 patent as viewed by one of ordinary skill in the art. Cima Op. ¶ 113.

76. The '556 patent specifically states that the "purpose of the present invention is to eliminate the unstable moexipril or acid addition salt thereof and replace it with stable moexipril magnesium." '556 patent, col. 2:57-59. The specification further states that, "it will be understood that it is desirable that the preparation of the moexipril or acid addition salt converted

13

SUBJECT TO PROTECTIVE ORDER
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

and moexipril magnesium be as high as possible." *Id.* at col. 2:59-63.  It also states the prior art methods were "difficult to precisely control the exact final ingredients in the composition" and to "completely avoid an acid-base reaction in the making of the composition." '556 patent, Col. 2:31-39; *see also id.* at col. 2:4-11.  Thus, I disagree with Dr. Chyall's opinion (Op. ¶ 92) that this term is "ambiguous."  One of ordinary skill in the art would understand that the claimed invention achieves a certain level of conversion through a chemical reaction by controlling various parameters relating to the reaction.

77.  For example, the '556 patent provides additional guidance by (1) identifying the contemplated reaction to be carried out (col. 3:7-21); (2) providing the amount of reactants needed to ensure the reaction goes to completion (col. 3:21-38); and (3) describing reaction conditions that facilitate the reaction (col. 3:29-4:64).  As to item (3), the specification is explicit in stating that the amount of solvent and time for reaction are important factors to allow the reaction to go to completion.  *See, e.g.*, col. 3:40-47; 3:61:66; col.4:27-33; 4:41-47; col. 4:55-61.

78.  Dr. Chyall opines that the '556 patent does not "describe any manner of control that improves on the prior art processes."  I disagree.  The '556 patent describes that the conditions and parameters of the method of making the pharmaceutical compositions must be such so that the reaction between moexipril and the magnesium compound goes to substantial completion or 100% completion.  The prior art methods did not disclose, teach, suggest, or motivate a POSA to even do a reaction, let alone a substantially complete reaction.

79.  It is my opinion that these disclosures provide a POSA with sufficient guidance as to the meaning of a "controlled manner" as used in the '556 patent.  A person of ordinary skill in the art would understand the term "in a controlled manner" to mean "in a way that results in a significant amount of conversion."  Accordingly, this term is not indefinite.

B.      "sufficient amount of solvent"

80.  Dr. Chyall contends that phrase "sufficient amount of solvent" as used in claim 1 is ambiguous.  Chyall ¶ 93.  Dr. Chyall asserts that the specification of the '556 patent fails to provide any guidance as to the meaning of this term. *Id.*  I disagree.

81.  As discussed above, the '556 patent identifies a number of exemplary processes for carrying out the claimed reaction. *Id.* at col. 3:52-6:15.  One of ordinary skill in the art would understand that each of these examples requires a "sufficient amount of solvent" to permit the reaction to occur.  While the amount of solvent required by each of these examples would vary

14

SUBJECT TO PROTECTIVE ORDER
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

depending on the particulars of the process, the existence of this variability does not render the claim term indefinite.  Rather, it is my opinion that one of skill in the art would be able to readily identify the meaning of these terms based on the disclosure of the '556 patent.

82.  Dr. Chyall opines that "the '556 patent specification and claims do not disclose the minimum amount of solvent that must be used to practice the claimed process."  (Op. ¶ 93) First, I disagree because the patent provides examples with 30% (w/w) solvent.  '556 patent at col.5:1-6:16, Examples 1-4.  Thus, one of skill would know that 30% (w/w) would work.  *See also* Sherman Dep. at 85:5-86:2 ("It's going to be more than 10 percent, it's going to be less than 70 or 80 percent, because that's likely to give him a mess.").  Second, even if there was no minimum disclosed, this does not make the patent indefinite.  The patent term "sufficient amount of solvent" is as accurate as the subject matter permits, given the variables and particulars of the processes that can be used to make pharmaceutical compositions in the presence of a solvent.  Once motivated by the '556 patent to do the reaction, those of ordinary skill in the art would have realized that the sufficient amount of solvent could be easily obtained by minimal and routine experimentation.

83.  I have reviewed the Dr. Sherman's deposition testimony cited by Dr. Chyall.  I respectfully disagree with Dr. Chyall's characterization of Dr. Sherman's testimony.  Dr. Sherman testified that "the person would … simply pick an amount … of water from those trials, based on whatever particular ingredients he wants to use and equipment he wants to use, to ensure that the amount of water used and the time used is enough to get the most stable product, without using so much as to complicate the process."  Sherman Dep. at 69:14-71:2.  This is consistent with my experience and the POSA's understanding in the early 2000s.

