# **EXHIBIT F**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO. 12-60706-CIV-MIDDLEBROOKS/BRANNON (CONSOLIDATED)

| | |
|---|---|
| APOTEX, INC. and APOTEX CORP.,<br><br>        Plaintiffs,<br><br>        v.<br><br>UCB, INC. and KREMERS URBAN<br>PHARMACEUTICALS INC.,<br><br>        Defendants. | C.A. No. 12-60706 (DMM) |

**REBUTTAL EXPERT REPORT OF LEONARD J. CHYALL, PH.D.**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

***"In the presence of a sufficient amount of solvent"***

13.     Dr. Cima opines that the claim term "in the presence of a sufficient amount of solvent" should be construed as "<u>a sufficient amount of a liquid to at least moisten the moexipril or acid addition salt thereof and the alkaline magnesium compound to permit the reaction to occur</u>." (Cima Report, ¶ 13.)  Dr. Cima does not cite to any information from the '556 patent or its file history in support of his construction.  I have reviewed the specification of the '556 patent and do not find any support for Dr. Cima's construction.

14.     The specific language proposed by Dr. Cima does not appear in the '556 patent specification, and there is no indication in the specification that a sufficient amount of solvent is an amount that "moistens" both the moexipril and the alkaline magnesium compound, as Dr. Cima suggests.  The '556 patent identifies several ways in which the claimed process can be carried out and, in describing one such approach, states that "a sufficient quantity of suitable solvent must be used and the mass must be left wet enough for sufficient time to enable the reaction between the moexipril or acid addition salt and the alkaline magnesium compound to be complete or substantially complete, before the solvent is removed by drying."  ('556 patent, col. 4, ll. 55-61.)  The phrase "wet enough" is not defined in the '556 patent.  This information does not indicate to me that a "sufficient amount of solvent" is any amount that "moistens" both the moexipril hydrochloride and the alkaline magnesium compound, as Dr. Cima suggests. Moreover, the specification does not quantify the minimum amount of solvent that can be used to practice the claimed process.  The only guidance in the specification regarding specific amounts of solvent appears in Examples 1-4 of the '556 patent, which Dr. Sherman acknowledged were never performed. (Sherman Dep. 13:10-14:7.)  Example 1 discloses the use of 480.0 g of water and 240.0 g of acetone in combination with 10.0 g of moexipril hydrochloride, 10.0 g of

3

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

magnesium hydroxide, and 30.0 g of povidone. Examples 2-4 disclose the use of 12.0 g of solvent (water and/or acetone) in combination with 5.4 g of moexipril hydrochloride, 5.4 g of magnesium oxide, and 37.2 g of anhydrous lactose. However, as Dr. Sherman and Dr. Lipp testified, these fictitious Examples are not meant to provide information regarding the amount of solvent that should be used in all cases. For example, Dr. Sherman and Dr. Lipp testified that several factors must be taken into account to determine the amount of solvent necessary to achieve the claimed reaction. In fact, Dr. Sherman testified that given an infinite amount of time, the amount of solvent that would be necessary to achieve the claimed reaction could be "almost none." (Sherman Dep. 78:15-79:3.) Accordingly, in my opinion the specification of the '556 patent does not provide any guidance for determining the amount of solvent, does not support Dr. Cima's construction of the claim term, and does not provide adequate guidance as to its meaning.

15. The file history of the '556 patent also does not provide guidance regarding the construction of this claim term. The term "sufficient amount" was not present in the original claims that were included in the application submitted to the PTO on March 16, 2001. Rather, the "sufficient amount" limitation was added to claim 1 in a June 2003 amendment following an Office Action rejecting the claims as obvious over the "Gu" reference in view of the '450 patent. (*See* Amendment & Remarks dated June 11, 2003.) In that Amendment, the applicant, Dr. Sherman, stated that "sufficient water is introduced (as a solvent) to moisten and to thereby permit a reaction to occur." (*Id.* at 9.) However, there is no further information regarding how much solvent would be "sufficient," nor is there any indication as to whether <u>both</u> the moexipril and the alkaline magnesium compound must be "moistened," how much solvent is necessary to "moisten" these ingredients, or the extent of the reaction that supposedly results by "moistening"

