# **EXHIBIT H**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF FLORIDA

**CASE NO. 12-60706-CIV-MIDDLEBROOKS/BRANNON (CONSOLIDATED)**

| | |
|---|---|
| APOTEX, INC. and APOTEX CORP., <br><br> Plaintiffs, <br><br> v. <br><br> UCB, INC. and KREMERS URBAN PHARMACEUTICALS INC., <br><br> Defendants. | C.A. No. 12-60706 (DMM) |

**EXPERT REPORT OF CLEVE B. TYLER, PH.D.**

**March 6, 2013**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

> *Factor 15 - The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee — who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention — would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license*

62. The hypothetical negotiation is the method that I use to estimate a reasonable royalty. In the next section, I analyze the negotiation between Apotex and Schwarz under certain assumptions. Then in Section V, I address the analysis performed by Mr. Haas in the context of the factors discussed above.

## IV. HYPOTHETICAL NEGOTIATION

### A. Hypothetical Negotiation Context

63. When using the hypothetical negotiation method to determine the amount of a reasonable royalty it is necessary to consider what each of the parties – hypothetical negotiators for the licensee and the licensor – would have reasonably sought and been able to accept had they met as reasonable business people to negotiate a license prior to the start of infringement. The analysis should produce a royalty that is reasonable given the business conditions surrounding the product and the technology involved, and the bargaining positions and goals of the parties.

64. The primary difference between the results of a hypothetical negotiation and the results of real-life product and licensing negotiations is that, unlike an actual negotiation, in the hypothetical negotiation the patent is acknowledged to be valid and enforceable. In addition, in the hypothetical negotiation the activity contemplated by the licensee is acknowledged to infringe the patent.

65. As discussed above, the date of the hypothetical negotiation is as of the alleged date of first infringement, which I understand to be when the '556 patent issued on July 27, 2004. Therefore the date of the hypothetical negotiation is by July 27, 2004, or around July 2004.[76]

66. Analysis of a reasonable royalty using the hypothetical negotiation method requires an evaluation of the respective bargaining positions of reasonable, well-informed negotiators working for each of the parties to create a license prior to infringement and to recreate the market situation facing the parties as a result. The negotiators are required to reach agreement and to do so with the certain knowledge that the patents are valid and would otherwise be infringed by the defendant.

---

[76] This is also the date used by Mr. Haas as the date of his hypothetical negotiation. (Haas Report, ¶ 31.)

17

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

68. The cost of modifying the manufacturing process to use a non-infringing alternative based on the '450 patent potentially would include development costs and costs related to the risk of lost product sales. I understand that UCB's technical expert, Dr. Leonard Chyall, will address that the development of a non-infringing alternative would take about 2 to 3 months from the beginning of development until the new manufacturing process was operational, and cost about $150,000 to $200,000.[80] I also assume that the manufacturing costs associated with using the non-infringing alternative process would be the same or similar to the manufacturing costs associated with using the '556 process.[81]

### C. Bargaining Position of Apotex's Negotiator

69. The negotiator for Apotex would have understood that the '450 patent was expiring in the near future and would have understood that to maximize the value of the '556 process, it would want to encourage licensing of the '556 patent by all of the moexipril generics that would enter. In other words, a license rate that was perceived as "too high" might encourage either Schwarz or generics (or both) to seek non-infringing alternatives or discourage generics from entering altogether. Apotex would also take into account that it might also wish to enter as a generic and would be able to use the '556 process for the manufacture of its own moexipril generic, as it did for a short time.

70. The negotiator for Apotex also would have understood that while the sales of Univasc and Uniretic were anticipated to be relatively small going forward, there would be some residual demand for Univasc and Uniretic (and its authorized generics), especially in the first couple of years of the agreement before the expiration of the '450 patent. However, sales of these products would erode quickly when faced with generic competition and the continued expansion of alternative ACE Inhibitor products. The negotiator for Apotex would also understand that a royalty (especially a running royalty based on net sales) would also discourage Schwarz from promoting the products at a time when promotions were declining.

71. The negotiator for Apotex would understand that Schwarz had a non-infringing alternative in the process described by the '450 patent. Developing a non-infringing alternative would take about 2 to 3 months and require up to $200,000 in development costs. Apotex would have preferred for Schwarz to not develop a non-infringing

---

NDA or ANDA, U.S. Department of Health and Human Services, Food and Drug Administration, Center for Drug Evaluation and Research (CDER), April 2004.

I am not aware of any evidence, and I understand that the '556 patent does not purport to claim, that using the '556 patent process results in greater stability than using the non-infringing '450 process.

[80] Conversations with Dr. Leonard Chyall, February 13 and March 1. I understand that the development time might be substantially shorter than this (as little as a few days) and the costs could also be substantially less (if developed internally, salaried staff would be used rather than an external lab, for example).

[81] I understand that the manufacturing process associated with the non-infringing alternative likely would involve minor adjustments in water content and/or time, and therefore, have small, if any, impacts on manufacturing costs. See, for example, Deposition of Bernard Sherman, pp. 229, 244-245, and 297-298.

19

alternative because it would impact Apotex's ability to license the '556 patent to generics that were selling and planning to sell moexipril products in the marketplace.