84.  Also, Dr. Sherman did not say there was no minimum.  Rather, he correctly opined that the questioner did not provide enough information to answer:

> [T]here's no minimum … unless you give me specific other factors … you have the reactants, you have … other excipients, you have equipment, you have all kinds of conditions.  And so the amount … would be different for each, and I'm not sure you can put an exact minimum on it.  If you want to wait for infinity, for example, you would need almost none.  But that's not practical.

*Id.* at 78:15-79:3; *see also id.* at 84:16-86:2.

85.  I also disagree with Dr. Chyall's mischaracterization (Op. ¶ 93) of Dr. Sherman's testimony regarding guidance in the specification.  Contrary to Dr. Chyall's opinion, Dr.

SUBJECT TO PROTECTIVE ORDER
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Sherman did not testify that the '556 patent contains no guidance or that the amount of solvent and time were "arbitrary." Instead Dr. Sherman testified:

> Q. Well, does your patent contain guidance like: If these are the quantity of starting materials and these are the excipients, and this is the relevant humidity and temperature in which you're conducting the experiment, use this much water?
>
> A. No, it does not -- it doesn't do it in those terms. It's -- it's not that explicit, but it's implicit. It says you want at least 70 percent converted. And you -- you therefore are going to try different amounts of water, perhaps, and you're -- along with whatever other parameters you're going to choose, many of which are arbitrary. And then you're going to check to make sure you've got the conversion.

Sherman Dep. at 130:13-131:1. Dr. Sherman is saying that the '556 patent provides enough information to guide the person of ordinary skill for the certain explicit conditions he or she would be operating under. Also, he states that the "other parameters" besides solvent and time, can be arbitrary. Again, Dr. Sherman's testimony is an accurate description of what a POSA would understand, Dr. Chyall's opinion is not.

86. The above disclosures in the '556 patent further support the definition of this term proposed by Dr. Cima, i.e., "a sufficient amount of a liquid to at least moisten the moexipril or acid addition salt thereof and the alkaline magnesium compound to permit the reaction to occur." *See* Cima Op. ¶¶ 114-117. Dr. Cima's proposed definition comports with my definition of this term and the knowledge and skill of those of ordinary skill in the art.

87. Accordingly, it is my opinion that the phrase "sufficient amount of solvent" as used in the claims of the '556 patent is not indefinite because its meaning would be readily understood to those of skill in the art in view of the disclosures contained in the '556 patent. This term would be understood to mean "a sufficient amount of a liquid to at least moisten the moexipril or acid addition salt thereof and the alkaline magnesium compound to permit the reaction to occur."

      C.     "predetermined amount of time"

88. Similar to the terms above, Dr. Chyall contends that phrase "predetermined amount of time" as used in claim 1 is ambiguous and the specification of the '556 patent fails to provide any guidance as to the meaning of this term. Chyall Op. ¶ 93. I disagree.

89. As discussed above, the '556 patent is explicit in describing that timing is an important factor to allow the reaction to go to completion. *See, e.g.*, col. 3:40-47; 3:61:66; col.4:27-33; 4:41-47; col. 4:55-61. As is customary in pharmaceutical processing, such a timing variable would necessarily be predetermined, i.e., set in advance of conducting the process. The primary

16

SUBJECT TO PROTECTIVE ORDER
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

purpose of setting the time in advance is to ensure that reproducible results can be obtained. Dr. Cima's proposed definition, i.e., "a minimum amount of time chosen before the process of making a solid pharmaceutical composition begins and is sufficient to permit the reaction to occur" is supported by the above disclosures and consistent with a POSA's understanding of this phrase. Cima Op. ¶118-120.

90.    Dr. Chyall opines that there is not "any information concerning the amount of time necessary to achieve the invention."  (Op. ¶ 93.)  First, I disagree with this statement because the patent gives examples that show that 30 minutes is sufficient time under some conditions.  Thus, the POSA would know that at a minimum 30 minutes would be sufficient in similar conditions. Second, even if there were no information, this does not make the patent indefinite.  The patent term "predetermined amount of time" is as accurate as the subject matter permits, given the variables and particulars of the processes that can be used to make pharmaceutical compositions in the presence of a solvent.  Once motivated by the '556 patent to do the reaction, those of ordinary skill in the art would have realized that the predetermined amount of time could be easily obtained by minimal and routine experimentation.  From Dr. Cima's report (e.g., Op. ¶ 200), I understand that UCB did just that.