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

these ingredients. Moreover, there is no information in the file history (or in the '556 patent) regarding any analytical method or test that can be used to determine whether the amount of water that is introduced is sufficient to "permit a reaction to occur," nor am I aware of any such methods. For example, I am not aware of any analytical test or method that can distinguish between conversion of greater than 80% of moexipril hydrochloride to moexipril magnesium as opposed to less than 80% conversion. Therefore, to the extent that Dr. Cima's construction of this claim term includes a requirement of greater than 80% conversion, I do not find any support for this construction in the '556 patent or in its file history. Indeed, for all of the reasons described above, and as described in my Opening Expert Report, it is my opinion that the claim term is ambiguous and indefinite. (*See* Opening Expert Report, ¶ 93.)

16. Dr. Cima's construction of the claim term "in the presence of a sufficient amount of solvent" does not distinguish the process of claim 1 from the well-known prior art wet granulation method, as described in my Opening Expert Report at ¶ 71. For example, the '450 patent describes the use of the wet granulation method to stabilize an ACE inhibitor, such as moexipril, using an alkaline magnesium compound. Wet granulation was a well-known method as of the time of Dr. Sherman's alleged invention, and was known to involve "moistening" both the ACE inhibitor and the alkaline magnesium compound. For example, the 1980 Lieberman reference discussed in my Opening Expert Report, which is cited by Dr. Lipp in his declaration in support of patentability of the '556 patent, specifically states that: "[w]et granulation consists of moistening the mixture of active ingredient and diluent with the granulating liquid." (*See* Opening Expert Report, ¶ 42.) Furthermore, as described in my Opening Expert Report, the '556 patent expressly states that it is difficult to "completely avoid" an acid-base reaction following the process disclosed in the '450 patent. Therefore, the '450 patent discloses the use of a liquid

5

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

in an amount sufficient to permit a chemical reaction between the ACE inhibitor and the alkaline magnesium compound, as in Dr. Cima's construction of this claim term.

***"Predetermined amount of time"***

17. Dr. Cima states that "a predetermined amount of time" shall be construed as "<u>an amount of time established before the manufacturing process begins and is sufficient to permit the reaction to occur</u>." (Cima Report, ¶ 13.) Again, Dr. Cima does not cite to any information in support of his construction. As with the "sufficient amount of solvent" limitation, I do not find any support for Dr. Cima's construction in the '556 patent or in its file history.

18. The claim term "predetermined amount of time" does not appear anywhere in the '556 patent, and there is no support in the '556 patent for the specific language proposed by Dr. Cima. For example, the specification of the '556 patent states that "the mass must be left wet enough for sufficient time to enable the reaction…to be complete or substantially complete." ('556 patent, col. 4, ll. 56-61.) The '556 patent does not indicate how much time is necessary to practice the claimed process, or whether the time must be "established before the manufacturing process begins," as required by Dr. Cima. The only additional guidance or information in the '556 patent concerning specific amounts of time necessary to practice the claimed invention appears in Examples 1-4, which disclose a 30 minute mixing time (Example 1) and a 30 minute "hold time" (Examples 2-4) before commencing drying. However, as noted above, these Examples were never actually performed and, according to Dr. Sherman, they do not provide guidance regarding the amount of time that is required to practice the claimed invention in all instances. (Sherman Dep. 88:12-19.) For example, Dr. Sherman testified that the "predetermined amount of time" could be "infinite" based on other factors such as the amount of solvent that is used, and that it "depends on everything else." (Sherman Dep. 87:5-10.)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

Accordingly, Dr. Cima's construction, which requires that "a predetermined amount of time" is an amount that is sufficient to permit the reaction between moexipril or an acid addition salt thereof and an alkaline magnesium compound to occur, also does not provide any meaningful guidance. Instead, this construction requires experimentation, as there is no information in the '556 patent for determining that such a reaction and conversion has occurred during manufacture of a solid pharmaceutical composition, and I am not aware of any test for making such a determination. As noted above, even assuming that such methods existed, the amount of time necessary to achieve the reaction is variable, and would not be known to a person of ordinary skill in the art based on the specification of the '556 patent.