### D. Bargaining Position of Schwarz's Negotiator

72. The negotiator for Schwarz would be interested in maintaining the sales and margins on Schwarz's moexipril products to the greatest extent possible. The negotiator would also be mindful that the viability of a pharmaceutical business depends on ongoing research and development efforts, which depend to a large extent on profits from products in commercial sale. From 2002 through 2004, Schwarz gross profit margin averaged 70 percent of sales.[82] However, its operating income had declined from 260 million euros in 2003 to less than 3 million euros in 2004.

73. The '556 manufacturing process had originally been developed by Schwarz and had been used by Schwarz in manufacturing its moexipril products since around 1995, or for nearly 10 years by the time of the hypothetical negotiation. Schwarz never had any serious manufacturing issues with its moexipril products. The moexipril products had made sales, therefore achieving a certain level of success, but by the time of the hypothetical negotiation Schwarz faced generic competition for its Univasc product and anticipated additional generic competition upon the expiration of its '450 patent in 2007 in addition to continued competition from other ACE inhibitors already in the market. This additional competition would have been expected to lead to greatly reduced profits for its moexipril products. Most of its sales would migrate to generics and a greater percentage of the sales that it did keep would be from its authorized generic products, with lower prices, and correspondingly, lower margins. Schwarz would have limited interest in paying royalties to sustain a minor product at the tail end of its life cycle with no follow-on products.

74. As discussed above, moving to a non-infringing alternative would require development costs of up to $200,000 and 2 to 3 months of time. Schwarz also faced costs in the form of risk of lost sales that might occur during the 2 to 3 month period in which the non-infringing manufacturing process was developed. The extent of these costs would depend upon factors such as inventory levels and manufacturing schedules. I understand that the '556 patent relates to a *process* of manufacturing. Therefore, I assume that Schwarz could sell pre-existing product from its inventory and not infringe the '556 patent, if that product in inventory had been manufactured prior to the date of first infringement (July 27, 2004).

75. In the normal course of business, Schwarz often manufactured its products with intervals exceeding 2 or 3 months.[83] Therefore, existing inventory likely would have been sufficient to maintain expected sales at the time of the hypothetical negotiation.

---

[82] Schwarz Pharma Annual Report (2004), p. 20.

[83] *See*, UCB0036307, UCB0036308, UCB0036530, UCB0036535, UCB0036617-618, UCB0036823, UCB0036912, and UCB0037144, showing manufacturing intervals exceeding about 3 months in at least 5 instances, and intervals exceeding about 2 months in at least 10 instances for moexipril products.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

Inventory for Schwarz's moexipril products targeted 14 weeks of sales for Univasc and 12 weeks of sales for Uniretic.[84] These inventory levels are about equal to the *longest* time period required to switch to the non-infringing alternative of 3 months (13 weeks). However, there would be some risk that inventory would not be sufficient to meet expected demand, and there is an economic cost associated with that risk.

76. Exhibit 16 estimates the expected cost of the risk of lost sales based on historical inventory records and actual prescription sales of Schwarz's moexipril products.[85] The analysis uses historical prescription sales information to calculate target inventory amounts for Univasc and Uniretic separately on a monthly basis. I evaluate how frequently these inventory amounts would be exceeded by subsequent sales over the following 2 months, 10.5 weeks, and 3 months (to correspond to the periods required for beginning production of the non-infringing alternative), and measure lost profits associated with any shortages.[86] The analysis is conducted from May 1999 through April 2004.[87] The economic cost associated with risk that inventory would not be sufficient to meet expected demand is approximately $400,000. These economic costs would have been considered by the negotiator for Schwarz.

### E. Reasonable Royalty

77. The presence of a non-infringing alternative would have shaped the royalty resulting from a hypothetical negotiation. Schwarz's expected direct costs associated with developing the non-infringing alternative were no greater than $200,000. However, Schwarz would also have understood that it faced some risk of lost product sales due to insufficient inventory during the development period. The estimated cost of this risk would have been approximately $400,000.

78. Apotex, on the other hand, would have wished to avoid having Schwarz develop a non-infringing alternative that could reduce Apotex's ability to license its '556 technology to generics who had entered and were expected to continue entering the market over the next several years.

---

[84] UCB0015044-46. This document is dated in 2000. I assume that the inventory targets in 2004 are the same as in 2000. I have not seen information related to actual inventory levels or inventory target levels in 2004.

[85] The structure of this analysis would tend to overstate the costs associated with the risk of lost sales.

[86] This analysis overstates the estimated cost in number of respects. For instance, using actual sales rather than anticipated sales would tend to overestimate the number of shortage days. Also, I have equally weighted the likelihood of the development period (using equal weights for the development period lasting 2 months, 10.5 weeks, and 3 months) even though I understand that 3 months would be the *maximum* amount of time to begin producing a non-infringing alternative. Finally, this analysis does not take into account inventory that exists at other levels in the supply chain.

[87] Information associated with this time period (60 months of history) would have been available at the time of the hypothetical negotiation, and could have been considered by the hypothetical negotiators. I have also conducted the analysis for time periods using information available following the hypothetical negotiation (through October 2007). Using this additional information in the analysis leads to similar results.