91.    I have reviewed Dr. Sherman's deposition testimony cited by Dr. Chyall.  I respectfully disagree with Dr. Chyall's characterization of Dr. Sherman's testimony.  Dr. Sherman testified that he thought 30 minutes would be long enough to cause the reaction because of his previous experience with quinapril.  Sherman Dep. at 66:18-676.  He also stated:

> There will be, certainly, … a range of things that will be too little, and wide range of things that will be sufficient.  And there's not exact line in between.  And again, it depends on how much conversion you want to get.  But a person of art, certainly, reading this would understand what to do, and would make sure that … they make the material wet enough for long enough and work it well enough to get the completeness of the reaction.  And if there were … any uncertainty, they would do their tests, to see if they'd gotten the result adequately.  If not they would increase the water or increase the time until they get the result they're looking for.

Id. at 66:18-67-25; *see also* ¶ 85 above.  This is entirely consistent with my opinion.

92.    Accordingly, it is my opinion that the phrase "predetermined amount of time" as used in the claims of the '556 patent is not indefinite because its meaning would be readily understood to those of skill in the art to mean "a minimum amount of time chosen before the process of making a solid pharmaceutical composition begins and is sufficient to permit the reaction to occur."

17

SUBJECT TO PROTECTIVE ORDER
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

### D.   "so as to convert greater than 80% of the moexipril … to moexipril magnesium"

93.   Dr. Chyall also asserts that the '556 patent lacks guidance regarding the "greater than 80%" claim term, and is therefore, indefinite.  Chyall Op. ¶94.  I disagree.

94.   The disclosure of the '556 patent specifically states that the "purpose of the present invention is to eliminate the unstable moexipril or acid addition salt thereof and replace it with stable moexipril magnesium." Col. 2:57-59.  The specification further states that, "it will be understood that it is desirable that the preparation of the moexipril or acid addition salt converted and moexipril magnesium be as high as possible." *Id.* at col. 2:59-63.  Thus one of ordinary skill in the art would understand that the claimed invention is directed to something more than *de minimis* conversion.

95.   As discussed above, the specification acknowledges that some moexipril or acid addition salt thereof may not be completely converted during this reaction.   Under some conditions, a significant reaction may not occur.  However, the '556 patent specification states that the amount of unreacted/unconverted moexipril or acid addition salt thereof must be small enough so as to not significantly alter the stability profile of the resulting composition. *Id.* at col. 2:44-65.

96.   Accordingly, one of ordinary skill in the art would understand that the invention described in the '556 patent is not directed to processes wherein a nominal amount of conversion to moexipril magnesium occurs.  Such a minimal reaction would not convert enough of the moexipril or acid addition salt thereof to moexipril magnesium, resulting in a composition that is not stable, which is inconsistent with the stated purpose of the invention.

97.   The disclosure provides additional guidance regarding the conditions of the reaction to encourage a conversion of a significant amount of moexipril HCl.  '556 patent at col. 3:52-4:64.  Additionally, the specification provides suggested numerical limits of the desired conversion. *Id.* at col. 6:63-65.  All of these disclosures seek to add clarity to the meaning of the claim terms, by defining the level of conversion required by the claimed invention. See also Cima Op., ¶¶ 104-108.

98.   Accordingly, in view of the above, it is my opinion that the meaning of the phrase, "so as to convert greater than 80% of the moexipril … to moexipril magnesium" as used in the '556 patent would be readily understood by a POSA, and it is therefore not indefinite.

18

SUBJECT TO PROTECTIVE ORDER
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

99.   I have reviewed Dr. Cima's rebuttal report (¶¶ 125-130) addressing Dr. Chyall's opinions regarding the POSA's understanding of the analytical chemistry disclosures.  I agree with Dr. Cima's opinions and defer to him on these issues because of his level of expertise in this area.

## X.   THE '556 PATENT SATISFIES THE WRITTEN DESCRIPTION AND ENABLEMENT REQUIREMENTS

100.  Dr. Chyall asserts that the claims of the '556 patent are invalid because the disclosure fails to meet the requirements of 35 U.S.C. § 112, first paragraph.  Chyall Op. ¶¶ 96-104.  As discussed above, it is my understanding that this statute contains two distinct requirements, i) the written description and ii) enablement requirements.