19. The file history of the '556 patent also does not provide support for Dr. Cima's construction, nor does it provide any additional guidance or information regarding the meaning of a "predetermined amount of time" as used in the claims. It is my understanding that this claim term was not present in the original claims of the application that eventually led to the issuance of the '556 patent. The claim term was added by applicant in a February 2004 amendment following an office action rejecting the pending claims as obvious over Gu in view of the '450 patent, for a second time. (*See* Amendment & Remarks dated Feb. 11, 2004.) The remarks accompanying the February 2004 amendment do not refer to the added limitation or provide any additional information regarding the meaning of this claim term. Nor is there any information in the remarks, or elsewhere in the file history, that would support Dr. Cima's construction of the claim term. Instead, applicant focuses on the alleged conversion of greater than 70% of moexipril hydrochloride to moexipril magnesium in the claimed process, and the alleged lack of such a disclosure or teaching in the prior art. Accordingly, the file history of the '556 patent does not provide any additional guidance regarding the "predetermined amount of time" claim

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

term. Indeed, for all of the reasons described above, and as described in my Opening Expert Report, it is my opinion that the claim term is ambiguous and indefinite. (*See* Opening Expert Report, ¶ 93.)

20. It is my opinion that the construction of "predetermined amount of time" proposed by Dr. Cima does not distinguish the process of claim 1 from conventional prior art wet granulation methods, as described above with respect to the "sufficient amount of time" limitation. For example, the '450 patent discusses the use of the wet granulation method, a well-known technique in which ingredients are mixed together for pre-established periods of time during the manufacture of tablets. (*See* Opening Expert Report, ¶ 71.)

21. In my opinion, Dr. Cima's construction highlights the fundamental flaw of the '556 patent. There is absolutely no guidance in the patent outlining the parameters of the claimed process, and the claims do not distinguish the process from the prior art. Dr. Cima's construction in fact directs the public to carry out experimentation to determine what a sufficient amount of time would be to permit the reaction to occur before carrying out the claimed process. This prescription for experimentation establishes that the '556 patent does not contain a written description sufficient to describe the invention and enable a person skilled in the art to carry out the invention.

*"In a controlled manner"*

22. Dr. Cima states that the claim term **"in a controlled manner"** shall be construed as "in a way that causes significant conversion of moexipril or its acid addition salt to moexipril magnesium." (Cima Report, ¶ 13.) Dr. Cima does not identify any information in support of this construction, and there is no guidance in the specification of the '556 patent or in its file history regarding the meaning of this claim term.

8

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

23. Dr. Cima's proposed definition of this claim term is not found in the '556 patent. In fact, the term "significant conversion" does not appear anywhere in the specification, and the claims specifically call for conversion of greater than 80% of moexipril hydrochloride to moexipril magnesium. The only reference to "controlled" reactions in the specification is in reference to the '450 patent. In particular, the specification states that "[i]t is difficult to control the ['450] process so as to completely avoid an acid-base reaction in the making of the composition. The exact composition of the final product is thus uncertain and probably variable." ('556 patent, col. 2, ll. 35-37.) In fact, the '450 patent does not mention controlling reaction conditions to avoid an acid-base reaction. The specification of the '556 patent does not provide any additional information regarding how to practice the claimed process in a "controlled manner," as opposed to in a manner that is not "controlled." Therefore, the only inference that can be made from the specification as to the meaning of "in a controlled manner" is that one must follow Examples 1-4 of the '556 patent. The only possible "control" a person of skill in the art could infer from those examples is "time". There are no other conditions, such as temperature, pressure, size or type of equipment, rate of mixing, etc. which a person of skill in the art would associate with process controls for the reaction. The time and temperature provided for the drying steps in the Examples, e.g. 60$^\circ$C for 4 hours, are standard and presumably do not relate to the reaction step. In my opinion, there is no guidance in the '556 patent to instruct a person of skill in the art as to what a "controlled manner" for the claimed reaction may be.

24. Dr. Cima's construction of the claim term requires "significant conversion of moexipril or its acid addition salt to moexipril magnesium," but, as discussed above, there is no guidance or information in the specification of the '556 patent regarding any tests or methods that can be used to determine whether "significant" amounts of moexipril hydrochloride have been

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

converted to moexipril magnesium during the manufacture of a solid pharmaceutical dosage form. For this additional reason, Dr. Cima's construction of "in a controlled manner" is not supported by the specification of the '556 patent.