101.  Dr. Chyall's opinion seems to be based on an understanding that the claims require that the compositions made by the patented methods to have "improved stability over prior art moexipril compositions."  Chyall Op. ¶¶ 103-104.  Besides being vague as to what prior art he means, I disagree with this construction because the claims do not mention stability.  In my opinion, the claims do not explicitly require any improved comparative stability.   While the '556 patent states that the tablets of Examples 1-4 "are more stable against degradation … than tablets comprising moexipril hydrochloride" alone (Col. 6: 16-21), the claims are not so required and the patent explicitly states that these examples "are intended to be illustrative but not limiting of the invention."  (Col. 4:65-67).  Despite this explicit statement, Dr. Chyall seems to be limiting the invention based on the examples.  In my opinion, upon reading the specification, a POSA would understand, at most, that the methods of the '556 patent  would result in pharmaceutical compositions that are more stable than methods of making compositions containing moexipril hydrochloride alone.

102.  I disagree with Dr. Chyall's opinions on enablement and written description for this and the additional reasons stated below.  It is my opinion that the claims satisfy both of these requirements.

### A.   Written Description

103.  As discussed above, I understand that written description inquiry is whether the '556 patent conveys with reasonable clarity to those skilled in the art that, as of the filing date sought, Dr. Sherman was in possession of the claimed methods as of March 2001.  I also understand the disclosure sufficient to satisfy the written description requirement varies with the nature and

SUBJECT TO PROTECTIVE ORDER
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

scope of the invention at issue, and with the scientific and technologic knowledge already in existence. I also understand that the invention must be a complete concept but it is not necessary that the patentee actually reduce the invention to practice prior to filing.

104. As detailed above, the '556 patent provides considerable disclosure regarding the desired reaction in addition to the conditions that are necessary to carry it out to completion. A person of ordinary skill in the art would understand these disclosures to establish that Dr. Sherman sufficiently articulated the conditions necessary to carry out the claimed reaction to the desired completion. The '556 patent provides sufficient detail that allows one of skill in the art to recognize that, by March 2001, Dr. Sherman had completely conceived of the patented ideas of using a reaction to stabilize moexipril, rather than a stabilizing additive as taught in the prior art and the ways in which it can be carried out.

105. Instead of looking at the patent itself, Dr. Chyall (¶¶ 99-103) focuses on Dr. Sherman's testimony, which is outside the four corners of the patent and not available to one of skill in the art.

106. That Dr. Sherman did not do any experimentation or analysis before filing the '556 patent does not change my opinion. Dr. Sherman testified that he had done experimental work on methods for stabilizing quinapril with basic magnesium salts prior to filing the patent and those experiments formed the basis for his conception of the methods of stabilizing moexipril. Sherman Dep. at 38:18-24. I have reviewed documents that demonstrate that Dr. Sherman did substantial work on developing quinapril methods that corroborate his testimony. *See, e.g.*, '486 patent (showing four examples and data that demonstrates quinapril magnesium tablets are stable); AI-MOEX0008315-50 (Apotex quinapril formulation trials Oct-Dec 1998). Dr. Sherman's testimony and these documents further supports my opinion that Dr. Sherman was in possession of the invention by March 2001. While on the one hand Dr. Chyall states, without explanation, this "assumption that moexipril would behave in exactly the same manner as quinapril is not appropriate" (Op. ¶ 99), on the other, his anticipation opinion assumes that moexipril could be substituted for quinapril in the '450 patent examples and work exactly the same way.

107. Also, Dr. Chyall opines that Dr. Sherman "was not in possession of any data or evidence demonstrating the tablets made according to the Examples would actually contain the recited amounts of moexipril magnesium." (Op. ¶ 101; see also ¶102 ("these equations do not

SUBJECT TO PROTECTIVE ORDER
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

demonstrate the inventor confirmed the presence of moexipril magnesium in any particular composition as a result of the reaction suggested in these equations.").  Dr. Chyall appears to be focused on the question of whether Sherman reduced the examples in the specification to practice, rather than whether he had conceived of the complete idea for the methods in the claims, which I understand is the appropriate inquiry.  Thus, his opinion on this topic does not change my opinion.