25. Similarly, Dr. Cima's proposed construction is not supported by the file history of the '556 patent. It is my understanding that the "controlled manner" limitation was added to claim 1 during the late stages of prosecution in order to overcome the Examiner's rejection of the pending claims as obvious over Gu in view of the '450 patent. (*See* Amendment & Remarks dated Feb. 11, 2004.) However, applicant did not provide any definition of the claim term, and did not indicate that a "controlled manner" means performing the claimed process in a way that causes "significant conversion," as suggested by Dr. Cima. Rather, applicant argued that: "Moexipril magnesium is only a result of Applicant's process which includes the step of reacting moexipril or an acid addition salt thereof with an alkaline magnesium compound in a controlled manner to convert at least 70% of the moexipril or acid addition salt to moexipril magnesium. Applicant is not risking any unknown side reactions but is taking specific steps to provide specific desired results." (*Id.* at 13.) There is no additional discussion or explanation of "unknown side reactions" or "specific steps" in the file history, nor is it clear whether applicant's reference to alleged "side reactions" and less than 70% conversion in the prior art is indicative of a process that is not "controlled." Therefore, there is no information in the '556 patent file history that suggests that Dr. Cima's construction of this claim term is appropriate. It is my opinion that the claim term is ambiguous in view of the '556 patent and its file history.

26. Dr. Lipp, whose declaration in support of patentability of the '556 patent accompanied the amendment in which the "controlled manner" limitation was added to the claims, testified that this limitation refers to consistency in the amount of conversion from "batch to batch."

10

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

(Lipp Dep. 164:18-165:15.) According to Dr. Lipp, a process that consistently produced only 40% conversion of moexipril hydrochloride to moexipril magnesium would be "controlled." (*Id.*) Therefore, Dr. Cima's construction of the claim term is also inconsistent with Dr. Lipp's testimony, to the extent that conversion of 40% of moexipril hydrochloride to moexipril magnesium is not a "significant conversion." Moreover, Dr. Lipp's testimony provides further evidence that the "in a controlled manner" claim term is ambiguous and indefinite. For example, it is apparent that Dr. Lipp, a person of skill in the art, construes the claim term differently than Dr. Cima, and neither Dr. Lipp's nor Dr. Cima's construction is supported by the specification of the '556 patent or its file history.

### *Dr. Cima's Conclusions on Infringement*

27. Based on his construction of the claim terms of the '556 patent, Dr. Cima concludes that the manufacture of moexipril products by UCB infringes claims 1 and 8-12. Dr. Cima does not specifically address in any detail how the UCB process meets the "sufficient amount of solvent," "in a predetermined amount of time," and "in a controlled manner" limitations of claim 1. (*See, e.g.*, Cima Report at ¶ 200 (claim chart).) Rather, Dr. Cima states – in a single sentence addressing these claim terms collectively – that "Kremer's process for manufacturing Univasc® products involve this reaction 'in a controlled manner in the presence of a sufficient amount of solvent for a predetermined amount of time' because the amount of water allows for over 80% conversion of moexipril HCl to moexipril magnesium in the amount of time determined by the protocol in the NDA that controls the parameters of the manufacture of the tablets, which was determined by Schwarz Pharma AG scientists in the mid-to-late 1990s." (*Id.*)

28. In effect, Dr. Cima opines that because, in his view, the UCB products tested contain what he represents is greater than 80% moexipril magnesium, as compared to other moexipril

11

compositions. To the contrary, the '556 patent states that "the tablets of examples 1, 2, 3, and 4 are more stable against degradation of the active drug than tablets comprising moexipril hydrochloride which has neither been converted to moexipril magnesium <u>nor stabilized by addition of a stabilizer</u>." ('556 patent, col. 6, ll. 17-21) (emphasis added). Dr. Sherman also testified that he did not perform any such analyses prior to drafting the application that eventually issued as the '556 patent, or at any time thereafter. Therefore, to the extent that Dr. Cima suggests that the '556 patent results in increased stability of moexipril compounds compared to moexipril compositions made by certain prior art methods, I disagree with his assumption and see no evidence to support such an assumption.