108. I disagree with Dr. Chyall's opinion that the "only additional guidance" beyond Examples 1-4 "consists of two molecular equations …" (Op. ¶ 102).  The entirety of Columns 3 and 4 of the '556 patent would provide guidance to one of ordinary skill on what moexipril magnesium is.  Also, I agree with Dr. Cima that it is unnecessary to know the chemical structure of moexipril magnesium, beyond knowing it is a magnesium carboxylate as described by the equations (as understood by one of ordinary skill).  I defer to Dr. Cima on discussions of chemical structure, polymorphism, and the like for moexipril magnesium as he has more experience in these fields than I do.

109. Dr. Chyall also opines that "there is no information or evidence that the stated amount of moexipril magnesium in each tablet made in accordance with Examples 2-4 represents greater than 80% of the total amount of moexipril therein." (Op. ¶ 101).  I disagree. The stated amount of 5.1 mg of moexipril magnesium in each tablet corresponds to 100% conversion of the 5.4 mg of moexipril HCl starting material listed in each example because of the stoichiometry and molecular weights of these compounds.

110. Dr. Chyall believes "Dr. Sherman admitted that the 80% limitation of the claim is arbitrary."  (Op. ¶ 101).  But this is a mischaracterization of Dr. Sherman's testimony:

> Q.  Okay.  And the amendment here is to delete "most or all of" and replace it with "at least 70 percent"?
> A.  Yes.
> Q.  In terms of the conversion?
> A.  Yes.
> …
> Q.  Okay.  So if you look at the office action that we just marked a moment ago -- I think it was Sherman 3.
> A.  Well, here, you see?  On page 4 of this response, at the bottom, it explains it.
> Q.  Right.  And what is the explanation generally?
> A.  It says:  (as read) "The examiner objects to the term 'most.'"
> Q.  And so why replace it with "70 percent"?

SUBJECT TO PROTECTIVE ORDER
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

A.   I don't know. **It's somewhat arbitrary**. It could have been 60 percent, could have been 80 percent.  It really wouldn't have mattered, because as a practical matter, as I said, a person practicing the invention is going to want to try to ensure that it's close to a hundred percent.  And so, you know, as a practical matter, it's going to be probably over 90 percent.  Maybe 99 percent.

Sherman Dep. Tr. at 108:8-109:17; *see also id.* at 140:1-13. This means that the reaction has to go to substantial completion, whether that is greater than 60%, 70%, or 80% is "somewhat arbitrary" in that Dr. Sherman had to pick a number as a lower limit.  However, once selected and put in the claim, the 80% limitation is not arbitrary, it is a limitation that needs to be met. Dr. Sherman provided guidance on how to get "greater than 80%" conversion as required by the claims, which demonstrates that he was in possession of the invention as currently claimed.

111. Dr. Sherman stated that "If you wait for infinity, for example, you would need almost [no solvent].  But that's not practical."  Sherman Dep. at 79:1-3; see also id. at 84:19-21 ("If you want to wait forever, there's no lower boundary.").  Dr. Chyall characterizes this testimony as "Dr. Sherman suggest[ing] that even a very small amount of solvent … could be used to achieve the claimed reaction, assuming that the amount of time allowed for the reaction to occur was extended indefinitely."  (Op. ¶ 101).  I disagree.  Also, in my opinion, the method described by Dr. Chyall where the reaction time "was extended indefinitely" would not meet the "predetermined amount of time" limitation of the claims.  Thus, Dr. Chyall's analysis is not focused on the claims.

112. I have reviewed Dr. Cima's rebuttal report (¶¶ 125-130; 135-44) addressing Dr. Chyall's opinions regarding the POSA's understanding of the analytical chemistry disclosures in relation to the written description inquiry.  I agree with Dr. Cima's opinions and defer to him on these issues because of his level of expertise in this area.

113. Accordingly, in view of the above, it is my opinion that the '556 patent specification adequately demonstrates that Dr. Sherman possessed the claimed methods in Claims 1, 8-12 of the '556 patent and thus, satisfies the written description requirement.

**B.   Enablement**

114. As discussed above, I understand that a patent specification should enable a person of ordinary skill in the art to perform the claimed invention. Put another way, the specification of the patent must teach a person of ordinary skill in the art how to make and use the claimed invention without undue experimentation.

SUBJECT TO PROTECTIVE ORDER
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

115. In reading the '556 patent, it is my opinion that there exists a sufficient level of detail such that one of skill in the art could apply the teachings therein and achieve the claimed reaction. For example, the '556 patent provides a number of ways that would serve as guide posts to those of skill in the art to demonstrate how to practice the claimed invention. '556 patent, Col.3:52-4:64. Furthermore, the '556 patent contains written examples which provide additional details regarding the conditions for the reaction to occur. Examples 1-4.