33. Dr. Cima also states that the process disclosed in the '556 patent provides advantages over the prior art because it results in "cost savings" due to alleged reduction in the amount of magnesium stabilizer necessary to formulate moexipril hydrochloride into a stable tablet. (Cima Report, ¶ 28.) In particular, Dr. Cima states that "avoiding this large excess of magnesium salt and other ingredients would also allow for larger batches of material to be processed because less powder would be needed in the '556 patent process to make an equivalent number of tablets. This translates into larger batches because the equipment used is of a fixed capacity. In other words, if you have a granulator that can hold 100 g of powder, you could make one set of tablets with the '450 patent process in one run, whereas you can make nine times the number of tablets using the '556 process." (*Id.* ¶ 29.) I disagree that these features are unique to the '556 patent because, in fact, they were disclosed in the prior art.

34. WO 99/62560 (the "PCT Publication") is prior art to the '556 patent. The PCT Publication discloses stabilization of ACE inhibitors by magnesium oxide, and specifically states that one of the advantages of the process disclosed therein is that "magnesium oxide

14

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

formulations are dense and can allow an increase in batch sizes using current equipment." (PCT Publication at 13.) The PCT Publication includes Example 1, in which quinapril hydrochloride and magnesium oxide were combined in equal amounts (21.7 mg) and "processed by wet granulation method for the manufacture of 20-mg tablets." This process resulted in a more stable composition compared to a formulation using magnesium carbonate hydroxide in large excess. (PCT Publication at 15-16.) Therefore, the PCT Publication discloses the use of magnesium oxide in a 1:1 weight ratio with the ACE inhibitor, just as the '556 patent does, and specifically identifies an increase in batch size as a beneficial result of reducing the amount of stabilizer used to manufacture tablets. Accordingly, I disagree with Dr. Cima to the extent that he opines that the process of the '556 patent confers advantages over the prior art.

V.      ANALYSIS OF ALTERNATIVE PROCESSES

35.     In the event that Apotex is able to demonstrate that UCB infringes the asserted claims of the '556 patent, I have been asked to assess non-infringing alternative processes that would have been available to UCB at the time of issuance of the '556 patent. For purposes of this analysis, I assume that the UCB process results in conversion of greater than 80% of moexipril hydrochloride to moexipril magnesium during the manufacture of Univasc® and Uniretic® tablets. I understand that a process that resulted in less than 80% conversion to moexipril magnesium would be a non-infringing alternative. The '556 patent identifies the process disclosed in the '450 patent as one example of such a process. ('556 patent, col. 2, ll. 12-39.) The '450 patent states that wet granulation is a preferred method for achieving stable compositions in accordance with the claimed invention. Moreover, Dr. Sherman testified at his deposition that it would not be difficult to avoid greater than 80% conversion during manufacture using a prior art wet granulation as disclosed in the '450 patent. In particular, Dr. Sherman testified that minor adjustments to the amount of solvent and time could result in less than 80%

15

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

conversion. (Sherman Dep. 244:3-245:4; 297:12-298:8.) Accordingly, to the extent that UCB's manufacturing process results in conversion of greater than 80% of moexipril hydrochloride to moexipril magnesium, it is my opinion that it would not have been difficult for UCB to adjust its process so as to avoid 80% conversion. For example, UCB would have been able to practice the wet granulation process disclosed in the '450 patent using magnesium oxide as the stabilizer, as disclosed in the prior art PCT Publication (Example 1), and by substituting moexipril hydrochloride for quinapril hydrochloride. It is my opinion that UCB would have been able to develop and implement such a process in 2-3 months in 2004, and that it would cost no more than $150,000 - $200,000 to do so.