116. It is my understanding that Dr. Sherman did not carry out the Examples 1-4 of the '556 patent. However, this fact is immaterial to an enablement determination because the examples provide sufficient detail such that one of skill in the art could follow the protocol provided. I understand from Dr. Cima's rebuttal report (¶¶ 131-33) that the resulting compositions could then be readily analyzed using one of the many techniques available to one of skill in the art. If the resulting compositions, in fact, did not achieve the desired level of conversion, then one of skill in the art could apply the additional teachings to vary the parameters of the process to encourage more of a reaction to occur. *See, e.g.*, Cima Reb. ¶ 133; Sherman Dep. at 66:18-67:25. Such an approach to pharmaceutical formulation development is routine to those of skill in the art. Indeed, I have carried out such testing throughout my career. The amount of experimentation required would not be substantial.

117. Accordingly, in view of the above, it is my opinion that the asserted claims of the '556 patent satisfy the enablement requirement because one of ordinary skill in the art could make and use the invention from the disclosures in the '556 patent, coupled with their knowledge and experience, without undue experimentation.

## XI.   THE ASSERTED CLAIMS ARE NOT ANTICIPATED

### A.   U.S. Patent 4,473,450

118. Dr. Chyall contends that the asserted claims are invalid because they are anticipated by the '450 patent. Chyall Op. ¶¶ 69-72. I disagree. Because the '450 patent does not teach or disclose each and every element of the claimed invention, expressly or inherently, it is my opinion that the asserted claims are not invalid in view of this reference.

119. I understand that, in order for a prior art reference to anticipate a claimed invention, each and every element must be expressly or inherently found in that single reference.

**SUBJECT TO PROTECTIVE ORDER**
**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

120. Apotex overcame the PTO examiner's rejections based on the '450 patent during the prosecution of the '556 patent. *See, e.g.*, Notice of Allowability, AI-MOEX0000654-57.   I note that the Examiner never rejected the claims for anticipation by the '450 patent despite relying on it for obviousness rejections.   In fact, the examiner did not state that the '450 patent disclosed moexipril, but did disclose enalapril, quinapril and indopril. *See, e.g.,* Office Action, AI-MOEX0000493-502 at 496.   Thus, Dr. Chyall's opinion seems to be different than the examiner.

121. The '450 patent does not disclose, suggest, teach, or otherwise mention a reaction. *See also* Lipp Decl. ¶¶ 38-39 (AI-MOEX0000546-47).   The '450 patent teaches a different method of stabilizing a number of ACE inhibitors (but moexipril was not a preferred compound) by contacting (i.e. mixing) a number of alkaline metal salts (not just magnesium salts).

122. As an initial matter, the '556 patent claims a process of making a solid composition comprising moexipril magnesium.   Moexipril is not explicitly named, disclosed or even mentioned in the '450 patent. *See also* Siefert Dep. at 332:9-19.

123. Furthermore, there are no examples of even contacting moexipril with an alkaline magnesium compound in the '450 patent.   The only four examples in the '450 patent describe compositions comprising quinapril.   '450 patent at col. 4:56-5:40; Siefert Dep. at 33:21-333:9 Outside of identifying "wet granulation" as a technique used for processing during the manufacture of a pharmaceutical product, the '450 patent does not disclose, suggest, or describe any process for making its claimed compositions.   In fact, it does not even give amounts of water to be used in the "wet granulation."   Thus, it is my opinion that the '450 patent does not expressly disclose each and every element of the asserted claims of the '556 patent.

124. Wet granulation is a physical process.   As discussed above, a POSA would not typically associate "wet granulation" with an in situ reaction.   A POSA reading "wet granulation" in the '450 patent would not understand that to mean a wet granulation to do a reaction.   In fact, the '450 patent discloses that these ACE inhibitors are water-sensitive.   Thus, one of ordinary skill would have read "wet granulation" to mean limited amounts of water, and short wet granulation times to avoid the hydrolysis degradation reaction.

125. Furthermore, I agree with Dr. Lipp that the term "stabilizer" in the '450 patent as used by a formulator in April 2000 would have been understood to mean an additive that inhibits reactions, not causes them.   Lipp Decl. at AI-MOEX0000534; AI-MOEX0000544-45 (¶¶ 36-37).

24