## VI. DEVELOPMENT OF UCB'S MOEXIPRIL PRODUCTS

36. Based on his review of the "Development Pharmaceutics" report for Moexipril Hydrochloride film coated tablets (UCB0001380 – 1440), Dr. Cima opines that "…Schwarz knew that the reaction between moexipril hydrochloride and the magnesium was likely occurring." (Cima Report, ¶ 158). I have reviewed this development report and do not find evidence to support Dr. Cima's opinion regarding Schwarz Pharma's understanding of this process. Based on my review of this report, it is clear that Schwarz Pharma viewed the role of the basic magnesium species as stabilizers of moexipril hydrochloride. The report is silent as to whether the stabilizers act as reagents to facilitate the chemical reaction to convert moexipril hydrochloride to moexipril magnesium. The formulation development activities of Schwarz Pharma were focused on optimization of the properties through rational "trial and error" experimentation using the design of experiments (DOE) approach. The factorial design (*see* UCB0001396) allowed Schwarz Pharma to hone in on an acceptable formulation without developing an understanding of the mechanisms of stabilization.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

37.     I have found no mention in Schwarz Pharma's report or any other Schwarz documents indicating that the mechanism of stabilization is due to the conversion of moexipril hydrochloride to moexipril magnesium. Schwarz Pharma took particular care to evenly distribute the basic magnesium species and to use magnesium oxide with a small particle size similar to the teaching of WO 99/62560. The wet granulation process was found to be an effective means to evenly distribute the solid magnesium compound and not necessarily to generate a chemical reaction.

38.     I believe that any understanding that Schwarz Pharma had about the mechanism for stabilization with respect to a chemical reaction was through the teachings of Gu, which was cited in the Schwarz Pharma development report. Gu teaches that a portion of the drug substance may be neutralized by basic excipients at the outer surface of the granulated material and/or that a portion of the moexipril hydrochloride is converted to the cation salt. Schwarz Pharma's development work involved no testing to identify whether or not these conversions actually took place during the granulation process.

39.     It is also my opinion that Dr. Cima has misinterpreted a statement made by Dr. Heinig in a development report concerning the content uniformity of magnesium oxide in the moexipril hydrochloride tablets manufactured by Schwarz Pharma. (Cima Report, ¶ 160.) It is my opinion that Dr. Heinig's statement that the formulations contain 5.9 times the amount of magnesium oxide which is necessary to neutralize the moexipril hydrochloride relates only to pointing out the relative amounts of these species.

40.     To the extent that Schwarz Pharma contemplated that a reaction was likely occurring between moexipril hydrochloride and magnesium oxide, Schwarz Pharma considered, as any other person skilled in the art would, that this reaction could be neutralization of the moexipril

17

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

a result of the process, greater than 80% of the moexipril or its salt is converted to moexipril magnesium during the process of making the solid pharmaceutical composition.

44. The process parameters necessary for achieving greater than 80% conversion are not clear to me from reading the claims or the specification of the '556 patent, except that the greater than 80% conversion must occur and be completed during the course of making the solid pharmaceutical composition.

45. I understand that during the course of discovery, Apotex was provided with detailed documentation of UCB's current and past processes of manufacturing solid pharmaceutical dosage forms of Univasc® and Uniretic®.

46. I understand that the UCB processes use moexipril hydrochloride and magnesium oxide as starting ingredients, among others, in a wet granulation process to make Univasc® and Uniretic®.

47. In my review of Dr. Cima's report, and the Chemir and Apotex testing, it is evident that Apotex never carried out the UCB process to determine whether conducting the UCB process beginning with moexipril hydrochloride and magnesium oxide would result in the conversion of greater than 80% of the moexipril hydrochloride to moexipril magnesium in the manufacture of Univasc® and Uniretic® tablets. In my view, to prove infringement of the '556 patent, such an evaluation would be required.

48. Univasc® and Uniretic® tablets are known to contain approximately 5-7% residual water content (see below). As Dr. Sherman testified at his deposition, the presence of even a small amount of water will facilitate a reaction and conversion of moexipril hydrochloride to moexipril magnesium in a solid dosage form over time. Dr. Cima does not address this possibility at all in his report. For example, according to Dr. Sherman's testimony, a conversion of moexipril

19

I reserve the right to revise or supplement my opinions as additional information becomes available. Exhibits to be used in support of the opinions stated in this report include all of the tables, graphics and information contained herein as well as the materials cited in or accompanying this report. Additional demonstrative exhibits may be prepared for trial and used to support my opinions.

Respectfully submitted,

Dated: March 6, 2013

Leonard J. Chyall, Ph.D.