# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 12-60706-CIV-MIDDLEBROOKS/BRANNON

APOTEX, INC., *et al.*,

      Plaintiff/Counter-Defendants,

vs.

UCB, INC., *et al.*,

      Defendants/Counter-Plaintiffs.

_____/



### <u>OPINION AND ORDER</u>

THIS CAUSE comes before the Court for final disposition of the issues presented during a bench trial held from July 29, 2013, through July 31, 2013. Apotex[1] asserts that UCB[2] infringes Claims 8, 9, 10, 11, and 12 of United States Patent No. 6,767,556 (the "'556 Patent") by manufacturing and selling their Univasc and Uniretic products, as well as generic versions thereof. UCB contends that it does not infringe the '556 Patent and that the patent is invalid. UCB also contends that: (1) Apotex disclaimed the Univasc process from the scope of the claims during prosecution of the '556 Patent; (2) Apotex's infringement claims are barred by judicial estoppel; (3) the '556 Patent is unenforceable due to inequitable conduct; and (4) Apotex is barred by the laches doctrine from collecting pre-filing damages.

This case involves an orchestrated scheme to deceptively obtain a patent with respect to a competitor's product. It is illustrative of inventive litigation, as opposed to the scientific discovery that the patent laws were designed to promote.

---

[1] Plaintiffs in this case are Apotex, Inc. and Apotex Corp. I refer to them collectively as "Apotex."

[2] Defendants in this case are UCB, Inc. and Kremers Urban Pharmaceuticals, Inc. I refer to them collectively as "UCB."

The claimed "invention" is the addition of an *unspecified* amount of water in a wet granulation process for an *unspecified* amount of time in a controlled but *unspecified* manner. The Patent issued because the inventor: (1) misrepresented the nature of an existing drug already on the market for years prior to his filing, as well as the prior art (pursuant to which that drug had been licensed); (2) concealed his knowledge of the Univasc process from the PTO; and (3) gave the United States Patent and Trademark Office (the "PTO") Examiner results of experiments that he never conducted. Now, nearly 8 years after the inventor and founder of Apotex, Dr. Bernard Charles Sherman ("Dr. Sherman"), explicitly told the PTO that the existing drug's manufacturing process was different, Apotex brings this suit alleging infringement by that same drug. Not only should the Patent never have issued, but this lawsuit should never have been brought, certainly not at this late date.

For the reasons stated in greater detail below, judgment is due to be entered in favor of UCB and against Apotex.

## I.   PROCEDURAL BACKGROUND

Apotex initiated this action for patent infringement on April 20, 2012. On July 24, 2012, I consolidated this case for pretrial purposes with another case before me, as the same plaintiffs alleged infringement of the same patent, but against different defendants. This separate case, No. 12-CV-60707-MIDDLEBROOKS/TORRES, was later dismissed upon the submission of a Rule 41 joint stipulation of dismissal.

In the Complaint, Plaintiffs allege that UCB[3] infringes '556 Patent, which is owned by Apotex Inc.[4] The '556 Patent is entitled "Pharmaceutical Compositions Comprising Moexipril

---

[3] UCB is a Delaware corporation with its principal place of business in Smyrna, Georgia. UCB is an affiliate of UCB S.A. Schwarz was a Delaware corporation with its principal place of business in Mequon, Wisconsin. Schwarz was an affiliate of Schwarz Pharma AG. In December

Magnesium," and was issued on July 27, 2004, naming Dr. Sherman as the sole inventor and assignee. Dr. Sherman subsequently executed a *nunc pro tunc* assignment of the '556 Patent to Apotex, Inc., effective as of July 2004. The '556 Patent claims a process for the manufacture of stable moexipril magnesium tablets for the treatment of high blood pressure.

Specifically, the Complaint alleges that UCB's processes for the manufacture of their "Univasc" and "Uniretic" products infringe the '556 Patent's claims. UCB has manufactured and sold Univasc and Uniretic in the United States for the treatment of hypertension since the 1990s.

Apotex is alleging infringement of Claims 8, 9, 10, 11, and 12 of the '556 Patent against UCB. Dependent Claims 9-12 are being asserted based on their dependency from Claim 8 only.[5] In response to the Complaint, UCB filed its Amended Answer, Affirmative Defenses, and Counterclaims ("Answer") (DE 88) on February 20, 2013. Defendants counterclaimed for the following: (1) a declaratory judgment of non-infringement of the '556 Patent (Count I); (2) a declaratory judgment of invalidity of the '556 Patent (Count II); and (3) a declaratory judgment of unenforceability of the '556 Patent (Count III).

The parties filed cross Motions for Summary Judgment. In Apotex's Motion, Apotex sought summary judgment on UCB's unenforceability, invalidity, and non-infringement defenses and counterclaims. In UCB's Motion, UCB sought summary judgment based on disclaimer, judicial estoppel, invalidity, unenforceability based on inequitable conduct, and laches. After

---

of 2006, UCB S.A. acquired Schwarz Pharma AG. Schwarz merged into UCB, Inc. in December 2010, and is no longer a distinct legal entity. Kremers is an Indiana corporation with its principal place of business in Princeton, New Jersey. Kremers is a wholly-owned subsidiary of UCB Manufacturing, Inc., which is a wholly-owned subsidiary of UCB, Inc.
[4] Plaintiff Apotex Corp. is the exclusive licensee of the '556 Patent.
[5] While Claim 1 is not being asserted, Claim 8 refers to and delineates the steps of Claim 1's process.

conducting a Status Conference held on July 11, 2013, during which I listened to the parties' arguments on the Motions, I determined that the best course action was to deny the motions and proceed to trial, given the specialized knowledge and understanding required. (*See* DE 188). Because of my suspicion based upon the argument and written submissions that the issues to be decided by the Court would predominate over matters entrusted to a jury, I decided to bifurcate the trial to spare jurors the inconvenience of a lengthy trial which might be unnecessary.

The Court held a three-day bench trial to address the issues suited to be resolved by the Court, with a jury trial scheduled to follow for the remaining issues.[6] After hearing the evidence and testimony presented by both parties, I found it appropriate to first rule on the bench issues before calling in prospective jurors. As stipulated by the parties, (*see* DE 209), the bench trial issues included claim construction issues (including UCB's disclaimer defense and indefiniteness invalidity defense) and UCB's equitable defenses (*i.e.*, inequitable conduct, laches, and judicial estoppel). Had a jury been selected, they would have considered infringement, damages, and UCB's other invalidity defenses (including anticipation, obviousness, and lack of written description and enablement).

This Opinion constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a). The parties filed post-trial proposed findings of fact and conclusions of law on August 7, 2013.

## II.   FACTUAL BACKGROUND

The issues in this case involve processes for making stable moexipril tablets, used to treat high blood pressure.[7] The stability of a drug is important, as both the efficacy and safety of the

---

[6] Prior to trial, the parties filed various *in limine* motions, which I addressed on the record as the issues arose.

[7] Moexipril is an angiotensin-converting enzyme ("ACE") inhibitor that lowers blood pressure

drug can be negatively affected if the drug degrades over time.  For example, moexipril must be stable because it will degrade over time into another chemical compound (diketopiperazine) that is not effective for treating high blood pressure.[8]  Moexipril's instability has been a known problem for pharmaceutical formulators for quite some time – long before the issuance of the patent-in-suit.

A.    **Univasc and Uniretic**

UCB has continuously marketed and sold stable moexipril tablets – Univasc and Uniretic – in the United States since 1995 and 1997, respectively.   The Univasc and Uniretic manufacturing processes are the same with respect to the moexipril component in each; they both involve the wet granulation of moexipril hydrochloride,[9] lactose monohydrate, and magnesium oxide.[10]  The ingredients, master formulation, and manufacturing processes for the Univasc and Uniretic products have not materially changed since both drugs' introduction to the market.

The exact processes for manufacturing Univasc and Uniretic were never explicitly disclosed by UCB.  While Apotex tried to argue that UCB took steps to retain the processes as a trade secret, the testimony from UCB's witness, Jeffrey Seifert, indicated that the processes were merely never publicly disclosed.   However, several factors lend themselves to allow an experienced pharmaceutical formulator to determine UCB's processes.  First, the Univasc and Uniretic products were sold in the United States and able to be examined.  Second, all of the ingredients used to manufacture Univasc tablets were publicly disclosed at least as early as 1998

---

by slowing or stopping ACE, which in turn constricts blood vessels.
[8] When organic molecules – such as moexipril – degrade, they can "literally fall apart into other molecules under certain conditions." (Trial Tr. Day 1 at 171:25 to 172:4 (Chyall)).
[9] Moexipril hydrochloride is the hydrochloride salt form of moexipril.
[10] Magnesium oxide is an alkaline magnesium compound.

in the "Product Monograph for Univasc" (JTX 2E).[11]   Third, the Food and Drug Administration's (the "FDA") *Approved Drug Products with Therapeutic Equivalence Evaluations* (the "Orange Book") associated Univasc and Uniretic with the '450 Patent, indicating that these products were made in accordance with the '450 Patent's teachings.[12]

In sum, Univasc and Uniretic had been on the market for several years by 2001.  This, combined with the publicly available information, allowed for a skilled pharmaceutical formulator to easily discover and practice UCB's processes.  As it turns out, Univasc's process, which reacts moexipril hydrochloride with magnesium oxide to get the more stable moexipril compound, moexipril magnesium, is nearly the same process that was later claimed by one such skilled formulator.

**B.**   **Dr. Bernard Sherman**

Enter Dr. Bernard Sherman, a distinguished engineer by education and accomplished pharmaceutical formulator and businessman by trade.  Dr. Sherman is the founder and chairman of Apotex, Inc. and Apotex Corp.  Apotex, Inc. is a pharmaceutical manufacturer of generic

---

[11] The Product Monograph displays UCB's use of gelatin in the Univasc tablet.  Gelatin is used as a strong binder in the granulation aspect of pharmaceutical processing.  Apotex's expert, Dr. Cima, unequivocally testified that one skilled in the art could not infer any particular manufacturing operation (i.e., wet granulation vs. dry granulation) based on the inclusion of gelatin in the Product Monograph.  However, on cross-examination, Dr. Cima's credibility was dented when UCB's counsel pointed to the Lieberman article (PTX 114), which lists gelatin as a strong binder for use in wet granulation, but omits the use of gelatin and all binders from its discussion of dry granulation.   In fact, the Lieberman article states that dry granulation eliminates the need for using binders.  (PTX 114 at AI-MEOX-631) ("[Dry granulation] *eliminates the need for binder solutions*, heavy mixing equipment, and the costly and time-consuming drying step required for wet granulation.") (emphasis added).  Accordingly, given Dr. Cima's poor credibility on the issue, the testimony elicited, the Lieberman article, and the fact that the '450 Patent disclosed the use of gelatin in wet granulation, I find that one of ordinary skill in the art would be able to determine that UCB used a wet granulation process for Univasc.
[12] UCB's expert, Dr. Chyall, testified that Univasc is indeed made in accordance with the teachings of the '450 Patent.  (Trial Tr. Day 1 at 178:21-23 (Chyall)).  This patent is discussed in more detail below.

drugs, and the largest pharmaceutical company in Canada. In all, Dr. Sherman has about 10,000 employees under his direction.

To say that Dr. Sherman is experienced in pharmaceutical formulations would be an understatement. He testified that he has supervised or conducted "tens of thousands" of formulations, "many hundreds" of which have become marketable. In creating the generic formulations, Dr. Sherman testified that doing so is sometimes obvious, "but in other cases, you have got technical problems and you have got patent problems, intellectual property problems that you have to analyze to determine what are the barriers of getting a product of this type to market, both technically and in terms of the intellectual property." (Trial Tr. Day 2 at 70:21 to 71:4 (Sherman)).[13]

Being the formulator that he is, it follows that Dr. Sherman is no stranger to patent applications. He testified that he has personally written 100 patent applications. Dr. Sherman is also highly familiar to patent prosecution and patent enforcement litigation, notwithstanding the fact that he is neither a lawyer nor a patent agent. Dr. Sherman directs all litigation for Apotex and has "been involved in litigation for [his] entire career." (*Id.* at 73:17-18).[14]

Beginning in 1999, Dr. Sherman and Apotex were involved in one case that is of particular relevance to the case at hand. In that case, Apotex sued brand pharmaceutical

---

[13] The April 13, 2002, edition of *The Economist* aptly characterized Dr. Sherman:

> To his supporters, Barry Sherman, chairman of Apotex, a Canadian maker of generic drugs, is an indefatigable champion of low-cost drugs against profiteering patent-holders, as well as a generous philanthropist whose millions fund universities and hospitals. To his detractors, Mr. Sherman is a shameless copy-cat who seeks to misappropriate the hard-won intellectual property of research-oriented drug companies.

*Face Value: Generic Gadfly*, THE ECONOMIST, Apr. 13, 2001, *available at* http://www.economist.com/node/1077450/print.

[14] Dr. Sherman testified that he has been involved in "well over" 100 litigations.

developer Merck & Co., Inc. ("Merck") alleging infringement of two patents issued to Dr. Sherman (which, as in the instant case, were assigned to Apotex prior to filing suit). *See Apotex Corp. v. Merck & Co.*, Inc., No. 96-C-7375, 2000 WL 97582 (N.D. Ill. Jan. 25, 2000) [hereinafter *Merck Litigation*].   The patents at issue in the Merck Litigation claimed a process for the manufacture of a pharmaceutical composition comprising enalapril sodium.  The district court granted summary judgment against Apotex, finding Dr. Sherman's patents to be invalid because Merck invented the process claimed in Dr. Sherman's patents within the United States before Sherman, and did not abandon, suppress, or conceal that invention within the meaning of § 102(g).   Contributing to the district court's conclusion was the fact that "anyone with a fundamental knowledge of chemistry" would be able to figure out Merck's manufacturing process once he or she knew the ingredients and knew that the process involved "adding water to the mix." *Merck Litigation*, 2000 WL 97582, at *8.

On June 8, 2001, the Federal Circuit affirmed the district court's summary judgment ruling that Dr. Sherman's patents were invalid in light of Merck's prior invention of the process. *See Apotex USA, Inc. v. Merck & Co., Inc.*, 254 F.3d 1031 (Fed. Cir. 2001).  In its opinion, the Federal Circuit found that "Merck's various disclosures [including the disclosure of the ingredients used, distribution of the product monograph, and description of the process through testimony given during a Canadian trial], in conjunction with Apotex's admissions [that the process was obvious after learning of the starting ingredients], therefore clearly and convincingly prove that Merck made the knowledge of its invention available to the public . . . ." *Id.* at 1040.

## C.   The '556 Patent

The road to the '556 Patent began on March 16, 2001, when Dr. Sherman filed United States Patent Application No. 09/809,173 (the "'173 Application").  The '173 Application was

written entirely by Dr. Sherman, (Trial Tr. Day 2 at 73:10-15, 77:9-10 (Sherman)), and filed while the Merck Litigation was still pending.   After a prosecution that lasted several years, the '556 Patent issued on July 27, 2004, naming Bernard Charles Sherman as the sole inventor.

   1)   *The Claims and Asserted Utility of the '556 Patent*

The stated purpose of the invention claimed in the '556 Patent is to eliminate unstable moexipril, or an acid addition salt thereof, and replace it with stable moexipril magnesium. According to the Patent, this is accomplished "by reacting the moexipril or acid addition salt with an alkaline magnesium compound, so as to convert most or all (i.e.[,] more than half) of the moexipril or acid addition salt to moexipril magnesium." (JTX-1, col. 2, ll. 47-65).   The utility of the claimed process is increased stability of moexipril.

   Claim 1 of the '556 Patent, the only independent claim, is as follows:

   A process of making a solid pharmaceutical composition comprising moexipril magnesium, said process comprising the step of reacting moexipril or an acid addition salt thereof with an alkaline magnesium compound in a controlled manner in the presence of a sufficient amount of solvent for a predetermined amount of time so as to convert greater then [sic] 80% of the moexipril or moexipril acid addition salt to moexipril magnesium.

(JTX 1, col. 6, ll. 24-31).   The reaction claimed in Claim 1 of the '556 patent is an acid-base reaction in which "moexipril or an acid addition salt thereof" is the acid and the "alkaline magnesium compound" is the base.  (JTX-1, col. 3, ll. 1-15, col. 6, ll. 23-31.)

   Claim 8 of the '556 Patent, which depends from Claim 1, is as follows:

   The process of claim 1 comprising the steps of:

   i)      mixing the moexipril or acid addition salt thereof and alkaline magnesium compound with one or more excipients;

   ii)     adding a solvent and mixing to obtain a wet mass;

   iii)    drying the wet mass to obtain a dry mass; and

iv)    further processing the dried mass into the solid pharmaceutical composition.

(JTX 1, col. 7, ll. 4-12).  The steps recited in Claim 8 describe the well-known wet granulation[15] method of manufacturing tablets.  (JTX-1, col. 7, ll. 4-12; Trial Tr. Day 1 at 68:22 to 69:3 (Cima)).

Claims 9-12 depend from Claim 8, and so also depend from Claim 1, adding further limitations including the use of specific solvents, the use of moexipril hydrochloride, and the use of specific alkaline magnesium compounds.  (JTX-1, col. 7, l. 13 to col. 8, l. 8; Trial Tr. Day 1 at 68:11 to 69:3 (Cima)).

As discussed in more detail below, there are three terms in Claim 1 that are disputed: (1) "sufficient amount of solvent"; (2) "predetermined amount of time"; and (3) "controlled manner."

2)    *Examples and Data in the '556 Patent*

Dr. Sherman included four Examples in the '556 Patent purporting to demonstrate his claimed process.  Each Example is written in the past tense, as if the experiments had been conducted, and includes very specific results.  (JTX-1 at cols. 5-6; Trial Tr. Day 1 at 200:22-201:11 (Chyall)).[16]  However, as made clear by the testimony elicited from Dr. Sherman, these Examples were *never* conducted, and the results were made up in Dr. Sherman's head.[17]

_____

[15] "Wet granulation" is a term used to describe a processing method in pharmaceutical drug manufacturing in which the dry ingredients (in the form of a powder) are mixed with a solvent (usually water) so that the ingredients stick together to form larger aggregates or granules.  Wet granulation has been a well-known method for manufacturing pharmaceutical drug products since at least the 1980s.

[16] Based on the fact that the Examples provide highly specific results – in some instances to the hundredth decimal point – Dr. Chyall explained that one of ordinary skill in the art would assume that the experiments were actually conducted.

[17] I will discuss the significance of these Examples being written in the past tense in more detail below.

Examples 2 through 4 disclose using 20% water (by weight) for wet granulation. (JTX-1, col. 5, ll. 53-64; Trial Tr. Day 2 at 21:10-13 (Chyall)). However, neither the Examples nor the specification provide stability or conversion data of any kind. (JTX-1, cols. 5-6; Trial Tr. Day 1 at 202:20-203:6 (Chyall)). This is so despite Claim 1's limitation of "greater than 80%." The only disclosure in the '556 Patent that relates to amounts of conversion is that "the amount converted will preferably be more than 70%, more preferably more than 80%, even more preferably more than 90%, and most preferably 100%, or virtually 100%." (JTX-1, col. 2, ll. 62-65). Further, the only data in the patent that supports any conversion is in the fictitious Examples, which disclose 100% conversion. (JTX-1, col. 2, ll. 62-65, cols. 5-6; Trial Tr. Day 1 at 202:20-203:6 (Chyall)).

While it is possible to figure out whether a product has achieved 100%, there are no tests readily available to determine whether, for example, a reaction has resulted in 79% conversion or 81% conversion. Given that the Examples show 100% conversion, and that there is no test described in the '556 Patent or readily available for one skilled in the art to determine the exact percentage of conversion from moexipril hydrochloride to moexipril magnesium, one cannot deduce how to achieve 70% or 80% conversion, as there are too many variables in organic chemistry reactions, such as an acid-base reaction, to predict in advance which parameters to adjust. (Trial Tr. Day 1 at 203:7-12 (Chyall)).

3)   *The Prior Art Before the Examiner*

The following prior art references were considered by the Examiner before the '556 Patent issued and are relevant to the issues in this case.

i)    *The '450 Patent*

On May 10th, 1988, United States Patent No. 4,743,450 (the "'450 Patent") issued, describing a pharmaceutical manufacturing process that purports to solve the moexipril instability problem.  The inventors of the '450 Patent were employees of Warner-Lambert, a major American pharmaceutical company.

The '450 Patent discloses how to stabilize an ACE inhibitor drug (i.e., moexipril) using alkaline stabilizers and saccharides.[18]  According to the '450 Patent, "[m]agnesium is most preferred" to be used as the alkaline stabilizer in the invention.  The '450 Patent also teaches that wet granulation is the "preferred" technique or process for manufacturing the '450 Patent's invention.

Each of the '450 Patent's Examples A through D are of wet granulations.  Examples A and B in the '450 Patent involve wet granulations of quinapril with magnesium carbonate, lactose, and gelatin.  (Trial Tr. Day 1 at 174:21-175:8 (Chyall)).  Except for Example C of the '450 Patent, which uses about 2% water, the Examples do not disclose how much water to use in the wet granulations.  (Trial Tr. Day 2 at 19:2-20:13 (Chyall)).  Example E of the '450 Patent provides stability data for tablets made pursuant to Examples A, B, and D, and indicates that the resulting tablets are more stable than tablets made without the use of an alkaline stabilizer

---

[18] The primary composition that the '450 Patent discusses is quinapril.  However, while the '450 Patent does not explicitly mention moexipril by name, the '450 Patent discloses a chemical formula that encompasses moexipril.  (JTX 5 at col. 2, ll. 11-31).  Additionally, the '450 Patent expressly incorporates compounds as listed in U.S. Patent No. 4,344,949 (the "'949 Patent"), which discloses moexipril.  (Chyall Day 1 Tr. at 213:17-18).  UCB's expert, Dr. Chyall, testified that a person of ordinary skill in the art would understand that quinapril and moexipril would act in a similar fashion in a stabilization formulation.

(Example C), as measured by the amount of certain degradation products.  (JTX-5, col. 5, ll. 42-55; Trial Tr. Day 1 at 175:4-176:14 (Chyall)).[19]

The '450 Patent is completely silent as to whether the disclosed processes are intended to cause or prevent a reaction.  (JTX-5; Trial Tr. Day 2 at 21:5-9 (Chyall)).  Further, the '450 Patent is silent as to acid-base reactions, and it does not indicate that the process disclosed therein is difficult to control or that it results in "variable" products.  (JTX-5; Trial Tr. Day 1 at 180:18-181:23 (Chyall)).

This patent was disclosed during the '556 Patent prosecution.  But what was not disclosed, however, was that if one just adds water to the mix, he or she would get what Dr. Sherman invented.  "Adding water to the mix" was exactly what Dr. Sherman was found to have done in the Merck Litigation.

      ii)    *The Gu Article*

In 1990, after the '450 Patent issued, an article was published by Leo Gu *et al.*, entitled "Drug-Excipient Incompatibility Studies of the Dipeptide Angiotensin-Converting Enzyme Inhibitor, Moexipril Hydrochloride: Dry Powder vs Wet Granulation" (the "Gu Article").  (JTX 2F).  The Gu Article teaches several things.  First, Gu teaches that alkalizing agents, such as sodium carbonate, sodium bicarbonate, and calcium carbonate, were found to be effective in stabilizing moexipril hydrochloride via wet granulation.  UCB's expert, Dr. Chyall, testified that "Gu [] combined moexipril hydrochloride with the metal – alkalide metal excipients in one of two ways.  One way was to dry powder blend them.  This would be a dry granulation or what is called a dry powder mix.  And then the second way was to combine moexipril hydrochloride and

---

[19] The experts agreed that Dr. Sherman's claimed process can be made by merely following the examples in the prior art references.  In fact, Dr. Cima admitted that Dr. Sherman's invention comes down to just adding more water to the examples in the prior art.  (Trial Tr. Day 1 at 161:2-7 (Cima)).

sodium bicarbonate in a wet granulation process. . . . What Gu identified from [his] research results is that *wet granulation is key in getting a stable formulation.*" (Trial Day 1 Tr. at 187:21 to 188:13 (Chyall)) (emphasis added).

Second, based on research results that were conducted, Gu teaches that a neutralization reaction may be useful in stabilizing moexipril. (JTX-2F at 383; Trial Tr. Day 1 at 183:18-184:4 (Chyall)).[20]  Specifically, the Gu Article postulated that the stabilization resulted "from the neutralization of the acidic drug by basic excipients at the outer surface of the granulated material." (JTX 2F at 383).[21]  The term "neutralization of the acidic drug by the basic excipients" in Gu refers to the reaction of a basic excipient with the moexipril hydrochloride to remove the proton on the nitrogen, thereby preventing the material from cyclizing to the DKP byproduct. (Trial Tr. Day 1 at 183:18-188:21; 192:2-9 (Chyall)).

Gu also identifies an alternative hypothesis for the mechanism of stability.  In the "Conclusion" section of the article, Gu states that "[i]t is also possible that a portion of the moexipril hydrochloride was converted to the cation salts via granulation and these cation salts degraded much slower in the solid state." (JTX-2F at 383.)  In other words, the moexipril hydrochloride could not only be neutralized, but could also be converted to a cation salt such as moexipril magnesium. (Trial Tr. Day 1 at 192:19-193:10 (Chyall)).  This hypothesis directly correlates with Dr. Sherman's claimed invention.

---

[20] "Neutralization" as used by Gu means a chemical reaction to convert the salt, moexipril hydrochloride, to the neutral species, the free base of moexipril.  It does not mean that the basic compound is creating a "microenvironment pH" to stabilize the moexipril hydrochloride, as Dr. Cima proposed.  (Trial Tr. Day 1 at 192:2-18 (Chyall)).

[21] To a person of ordinary skill in the art, this "neutralization" refers to the reaction of the sodium bicarbonate or any other basic stabilizer with moexipril hydrochloride.  (Chyall Day 1 Tr. at 192:2-9).

From Gu it is clear that wet granulation is important for making stable formulations of moexipril. Moreover, a person of ordinary skill looking at the science disclosed in Gu would understand that stabilization can come from chemical reactions that convert moexipril hydrochloride to either the neutral species or the cation salt, or from some combination of these reactions. (Trial Tr. Day 1 at 194:6-14, 195:12-21 (Chyall)).[22]

However, one cannot determine from the disclosure in Gu how much of the moexipril hydrochloride converts to the cation salt. (Trial Tr. Day 1 at 194:15-18 (Chyall)). Further, there is no analytical method disclosed in Gu, and there was no technique available at the time or in existence today, as discussed further below, that could differentiate between the amounts moexipril hydrochloride and a neutralized form of moexipril in a final product. (Trial Tr. Day 1 at 195:2-7 (Chyall)).

4)   *The '556 Patent Prosecution*

When Dr. Sherman filed the '173 Application, he executed a declaration in connection with his inventorship of the '173 application, attesting that he had reviewed and understood the contents of the application and acknowledging his duty to disclose any information material to patentability as defined in 37 C.F.R. § 1.56. He also averred:

> I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and

---

[22] Dr. Cima initially testified that Gu did not suggest to a person of ordinary skill in the art that a reaction had occurred during the wet granulation process. Rather, he characterized the result of Gu's wet granulation as an "intimate mixture." (Trial Tr. Day 1 at 107:10 to 108:7 (Cima)). Even though Gu states that the acidic drug is neutralized by the basic component, Dr. Cima averred that this is not how it would be interpreted by a person of ordinary skill in the art would interpret it. (Trial Tr. Day 1 at 155:6-9 (Cima)). In later testimony, however, Dr. Cima conceded that Gu discloses a neutralization reaction between the sodium bicarbonate and the moexipril hydrochloride. (Trial Tr. Day 3 at 39:10 to 41:3, 53:13-15, 54:10-13 (Cima)). Cima further testified that in the Advisory Action at one point during prosecution of the '556 patent, the Examiner recognized that Gu disclosed a neutralization reaction, and that it was indeed a chemical reaction. (Trial Tr. Day 3 at 41:11-42:3 (Cima); JTX 2N).

further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under 18 U.S.C. 1001 and that such willful false statements may jeopardize the validity of the application or any patent issued thereon.

(JTX-2 at AI-MOEX0000334-5).

Throughout the prosecution of the '173 Application, Dr. Sherman was represented by his patent agent, Mr. Neil Hughes.   Dr. Sherman would have the Court believe that his only involvement of the prosecution was that he was "aware the prosecution was going on," and that Mr. Hughes handled *everything*.   This claim appears to be a mechanism by Dr. Sherman to impute the blame for any omissions or misrepresentations to the Examiner to Mr. Hughes. However, as discussed further below, the evidence demonstrates that Dr. Sherman has a hand in every aspect of his business, including the prosecutions of his patents, and that he was indeed aware of and involved in decisions made regarding the '173 Application's prosecution.[23]

> i)     *The September 18, 2002, Office Action Response*

Initially, Claim 1 of the Dr. Sherman's patent application read as follows:

A process of making a solid pharmaceutical composition comprising moexipril magnesium, said process comprising the step of reacting moexipril or an acid addition salt thereof with an alkaline magnesium compound in the presence of a solvent so as to convert *most or all* of the moexipril or moexipril acid addition salt to moexipril magnesium.

(JTX-2 at AI-MOEX0000337) (emphasis added).

On March 21, 2002, the PTO Examiner rejected the then-pending claims on the grounds that the term "most or all" rendered claim 1 indefinite, and that the claims were otherwise invalid as obvious over the '450 Patent alone or in view of the '949 Patent.   (JTX-2C at AI-

---

[23] As discussed in more detail below, Dr. Sherman repeatedly claimed lack of memory and lack of responsibility, disclaimed knowledge of statements made on his behalf or on behalf of his company, and displayed a lack of interest in the accuracy of statements made by Apotex to regulators, including the FDA.   I did not find him to be a credible witness.

MOEX0000413-417).  The Examiner stated: "it would have been obvious to one of ordinary skill in the art at the time the invention was made to use any ACE inhibitor, particularly moexipril, in combination with alkalizing agents, to obtain a highly stable and effective drug composition for use in the treatment of hypertension." (*Id.*).

In response to the September 18, 2002, Office Action, Dr. Sherman, through his agent Mr. Hughes, attempted to distinguish his invention from the '450 Patent.  As part of his argument, he submitted the Product Monograph for Univasc, which, *inter alia*, discloses the ingredients used to make the drug.  Dr. Sherman told the PTO that the Product Monograph describes the actual contents of Univasc tablets, that moexipril and magnesium oxide were "unreacted but combined" in the tablets, and he linked Univasc to the '450 Patent:

> Applicant herewith submits the Product Monograph for Univasc® (Moexipril Hydrochloride Tablets) *wherein the tablets* marketed by Schwarz Pharma (as listed in the FDA Orange Book as per the teachings of United States Patent No. 4,743,450) *include magnesium oxide; unreacted but combined and functioning as a stabilizer* (see first page). The Examiner is referred to those pages. Full reconsideration is respectfully requested.

(JTX-2D at AI-MOEX0000429) (emphasis added).[24]

Dr. Sherman also represented that the Gu Article "discusses that the stabilization is a result from the neutralization of the acid drug by basic excipients at the outer surface of the granulated material.  However, primarily the product is moexipril hydrochloride as the active." (*Id.*) (emphasis in original).  This statement omits important aspects of Gu's teachings.

Dr. Sherman also amended Claim 1 to recite conversion of "at least 70%" in order to overcome the Examiner's rejection based on indefiniteness.  (JTX-2D at AI-MOEX0000420; Trial Tr. Day 1 at 202:14-19 (Chyall)).

---

[24] I note that the responses are written as though it is the "Applicant" responding, as opposed to Neil Hughes, as agent for the Applicant, responding.

ii)    *The June 11, 2003, Office Action Response*

On December 18, 2002, the PTO Examiner rejected the claims of the '173 Application as obvious over the Gu Article in view of the '450 Patent.  (JTX-2G at AI-MOEX0000469-474; Trial Tr. Day 1 at 205:12-20 (Chyall)).

Dr. Sherman responded by further amending the claims to add the limitation "sufficient amount" in reference to the term "solvent" in the claim.  (JTX-2H at AI-MOEX0000477; Trial Tr. Day 1 at 205:21-206:2 (Chyall)).

Dr. Sherman's response also again repeated his representation that the ingredients in Univasc are "unreacted but combined," this time underscoring the phrase for added emphasis:

> Applicant previously submitted the Product Monograph for Univasc® (Moexipril Hydrochloride Tablets) hereby incorporated by reference wherein the tablets marketed by Schwarz Pharma (as listed in the FDA Orange Book as per the teachings of United States Patent No. 4,743,450) also hereby incorporated by reference include magnesium oxide; <u>unreacted but combined</u> and functioning as a stabilizer (see first page). The Examiner is again referred to those pages. Full reconsideration is respectfully requested.

(JTX-2H at AI-MOEX0000481) (emphasis in original).

Sherman also argued that "Gu et at [sic] teaches that only a portion (if any) of the drug, and only that portion at the outer surface of the granules, may be converted to the alkaline salt, and **that the stable product thus results entirely or primarily not from conversion to alkaline salts, but from stabilization of the moexipril hydrochloride by the presence of the alkaline stabilizing compound in the final product**."  (JTX-2H at AI-MOEX0000480) (emphasis in original).  He then went on to distinguish the prior art Gu Article and '450 Patent from his invention on the grounds that those references taught combining the ingredients, whereas his invention was reacting them.  Dr. Sherman again described Univasc as an example of a product made in accordance with the teachings of Gu and the '450 Patent, wherein the ingredients are combined but not reacted:

18

> Even if one skilled in the art were to combine Gu et al with [the '450 Patent] they would arrive at moexipril hydrochloride which is stabilized by an alkaline agent and preferably magnesium oxide *as per the product monograph of the moexipril hydrochloride tablets manufactured by [Schwarz] attached in the prior Information Disclosure Statement provided. Applicant is not "combining" but is "reacting" the active and the agents to result in the moexipril magnesium.*

(JTX-2H at AI-MOEX0000480, AI-MOEX0000486) (emphasis added).

  iii)  *The February 12, 2004, Office Action Response*

On August 22, 2003, the PTO Examiner issued a Final Rejection, once again rejecting the claims of the '173 Application as obvious over Gu in view of the '450 Patent. (JTX-2I at AI-MOEX0000493-502.)

In his response to this Final Rejection, Dr. Sherman amended Claim 1 yet again, this time to include the terms "in a controlled manner" and "for a predetermined amount of time." (JTX-2J at AI-MOEX0000521). There is no discussion in the Patent or in the prosecution history as to what these newly added claim terms mean, although they appear from the amendment to be tied to the 70% conversion limitation. (JTX-2J at AI-MOEX0000505-525; Trial Tr. Day 1 at 207:2-22 (Chyall)).

Dr. Sherman again identified Univasc as an example of a product made in accordance with the prior art processes and again underscored the phrase "unreacted but combined." (JTX-2J at AI-MOEX0000508). And, once again, Dr. Sherman distinguished Gu and the '450 Patent as processes for stabilization in which moexipril and magnesium oxide are combined but not reacted and that Univasc is stabilized according to that prior art process:

> A reaction is not disclosed, inferred, suggested or discussed in [the '450 Patent] whatsoever. In fact only the stabilizing activity of the magnesium compound is discussed and the importance of avoiding excipients and saccharides which might interfere with that stabilizing function. Gu et al postulates that a minor insignificant portion may react *but the stabilization is a result of the combination of the moexipril hydrochloride with the alkaline stabilizer as evidenced by the Product Monograph previously provided.* No other conclusion can be reached.

(JTX-2J at AI-MOEX0000513-514) (emphasis added).

Relying on the Univasc example, Dr. Sherman also argued (again) that Gu teaches that a

stable moexipril product results from the *combination* of ingredients and not a reaction:

> It thus appears clear that Gu et at [sic] teaches that only a portion (if any) of the drug, and only that portion at the outer surface of the granules, may be converted to the alkaline salt, and **that the stable product thus results entirely or primarily not from conversion to alkaline salts, but from stabilization of the moexipril hydrochloride by the presence of the alkaline stabilizing compound in the final product.**

(JTX-2 at AI-MOEX0000507) (emphasis in original).

iv)    <em>The Lipp Declaration</em>

Near the time of the response to the final rejection, Dr. Sherman, through Hughes, hired

Dr. Michael Lipp to submit a sworn declaration to the PTO, dated February 9, 2004, reinforcing

Dr. Sherman's arguments that Univasc was made by the prior art '450 Patent's process.  Dr. Lipp

declared:

> Thus, as would be understood by persons skilled in the area of pharmaceutical chemistry, stabilizers used in standard pharmaceutical practice are molecules that inhibit or prevent reactions between active ingredients and other chemical species in pharmaceutical formulations. . . . *An additional example particularly relevant to the matter at hand is the UNVASC® [sic] moexipril hydrochloride formulation.* . . . The product monograph for the UNVASC® [sic] moexipril hydrochloride formulation lists moexipril hydrochloride as being present in the final formulation in addition to magnesium oxide as an alkaline stabilizer, as per the teachings of the '450 patent which is listed in the FDA Orange Book for this formulation. *As a result, in my opinion, a skilled formulator reading Harris et al* [the '450 Patent] *would not expect a reaction to occur* between an alkaline or saccharide stabilizer and an ACE inhibitor drug in the formulations disclosed therein.

(JTX-2K at AI-MOEX0000545-546, ¶ 37) (emphasis added).

At trial, Dr. Sherman testified he could not recall whether he instructed Hughes to have

an expert declaration prepared in order to respond to the final office action.  (Trial Tr. Day 2 at

156:3-17 (Sherman)).  When presented with a letter from Hughes to Sherman enclosing the final

office action and previous response, (DTX-535), Dr. Sherman testified that he did not recall

20

whether he was informed about the prosecution on every occasion. (Trial Tr. Day 2 at 156:18-157:13 (Sherman)). Then, when presented with an e-mail from Hughes to Dr. Lipp stating that "Dr. Sherman has advised us to file further arguments with affidavit evidence," (DTX-82), Dr. Sherman did not have a strong recollection of any such conversation, but presumed that it took place. (Trial Tr. Day 2 at 157:19-159:10 (Sherman)).

> v)   *The Examiner's Acceptance*

It was only after Dr. Sherman amended Claim 1 to require "greater than 80%" conversion to moexipril magnesium that, on April 7, 2004, the PTO Examiner finally approved the claims of the '556 Patent. (JTX-2Q at AI-MOEX0000650-651; JTX 2S at AI-MOEX0000654-657; Trial Tr. Day 1 at 146:21-148:7 (Cima)).

In the statement allowing the claims, the PTO Examiner accepted Dr. Sherman's previous representations, stating that:

> The primary reason for allowance is that the prior art does not disclose nor fairly suggest a process of making a pharmaceutical composition comprising moexipril magnesium, comprising the step of reacting moexipril or an acid addition salt thereof with an alkaline magnesium compound so as to convert greater than 80% of the moexipril or moexipril acid addition salt to moexipril magnesium. Rather, the prior art teaches that only a portion of drug (if any) may be converted to the alkaline salt and that the stable product results entirely or primarily not from conversion to alkaline salts, but from stabilization of the moexipril hydrochloride by the presence of the alkaline stabilizing compound in the final product.

(JTX-2 at AI-MOEX0000656; Trial Tr. Day 1 at 199:21-200:17 (Chyall)). These are basically the same opinions that were offered in the Lipp Declaration and by Dr. Sherman's several Office Action responses.

In each response to each rejection, Dr. Sherman referred the PTO to the "Product Monograph for Univasc," stating that "tablets marketed by [Schwarz] (as listed in the Orange Book as per the teachings of United States Patent No. 4,743,450) [. . .] include magnesium oxide; <u>unreacted but combined</u> and functioning as a stabilizer." (JTX-2 at AI-MOEX0000429

(emphasis added); JTX-2 at AI-MOEX0000481 (emphasis in original); JTX-2 at AI-MOEX0000508) (emphasis in original). He repeatedly represented to the PTO that Univasc was made by the process disclosed in the '450 Patent and Gu, and that Univasc contained moexipril hydrochloride and magnesium oxide "unreacted but combined." (JTX-2 at AI-MOEX0000343, 429, 481, 486, 508, 513-14, 516-17, 545). Accordingly, Dr. Sherman argued, the prior art was outside the scope of what he was claiming.

The phrase "unreacted but combined" does not appear in the prior art, including in the '450 Patent and Gu. Dr. Sherman distinguished the claimed invention from the prior art processes by stating that the prior art teaches "combining" moexipril and an alkaline magnesium compound as evidenced by Univasc, rather than "reacting" the ingredients so as to convert the moexipril or acid addition salt thereof to moexipril magnesium. (JTX-2 at AI-MOEX0000426, AI-MOEX0000429; Trial Tr. Day 2 at 141:22-144:2 (Sherman).)

But in the midst of all Dr. Sherman's arguments and representations to the PTO, he never once mentioned that the process used to make Univasc was secret, or that he did not know the actual process used to make Univasc. In fact, the evidence before this Court indicates otherwise.

     5)    *Misrepresentations or Omissions*

         i)     *Knowledge of Univasc's Process*

At trial, Dr. Sherman admitted everything but knowledge of the fact that Univasc was made according to his claimed process. He even ventured to say that, even before he filed his application, he had a "strong suspicion" and a "belief" that Schwarz was utilizing his process. (Trial Tr. Day 2 at 95:6-10, 104:13 to 105:7 (Sherman)). Dr. Sherman was not a credible witness at trial, and, given the evidence presented, including his own testimony, I find that he indeed *knew* that Univasc was made according to his claimed process.

On March 16, 2001, the same day Dr. Sherman filed the '173 Application, Dr. Sherman prepared a handwritten memorandum addressed to a Mr. Murthy, recording the results of stability tests comparing Apotex #1002[25] to Univasc. (*See* DTX-51). These tests showed that Univasc was significantly more stable than moexipril hydrochloride alone, as measured by the DKP[26] impurity content. (DTX-51; Trial Tr. Day 2 at 91:5-92:8, 95:6-10, 104:13-105:7 (Sherman)). In his own handwriting, Dr. Sherman commented, "Hence it appears that the moexipril hcl <u>itself</u> is much less stable than the magnesium salt." (DTX-51 (emphasis in original); Trial Tr. Day 2 at 92:2-8 (Sherman)).

In this memorandum, Apotex #1002 and Univasc are the only two substances identified. Since "Apotex #1002" was the "moexipril hcl <u>itself</u>," Univasc must have been the "moexipril salt" identified by Sherman. (DTX-51). This demonstrates that Dr. Sherman knew Univasc was moexipril magnesium on the date that he filed his patent application.

At trial, Dr. Sherman refuted this conclusion, arguing that he was not referring to Univasc as the magnesium salt.[27] However, I did not find this testimony to be credible.

On April 30, 2001, during the pendency of the '173 Application, two scientists at Apotex produced a detailed report entitled "Interim Report for Study of Moexipril Magnesium Salt" (the "2001 Study"). (DTX-94). The 2001 Study describes mass spectrometry ("MS") tests Apotex had conducted to determine whether moexipril magnesium was present in Univasc tablets. (DTX-94; Trial Tr. Day 2 at 102:24-104:12 (Sherman)). Based on the observations from the

---

[25] Apotex #1002 is moexipril hydrochloride plus several excipients, but without an alkaline stabilizer.

[26] "DKP" is short for diketopiperazine. When moexipril degrades, it degrades by an intramolecular cyclization reaction into diketopiperazine, a different compound.

[27] Conveniently, Dr. Sherman could easily remember that at the time of writing this, his mind was going back to his testing of quinapril, which he was able to make stable by converting it to the magnesium salt. He claims that his conclusions were based solely on his previous work with quinapril. (Trial Tr. Day 2 at 92:9 to 93:9 (Sherman)).

2001 Study, the researchers suggested (and, in my opinion, concluded) that the moexipril in Univasc is "mainly present in the form of magnesium complex" and that the moexipril in Univasc "could exist as moexipril magnesium complex." (DTX-94 at 2-3; Trial Tr. Day 2 at 104:13-22 (Sherman)).  Moexipril magnesium complex is the same compound that supposedly results from the process claimed in the '556 Patent.  (JTX-1, col. 6, ll. 24-31; Trial Tr. Day 2 76:7-77:4 (Sherman)).

The 2001 Study further states that "NMR studies of Moexipril raw material, prepared MO-Magnesium sample and brand product [i.e., Univasc] *will be conducted* for further confirmation" of the "extensive MO-Magnesium complex" detected.  (DTX-94 at 3) (emphasis added).  However, such NMR tests[28] apparently were not performed on Univasc until 2012, shortly before Apotex filed suit.  (Trial Tr. Day 2 at 81:21-83:23, 106:7-20 (Sherman)).[29]

The conclusion[30] of Apotex's 2001 Study – that moexipril is mainly present in Univasc as moexipril magnesium, (DTX-94 at 2-3) – directly refutes Dr. Sherman's repeated representations to the PTO that the moexipril hydrochloride in Univasc was *not* reacted but was merely combined with an alkaline magnesium compound.   (JTX-2 at AI-MOEX0000483, AI-MOEX0000511; Trial Tr. Day 2 at 145:1-146:16 (Sherman)).

Dr. Sherman claims that he does not remember this study being done, and that he does not recall having knowledge about it.  However, given Dr. Sherman's hands-on approach to his

---

[28] An "NMR test" is a nuclear magnetic resonance test.  This test is a form of spectroscopy, and according to Dr. Sherman, such a test performed on the Univasc tablet would help prove infringement.  (Trial Tr. Day 2 at 107:13-20 (Sherman)).

[29] Given the language of certainty in the 2001 Study regarding the intent to conduct the NMR studies, and a later e-mail chain between Dr. Sherman and Apotex employees, I have a "strong suspicion" that these tests were actually conducted long before 2012, as implied by UCB.  However, this is irrelevant to my factual or legal determinations.

[30] There was some argument at trial by Dr. Sherman that this asserted "conclusion" is a mere "suggestion" by Apotex's researchers.  However, based on the language in the 2001 Study, as well as the purpose of the study, I find that this "suggestion" is indeed a conclusion.

business, including litigation and formulation, as well as the fact that he was very much involved with Univasc stability testing, even doing tests himself and handwriting notes to his employees regarding Univasc's stability, I find that Dr. Sherman was aware of this 2001 Study, and certainly would have been told of the study's results.[31]  But despite the 2001 Study's findings, Dr. Sherman continued to represent to the PTO that Univasc was made by a prior art process in which there was no conversion to moexipril magnesium.  (JTX-2; Trial Tr. Day 2 at 143:25-144:10 (Sherman)).  Nor did Dr. Sherman disclose the results of the 2001 Study, or the results of any testing on Univasc, to the PTO at any time during the three subsequent years of prosecution of the '173 Application.

Further, Dr. Sherman testified that in January 2002 he was of the view that Univasc was probably not made according to the '450 Patent.  Dr. Sherman claims he believed at the time that if one followed the teachings of the '450 Patent, it would be impossible to have a product suitable for regulatory approval.  (Trial Tr. Day 2 at 110:25-111:14 (Sherman)).  Keeping in mind that the '556 Patent did not issue until July 2004, Dr. Sherman went at least over two years without disclosing to the PTO his belief that Univasc was not created in accordance with the teachings of the '450 Patent.

Based on these facts, I find that Dr. Sherman's arguments to the Examiner regarding the nature of Univasc were knowingly false.

        ii)     *The Second Moexipril Patent Application*

Additional evidence of Dr. Sherman's knowledge of the Univasc process is found in the disclosures of a second moexipril patent application filed by Dr. Sherman.

---

[31] This is especially true given the fact that the study confirmed his beliefs about the Univasc product.  Such confirmation is something that Dr. Sherman would have sought.

On February 1, 2002, Dr. Sherman filed a second patent application directed toward processes of stabilizing moexipril, and published a PCT patent application, WO 03/063867 (the "'867 PCT").[32] (DTX-84; Trial Tr. Day 2 at 112:11-25 (Sherman)).  Dr. Sherman prepared the specification of the '867 PCT application (DTX-84) himself and had it filed in the USPTO on February 1, 2002, less than one year after filing the '173 Application. (Trial Tr. Day 2 at 112:11-113:22 (Sherman)).

First mention of this second moexipril application was in a January 12, 2002, Apotex Project Initiation Form (DTX-85), wherein Dr. Sherman referred to the second patent application (in addition to the '173 Application) that was about to be filed, which Teva (another pharmaceutical company) would probably infringe.  (DTX-85; Trial Tr. Day 2 at 111:18 to112:16 (Sherman)).  Teva's process was not publicly disclosed at the time, yet Dr. Sherman was still able to make this assertion.

At trial, Dr. Sherman acknowledged that this second application (the '867 PCT) cites to the '949 Patent, (JTX-3), and that the '949 Patent discloses and claims moexipril. (Trial Tr. Day 2 at 113:17 to 114:15 (Sherman)).  The '867 PCT further discloses that the Examples of the '450 Patent disclose the use of gelatin as a binder.  (DTX-84 at 2; Trial Tr. Day 2 at 114:16-115:4 (Sherman)).  Dr. Sherman testified that when gelatin is used as a binder for a tablet, it is used in wet granulation. (Trial Tr. Day 2 at 115:2-24 (Sherman)).

The '867 PCT also discusses the Gu Article and its teaching that the stabilization of moexipril is accomplished only when the compositions are made by a wet granulation process. Sherman testified that he agreed with that statement and that the Gu Article teaches that a dry mix does not work in 2002.  (DTX-84 at 2-3; Trial Tr. Day 2 at 115:21-116:18 (Sherman)).

---

[32] The '867 PCT is an international patent application under the Patent Cooperation Treaty ("PCT").

The '867 PCT then discloses that quinapril is sold in the United States under the tradename "Accupril," and that the labeling indicates the formulation contains gelatin. (DTX-84 at 3; Trial Tr. Day 2 at 116:15-23 (Sherman)). The '867 PCT next discloses Univasc and states that its labeling indicates that it contains moexipril hydrochloride, magnesium oxide, lactose, gelatin, crospovidone, and magnesium stearate. (Trial Tr. Day 2 at 116:24 to 117:5 (Sherman)). The '867 PCT then concludes that the labeling of both products, Univasc and Accupril, "thus indicates that both products are made in accordance with the teaching[s]" of the '450 Patent and the Gu Article. (DTX-84 at 3; Trial Tr. Day 2 at 117:6-9 (Sherman)).

I previously found that Dr. Sherman had knowledge of the Univasc process as of the date he filed the '173 Application. However, given the disclosures in the '867 PCT, and noting that Dr. Sherman wrote this PCT application, I now make the additional finding that, by no later than February 1, 2002 (the filing date of the '867 PCT), Dr. Sherman knew Univasc to be made by a wet granulation process and that, therefore, some reaction and conversion was certain to take place during that process. Notwithstanding, Dr. Sherman continued to make his consistent – yet deceptive – representations regarding Univasc, the '450 Patent, and the Gu Article to the PTO in the '173 Application prosecution.

### iii)   The '560 PCT

The prior art WO 99/62560, entitled "Stabilization of Quinapril Using Magnesium Oxide" (the "'560 PCT"), was published on December 9, 1999.[33]

The abstract of the '560 PCT reads as follows:

> The present invention is directed to ACE inhibitor-containing compositions stabilized by the presence of magnesium oxide. Preferably, the ACE inhibitor, quinapril, is protected from certain forms of degradation when

---

[33] The '560 PCT's inventors are Harris and Hokanson, the same inventors listed on the '450 Patent. They were employees of Warner-Lambert at the time.

> prepared in a pharmaceutical composition consisting essentially of magnesium
> oxide as the stabilizing agent. The presence of magnesium oxide also lends itself
> to favorable processing conditions during the manufacture of ACE inhibitor-
> containing compositions, especially processing by wet granulation.

(JTX 10).[34] This PCT application is an improvement over the '450 Patent because it recognizes

magnesium oxide as a better stabilizing agent, as show in Example 5, than magnesium carbonate

as preferred in the '450 Patent. (Trial Tr. Day 1 at 209:22 to 210:3, 211:24 to 212:19 (Chyall);

JTX-10 at 17-18). Magnesium oxide is the same stabilizer used to make Univasc. (Trial Tr. Day

1 at 212:7-9 (Chyall); JTX-10 at 8, ll. 25-26). The '560 PCT describes advantages of the

claimed process over the prior art, including the '450 patent. (JTX-10 at 1-2; Trial Tr. Day 2 at

211:24-212:6 (Chyall)). Example 4 of the '560 PCT contains data demonstrating that

compositions that are wet granulated using magnesium oxide (Example 1) are stable. (JTX-10 at

16; Trial Tr. Day 1 at 214:13-18 (Chyall)).

The '560 PCT also provides details of prior art wet granulation methods of making ACE

inhibitors that are not disclosed in the '450 Patent. (Trial Tr. Day 1 at 210:8-13 (Chyall); JTX-

10 at 2-3).[35] Specifically, the '560 PCT (1) describes the steps of wet granulation, including

"form[ing] a moist mass," (JTX-10 at 14, line 6); (2) discloses specific amounts of time for

mixing and drying (JTX-10 at 17-18); and (3) offers an example using granulation times of 4.5 to

5 minutes when using magnesium oxide as a stabilizer, (JTX-10 at 17, ll. 12-14). (Trial Tr. Day

1 at 214:19 to 215:12 (Chyall)).

The '560 PCT discloses that the wet granulations were done using a gelatin solution.

(Trial Tr. Day 1 at 213:18 to 214:6; JTX-10 at 5, 10, 15-17). It also indicates that in prior art wet

---

[34] While quinapril is named as the ACE inhibitor in this application, the '560 PCT expressly
incorporates by reference the list of compounds in the '949 Patent, which, as noted above,
includes moexipril.
[35] Dr. Chyall testified that the '560 PCT goes into the "nitty-gritty" of how wet granulations were
conducted for some of the ACE inhibitors.

granulation processes for ACE inhibitor drugs such as quinapril, at least 23 to 29% solvent was removed on drying, and thus the wet mass contained 23 to 29% water. (JTX-10 at 3; Trial Tr. Day 2 at 32:5-34:15 (Chyall)). The amount of water in the wet mass after wet granulation in the '560 PCT is equivalent to the 20% water for wet granulation used in the '556 Patent. This teaches that adding a relatively large amount of water to wet granulation would allow for a much more stable product.

The granulation times of 37 minutes disclosed in the '560 PCT and the hold times of 30 minutes (after an unspecified granulation time) disclosed in Examples 2-4 of the '556 Patent are similar. (Trial Tr. Day 1 at 216:11-25 (Chyall)).

The '560 PCT demonstrates the many variables involved in using wet granulation to prepare a stable ACE inhibitor tablet, and that these variables affect the amount of solvent and time necessary to complete the process. This lends itself to the conclusion that a person of ordinary skill in the art would not know in advance how to set up conditions to achieve greater than 80% conversion, or less than 80% conversion if one wanted to work outside the claims of the '556 Patent. (Trial Tr. Day 1 at 217:1-22 (Chyall)).

Moreover, the four basic steps of wet granulation are disclosed in the '560 PCT. They are the same steps claimed in Claim 8 of the '556 Patent. (JTX-1 col. 7, ll. 4-12; JTX-10 at 14; Trial Tr. Day 1 at 217:23-218:6 (Chyall)). Given such, Dr. Chyall testified that the '556 Patent's Claims are therefore not patentable over the '560 PCT publication. Dr. Chyall also testified that the '560 PCT is "not at all" cumulative of the '450 Patent's disclosure. (Trial Tr. Day 1 at 218:7-13 (Chyall)). Further, given that the '560 PCT taught the use of large amounts of water in wet granulation to improve stability, one could easily apply this teaching to the '450 Patent's examples and arrive at exactly what Dr. Sherman is claiming.

Dr. Sherman never provided the '560 PCT to the PTO as part of the '173 Application.

> (1)   Dr. Sherman's Knowledge of the '560 PCT

United States Patent Application No.10/060,191 (the "'191 Application") is the United States counterpart of the '867 PCT. (DTX-534). The '191 Application's claims were directed to stable saccharide-free tablets containing quinapril or moexipril, an alkaline stabilizer, and an excipient that stabilizes against hydrolysis. (DTX-534). To prosecute this application, Dr. Sherman hired the Nixon & Vanderhyde firm, not Hughes's firm. (Trial Tr. Day 2 at 128:2-4 (Sherman)).

The purported invention of the '191 Application encompassed having an excess of alkaline magnesium compound in the final composition to stabilize moexipril, even when the moexipril had been converted to moexipril magnesium. (DTX-534; Trial Tr. Day 2 at 121:8-18 (Sherman)). The similarities between the '191 and '173 Applications are readily apparent.

In the sole office action in the '191 Application, dated August 26, 2003, the claims were rejected as anticipated under 35 U.S.C. § 102(b) by the '560 PCT and also as obvious in view of the combination of the '560 PCT and the Gu Article. (Trial Tr. Day 2 at 127:8 to 129:12 (Sherman)). The PTO Examiner stated that:

> As discussed above, [the '560 PCT] disclose[s] a tablet formulation comprising quinapril, alkaline compounds, and excipients. The formulation however discloses the hydrochloride salt of quinapril. However a product of the process described in [the '560 PCT] is the magnesium salt of quinapril. The [salt] is produced from a reaction of the hydrochloride salt and the alkaline base.

(DTX-534 at Office Action, page 3) (emphasis added).

Given that the Examiner cited the '560 PCT as the basis for the rejection, Dr. Sherman certainly would have known about the '560 PCT during prosecution of the '556 Patent and, given his experience, he would have understood its relevance and materiality. Nevertheless, he

never disclosed it to the PTO Examiner working on the '173 Application, nor was it considered by the PTO Examiner during the '173 Application prosecution.

Immediately after receiving a notice of allowance in the '173 Application, Dr. Sherman abandoned the '191 Application. (DTX-534; JTX-2; Trial Tr. Day 2 at 130:4-24 (Sherman)).

**D.   Dr. Sherman's Intent**

As delineated below, the evidence demonstrates that Dr. Sherman engaged in a pattern of deceptive practices with the purpose of misleading the PTO into allowing the '556 Patent.

   1)   *Past Tense in the Examples*

As noted above, Dr. Sherman repeatedly used the past tense in describing Examples 1 through 4, even though he had never performed the experiments described in the Examples. (Trial Tr. Day 1 at 200:19 to 201:17 (Chyall); Trial Tr. Day 2 at 77:11-20 (Sherman)).  As explained by Dr. Chyall, a person of ordinary skill in the art reading the Examples of the '556 Patent would have believed the experiments were actually conducted. (Trial Tr. Day 1 at 200:22 to 201:11 Chyall)).  In addition to describing the steps of the experiments entirely in the past tense, he also reported specific results of the experiments, even out to the hundredths-of-a-gram. (JTX-1, cols. 5-6).

At trial, Dr. Sherman admitted that he had not performed the experiments described in Examples 1 through 4, but that he "really did them in [his] mind and on paper" based on his previous work with quinapril. (Trial Tr. Day 2 at 77:11-20 (Sherman)).  Sherman also testified that he is not a lawyer, and that he was told that paper or "prophetic" examples are acceptable. (Trial Tr. Day 2 at 73:16-24, 79:14-80:2 (Sherman)).  But the language used by Dr. Sherman in

his Examples disallows a description of "prophetic" as the word is commonly understood.  *See* RANDOM HOUSE DICTIONARY 1550 (2d ed. 1983) (defining "prophetic" as "predictive").[36]

> 2)      *Mischaracterization of the '450 Patent and the Gu Article*

In the '173 Application and throughout prosecution of the '556 Patent, Dr. Sherman repeatedly mischaracterized the contents of the prior art Gu Article and the '450 Patent.

In the '556 Patent, Dr. Sherman stated that "Gu, et al teaches that only a portion (if any) of the drug, and only that portion at the outer surface of the granules, may be converted to the alkaline salt, and that the stable product thus results entirely or primarily not from conversion to alkaline salts, but from stabilization of the moexipril hydrochloride by the presence of the alkaline stabilizing compound in the final product." (JTX-1 at col. 2, ll. 5-11).  Contrary to this assertion, Gu offered two hypotheses for the stabilization results he achieved:  (1) neutralization of the acidic drug by the basic excipients at the outer surface of the granulated material (i.e., conversion to the free form of moexipril); and (2) "that a portion of the moexipril hydrochloride was converted to the cation salt by wet granulation."  (Trial Tr. Day 1 at 191:11 to 193:10 (Chyall)).  This second conversion is not limited to the "outer surface of the granules," as Dr. Sherman represented.  Nor does Gu suggest that no reaction had occurred, which is contrary to Dr. Sherman's statement, "if any".  (Trial Tr. Day 1 at 197:13 to 198:11 (Chyall)).

Also, Dr. Chyall testified that he disagreed with the description of the Gu Article at column 2 of the '556 Patent to the extent that it states that Gu teaches the stabilization of moexipril is due to the presence of the basic material and not the result of a neutralization reaction and that the neutralization is limited to the outer surface of the granules. (Trial Tr. Day 1 at 195:25 to 197:9 (Chyall)).  As explained by Dr. Chyall, "[t]he stabilization can't be due to the

---

[36] I note that Dr. Sherman is a native English speaker.

mere presence of the material because when you mix these powders in dry granulations, they don't work." (*Id.*).

Additionally, during prosecution, Dr. Sherman represented that Gu "postulates that a minor insignificant portion may react but the stabilization is a result of the combination of the moexipril hydrochloride with the alkaline stabilizer as evidenced by the Product Monograph previously provided.  No other conclusion can be reached."  (JTX-2 at AI-MOEX0000484) (emphasis added).  However, Gu says nothing at all about the amount of reaction and conversion taking place in his experiments, and Gu does not state or suggest that the stabilization is the result of combining, rather than reacting, the ingredients.  Nor does Gu use the words "minor insignificant" with respect to a reaction.  (JTX-2F; Trial Tr. Day 1 at 197:19-198:11 (Chyall)). Moreover, Gu specifically found that combining the ingredients in a dry mix did not result in a stable composition.  (JTX-2F at 383; Trial Tr. Day 1 at 196:14-17 (Chyall)).  This contradicts the representations made to the PTO.

The Gu Article was also mischaracterized in the Lipp Declaration.[37]  Paragraph 21 of the Lipp Declaration states that Gu does not teach significant conversion of moexipril hydrochloride into a cation salt formation such as moexipril sodium.  (JTX-2 at AI-MOEX0000536; Trial Tr. Day 1 at 198:18-199:20 (Chyall)).  This again mischaracterizes Gu because, as Dr. Chyall testified, Gu teaches that a reaction does occur and it may indeed be responsible for achieving stability.  (Trial Tr. Day 1 at 199:4-6 (Chyall)).

The Lipp Declaration also states that Gu teaches that the increased stability is due to an increase in the "microenvironmental pH on the outer surface of the granules."  (JTX-2 at AI-MOEX0000536; Trial Tr. Day 1 at 199:7-12 (Chyall)).  There is no discussion or disclosure in

---

[37] Dr. Lipp was hired by Hughes to submit an expert opinion only after Dr. Sherman directed Hughes to submit affidavit evidence in response to the PTO Examiner's Final Rejection.

Gu of an increase in the "microenvironmental pH," and Gu clearly connects the resulting stability to a chemical reaction. (DTX-2F; Trial Tr. Day 1 at 198:18 to 199:20 (Chyall)).

Importantly, the PTO Examiner's notice of allowance repeats verbatim the arguments Dr. Sherman made about the prior art in favor of patentability—i.e., repeated misrepresentations that Univasc is an example of a product made by a prior art process wherein the ingredients were "combined but unreacted." (JTX-2 at AI-MOEX0000656; Trial Tr. Day 2 at 42:1-18, 43:18-44:1 (Chyall)).

      3)    *"Unreacted but Combined"*

At trial, Dr. Sherman testified that he did not think his statements to the PTO about Univasc being "unreacted but combined" were false. According to Dr. Sherman, he was merely explaining what the prior art taught about Univasc, not commenting about Univasc itself. (Trial Tr. Day 2 at 141:20 to 143:24 (Sherman)). But Dr. Sherman did not tell the PTO that, in fact, he believed that Univasc contained moexipril magnesium, claiming he did not believe such information was relevant. (Trial Tr. Day 2 at 143:25 to 144:10 (Sherman)).

Dr. Sherman admitted that, at the time the "unreacted but combined" statement was made to the PTO, he had information that the statement was not true, and that he had a "strong suspicion" or "belief" that, in fact, UCB was following the process that he was attempting to patent.[38] According to Dr. Sherman, that information was not relevant because, in his view, his statements about Univasc accurately characterized what the prior art and publicly available information taught about Univasc. (Trial Tr. Day 2 at 145:13-146:3 (Sherman)).

Dr. Sherman acknowledges that UCB invented the process first, but asserts that he has prior rights because UCB kept its process secret. He claims "[t]hey told the world information

---

[38] As noted above, I find that his state of mind amounted to knowledge.

that led away from what I had discovered and patented." (Trial Tr. Day 2 at 146:25-147:12 (Sherman)). But in reality, he knew exactly what was going on.

    4)    *The Lipp Declaration*

Dr. Lipp, who had worked as an expert witness on approximately 10 other matters for Apotex by the time of this request, submitted a declaration to the PTO, under oath, in which he essentially repeated Dr. Sherman's arguments. (JTX-2K). In the declaration, dated February 2004, Dr. Lipp described Univasc as a "particularly relevant" example of a product made by the prior art processes over which Sherman's invention was patentable. (JTX-2K at AI-MOEX0000545). However, in his deposition testimony, Dr. Lipp conveniently could not recall why he characterized Univasc as "particularly relevant."

Dr. Lipp was paid for his work in preparing his sworn declaration to the PTO. (Trial Tr. Day 3 at 5:9 (Lipp Dep. at 29:12-15, 29:21-30:4)). Neither Dr. Lipp nor Dr. Sherman disclosed to the PTO that Lipp was a paid consultant or that he had previously worked for Apotex on many other matters. (JTX-2K). While this alone is not dispositive on the issue of Dr. Sherman's intent, it supplements my findings and exemplifies the lack of candor and completeness in Dr. Sherman's interactions with the PTO.

    5)    *Dr. Sherman's Selective Memory*

At trial, Dr. Sherman's poor memory seemed to be at issue throughout his testimony. Numerous times he claimed inability to recall crucial information about what he knew during and about the prosecution of the '556 Patent. For ease of reference, here is a sampling of Dr. Sherman's memory lapses at trial:

- What he knew about Univasc based on the stability and MS tests in the 2001 Study, (DTX-94; Trial Tr. Day 2 at 104:2-12, 104:23 to 105:7 (Sherman));

- Whether he ordered someone to do the NMR tests described in the 2001 Study report, whether the tests were done, and why, (Trial Tr. Day 2 at 106:10 to 107:12 (Sherman));

- The basis for his own statement in the '867 PCT that the Examples in the '450 Patent used gelatin as a binder, (Trial Tr. Day 2 at 114:16 to 115:17 (Sherman));

- Whether he knew about the '560 PCT publication during the prosecution of the '556 Patent, (Trial Tr. Day 2 at 130:4-24 (Sherman));

- Whether he was prosecuting a moexipril patent application, the '867 PCT, in Europe during the '556 Patent prosecution (Trial Tr. Day 2 at 132:6-14 (Sherman));

- Whether a Schwarz Pharma German Patent Application, which discloses a process for wet granulating moexipril hydrochloride with an alkaline magnesium compound, was cited by the European Patent Office in Dr. Sherman's European application, (Trial Tr. Day 2 at 132:15 to 133:22 (Sherman));

- Whether he instructed Hughes to hire Dr. Lipp to submit a declaration to the PTO in support of the '173 Application, and, if so, whether he instructed Hughes as to what he might have thought or told Hughes at the time, (Trial Tr. Day 2 at 156:3-17, 157:19 to 158:13 (Sherman)); and

- Even when presented with a letter from Hughes to him about the prosecution, whether he kept track of the prosecution of the '556 Patent, whether he reviewed office actions, and whether he participated in formulating office responses, (Trial Tr. Day 2 at 156:22 to 157:18 (Sherman)).[39]

Further, there were numerous instances during trial when Dr. Sherman gave contradictory testimony. For example, Dr. Sherman testified that he could not conclude that Univasc tablets were made by wet granulation based solely on the publicly disclosed ingredients, but testified that he was able to conclude that Merck's enalapril tablets were made by wet granulation by

---

[39] This list is by no means exhaustive, and there were various other examples of Dr. Sherman's memory lapses that did not relate to the prosecution. For instance, Dr. Sherman claimed a lapse of memory with regard to tests done in 2005 and 2006 confirming the results of the 2001 Study. (*See, e.g.*, Trial Tr. Day 2 at 138:15 to 139:2 (Sherman)) ("Q: Do you remember the test? . . . A: I see in front of me that a test was done. I accept that this was a result of a test. That was done at the time you tell me was done. I accept that because it is in front of me. . . . And I do know that some tests were done and this appears to be one of them. That's the best answer I can give you.").

inspecting the tablets and from knowledge of its ingredients. (Trial Tr. Day 2 at 100:2-6 (Sherman)).

But, rather conveniently, Dr. Sherman was able to remember things in meticulous detail when helpful to his case. (*See, e.g.*, Trial Tr. Day 2 at 74:17 to 76:2 (Sherman)) (recalling his exact thought process regarding his earlier quinapril patent application).

I did not find Dr. Sherman to be a credible witness, particularly with respect to his knowledge about Univasc at the time of his patent application and during its prosecution.

## II.   ANALYSIS

### A.   Inequitable Conduct

UCB asks the Court to find the '556 Patent unenforceable for inequitable conduct during patent prosecution. Inequitable conduct is an equitable defense to patent infringement that, if proved, would bar enforcement of the '556 Patent. *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1285 (Fed. Cir. 2011). This Court's authority to render the '556 Patent unenforceable for inequitable conduct is founded in the equitable principle that "he who comes into equity must come with clean hands." *Dayco Prods., Inc. v. Total Containment, Inc.*, 329 F.3d 1358, 1364 n.3 (Fed. Cir. 2003) (quoting *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945)).

Recently, the Federal Circuit in *Therasense* heightened the standard for proving inequitable conduct based on misrepresentations or omissions to the PTO. To prevail on the defense of inequitable conduct, the accused infringer must prove by clear and convincing evidence that the applicant misrepresented or omitted material information with the specific intent to deceive the Patent Office. *Id.* at 1290.[40]   Intent and materiality are separate

---

[40] "This requirement of knowledge and deliberate action has origins in the trio of Supreme Court

requirements that must each be satisfied. *Id.*[41]  "[T]o meet the clear and convincing evidence standard, the specific intent to deceive must be 'the single most reasonable inference able to be drawn from the evidence.'" *Id.* (quoting *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1366 (Fed. Cir. 2008)).  Thus, "when there are multiple reasonable inferences that may be drawn, intent to deceive cannot be found." *Id.* at 1290-91.  Additionally, a finding that the misrepresentation or omission amounts to gross negligence or negligence under the "should have known" standard does not satisfy this intent requirement. *Id.* at 1290.

The *Therasense* court also heightened the separate materiality requirement by requiring "but-for materiality," meaning that the PTO would not have allowed a claim had it been aware of the undisclosed information. *Id.* at 1291; *Aventis Pharma S.A. v. Hospira, Inc.*, 675 F.3d 1324, 1334 (Fed. Cir. 2012) (affirming inequitable conduct based on withheld prior art references that were but-for material to patentability).  "In making this patentability determination, the court should apply the preponderance of the evidence standard and give claims their broadest reasonable construction." *Therasense*, 649 F.3d at 1291-92; *accord Aventis Pharma S.A.*, 675 F.3d at 1334.

However, notwithstanding the but-for materiality required to satisfy the materiality prong of inequitable conduct, the *Therasense* court recognized the flexibility of its new approach to capture extraordinary circumstances – namely, in "cases of affirmative egregious misconduct."

---

cases that set in motion the development of the inequitable conduct doctrine.  In each of those cases, the patentee acted knowingly and deliberately with the purpose of defrauding the PTO and the courts." *Id.* (citing *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806 (1945); *Hazel-Atlas Glass Co. v. Hartford–Empire Co.*, 322 U.S. 238 (1944); *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240 (1933)).  These cases all dealt with the doctrine of "unclean hands."

[41] The *Therasense* court put an end to the "sliding scale" approach to inequitable conduct "where a weak showing of intent may be found sufficient based on a strong showing of materiality, and vice versa." *Id.*

*Therasense*, 649 F.3d at 1292-93. "When the patentee has engaged in affirmative acts of egregious misconduct, such as the filing of an unmistakably false affidavit, the misconduct is material." *Id.* at 1292.[42]  But the *Therasense* court did not limit such egregious acts of misconduct to the filing of false affidavits; it was careful to point out that this exception is sufficiently flexible to capture extraordinary circumstances, while being sensitive to varied facts and equitable considerations. *Id.* at 1293.

    1)    *Intent to Deceive*

In applying the *Therasense* standard, I find that the single most reasonable inference to be drawn from the circumstantial evidence, Dr. Sherman's overall pattern of misconduct, and his poor credibility at trial is that Dr. Sherman had the intent to deceive the PTO in order to obtain the '556 Patent.

Dr. Sherman did not invent any new process.  What he did was take the publicly available information for Univasc, combine this information with the teachings of the '450 Patent, secretly conduct his own testing on the Univasc product, and then purposefully mislead the Examiner into believing that his process was not taught by the prior art.[43]  Dr. Sherman was an experienced formulator and litigator, and he knew how to manipulate formulations and the subsequent examination process.  In fact, at the time he filed his application, he was being accused of doing *the exact same thing* in the *Merck* Litigation.   The district judge in that case acknowledged that Dr. Sherman simply figured out the accused process and "added water to the mix" in arriving at his claimed invention.  Even Dr. Cima agreed that you would presumably get what is claimed in the '556 Patent by adding more water to the prior art processes.

---

[42] "In other words, a false affidavit or declaration is per se material." *Outside the Box Innovations, LLC v. Travel Caddy, Inc.*, 695 F.3d 1285, 1294 (Fed. Cir. 2012).
[43] In reality, his "invention" consisted of adding more water to the mix described in the prior art.

Given his experience with the PTO, Dr. Sherman knew that patent applicants "have a duty to prosecute patent applications in the Patent Office with candor, good faith, and honesty." *See Symantec Corp. v. Computer Assocs. Int'l, Inc.*, 522 F.3d 1279, 1296 (Fed. Cir. 2006) (quotation omitted).  Notwithstanding, from as early as Day 1, Dr. Sherman violated this duty. Dr. Sherman knew that his "invention" was the same process used to make Univasc, but continuously argued otherwise.  This knowledge was documented in a handwritten memorandum to his employees, indicating that Univasc was moexipril magnesium.  Dr. Sherman nevertheless repeatedly told the Examiner that Univasc tablets were moexipril hydrochloride tablets, despite knowing that Univasc was moexipril magnesium.

And even when faced with the results from tests that he likely ordered, which concluded that Univasc contains the same compound (moexipril magnesium) as that which results from the claimed process, Dr. Sherman continued his representations to the Examiner that the moexipril hydrochloride in Univasc was *not reacted* but was merely *combined* with an alkaline magnesium compound.  Given Dr. Sherman's experience with the PTO, and in light of the *Merck* Litigation, Dr. Sherman would most certainly have understood that his representations about Univasc were material, and that the PTO Examiner would not have allowed the claims had she known the results of the 2001 Study.

He violated his duty of candor by drafting the Examples as if they had actually been conducted.  This demonstrates his intent to deceive the PTO, as the Examples are written in the past tense and provide very specific results.  He did not disclose that he never actually conducted these tests, nor that the specific results were falsified.  In effect, Dr. Sherman deceived the PTO into thinking that he had achieved conversion of greater than 80% of moexipril hydrochloride to moexipril magnesium – the basis for allowance – when in fact he had done no work whatsoever

on moexipril prior to drafting the '173 Application.  Nor had he conducted any testing for stability or a conversion greater than the 80% threshold, a limitation that was critical to the Examiner's decision to grant the patent.

Dr. Sherman also exceeded the bounds of acceptable argument by misrepresenting the contents of the prior art Gu reference during prosecution of the '556 Patent.  Dr. Sherman consistently represented that Gu teaches that "only a portion (if any)" of the drug is converted to moexipril magnesium, despite the fact that Gu does not state or suggest that none of the drug is converted.  Dr. Sherman also represented that Gu teaches that only a "minor insignificant portion" may react, but, again, that phrase is not found in Gu.[44]  Moreover, Dr. Sherman misrepresented Gu as teaching stability due to the presence of the alkaline compound in the final product, as opposed to reaction and conversion to the cation salt.  He also omitted that Gu specifically found that merely combining the ingredients in a dry mix did *not* result in a stable composition.  In fact, a person of skill in the art would understand from Gu that wet granulation is important for making stable formulations of moexipril, and would understand from Gu that stabilization was the result of chemical reactions to convert moexipril hydrochloride to either the neutral species or the cation salt, or some combination thereof.

The sworn Lipp Declaration that Dr. Sherman commissioned and submitted during the prosecution also mischaracterizes the Gu Article and Univasc.  Given the striking similarities between the Lipp declaration and Dr. Sherman's previous arguments, I conclude that Dr. Lipp was only hired to add legitimacy to Dr. Sherman's misrepresentations.

In addition, Dr. Sherman failed to disclose Dr. Lipp's significant financial relationship with Apotex.  Nondisclosure of Dr. Lipp's financial interest created the presumption that Dr.

---

[44] As discussed above, Gu does not disclose or suggest what portion of the moexipril compound had reacted.

Lipp was a disinterested and an independent expert.  The disclosure duties of declarants who submit declarations to the PTO in support of patentability are material because the PTO has no means of questioning the experts who provide the opinions in support of patentability.  By reference to Federal Rule of Civil Procedure 26(a)(2)(B)(vi), when an expert in a civil case does not include a statement as to compensation in his expert report, it creates the presumption that the expert is not receiving compensation in connection with his opinion.  The same is true, and possibly even to a greater extent, in proceedings before the PTO, since the PTO has no ability to examine the expert.

Dr. Sherman failed to inform Dr. Lipp of the true facts about Univasc, and shielded Dr. Lipp from the truth.  Dr. Sherman's deliberateness is shown by Dr. Lipp's testimony that he was specifically asked to limit his discussions to *only* the documents provided by Apotex.[45]  Had Dr. Sherman discussed with Dr. Lipp the 2001 Study and his own testing, or even his true beliefs about the relevant products, Dr. Lipp in all likelihood would arrive at different conclusions.  Dr. Sherman's submission of the Lipp Declaration, which misrepresented Univasc, the teachings of the Gu reference, and the teachings of the '450 Patent, and failed to disclose that Dr. Lipp was a paid consultant to Apotex, is further evidence that Dr. Sherman had the specific intent to deceive the PTO.

I also find that withholding the '560 PCT prior art from the Examiner demonstrates Dr. Sherman's intent to deceive.  He had to have known about this reference, as it was cited as prior art in his second patent application directed at stabilizing moexipril.  Not only was the '560 PCT cited by Dr. Sherman in his second application, but also it was the basis for the Examiner's

---

[45] Dr. Lipp was unaware of the data Dr. Sherman and Apotex possessed about Univasc, and testified that he was told to limit his discussions to *only* documents provided by Apotex.  He was not provided with the testing of the Univasc product.

rejection. Given Dr. Sherman's involvement in his applications, he must have known of the '560 PCT, especially since it was the basis of a PTO rejection on a moexipril stabilizer, a project in which Dr. Sherman was personally invested. Also, given his experience in formulation, he had to have known that the '560 PCT was not only relevant, but material to the '556 Patent application.

Finally, I consider Dr. Sherman's demeanor and evasive testimony at trial instructive of his intent to deceive the PTO. As set forth above, I did not find him to be credible, and I disbelieve his testimony that he was acting in good faith.

In sum, I find by clear and convincing evidence that Dr. Sherman had the intent to deceive the PTO. This finding is the single most reasonable inference to be drawn from the evidence of his overall pattern of conduct during prosecution of the '556 Patent, including, but certainly not limited to, misrepresenting the prior art Univasc product, withholding the prior art '560 PCT application, misrepresenting the teachings of the '450 Patent, misrepresenting the teachings of the Gu reference, withholding the 2001 Study, drafting Examples in the past tense when they were never executed, and submitting an incomplete and misleading affidavit from an expert who was shielded from the true facts. The conduct evidenced in the Merck Litigation further supports my finding with respect to motive, scheme, and intent to deceive. *See* FED. R. EVID. 404(b)(2) ("[E]vidence [of other wrongs or acts] may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.").

2)   *Materiality*

During prosecution of the '556 Patent, in response to three separate rejections, Dr. Sherman repeatedly identified Univasc to the PTO as an example of a product made by the prior

art '450 Patent's process, as "unreacted but combined," all the while believing that the moexipril in Univasc had indeed converted by chemical reaction to moexipril magnesium, and that such reaction was the source of the stability.  That belief was supported by Dr. Sherman's personal testing of Univasc on the day he filed the '173 Application, and confirmed by Apotex's testing in 2001 that concluded Univasc contained "mainly" moexipril magnesium as the result of a reaction, and that the moexipril and magnesium in Univasc were not merely combined or contacted.  Dr. Sherman persisted in advancing this argument even though he believed it to be false and possessed evidence to the contrary.  Dr. Sherman did not disclose the results of the 2001 Study, or the results of any testing on Univasc, to the PTO at any time during the three years of prosecution of the '556 Patent application.

With regard to the materiality prong of the *Therasense* test, I find that UCB has met its burden of proving by a preponderance of the evidence that the Examiner would not have allowed the '556 Patent had it known of the 2001 Study withheld by Dr. Sherman, and Dr. Sherman's knowledge that the Univasc product contained moexipril magnesium.   Thus, the misrepresentations regarding Univasc to the PTO during prosecution were material to the PTO's issuance of the '556 Patent.  In relenting and allowing the claims, the Examiner adopted Dr. Sherman's repeated arguments verbatim.

I also find that Dr. Sherman withheld the '560 PCT, and that the '560 PCT was material to the patentability of the '556 Patent.  As discussed above, the '560 PCT discloses methods of stabilizing ACE inhibitors, including moexipril, using alkaline magnesium compounds, particularly magnesium oxide, and wet granulation, and provides stability data.  The '560 PCT was not cumulative of the '450 Patent because it included the granulation times and amounts of water used in prior art wet granulations of ACE inhibitors, such as quinapril, and alkaline

magnesium stabilizers. The '560 PCT application also discloses the prior art use of magnesium carbonate, gelatin, granulation times of between 15 and 37 minutes, and at least 23 to 29% water (by weight) as a solvent—information not disclosed in the '450 Patent or any other prior art reference.

Not only do I find that Dr. Sherman was aware of the '560 PCT during prosecution of the '556 Patent, but also that he was aware of its materiality to the patentability of the '556 Patent. Dr. Sherman knew that his other moexipril application, the '191 Application, was rejected as anticipated by the '560 PCT and obvious in view of the '560 PCT and the Gu Article. Also, Dr. Sherman selected a different law firm to prosecute the '191 Application from the law firm prosecuting the '556 Patent. This implies that Dr. Sherman knew of the materiality of the '560 PCT, and hired a different firm in a possible attempt to shield the attorney prosecuting the '556 Patent (Hughes) from information disclosed and arguments made in the prosecution of the '191 Application.

Dr. Sherman's falsification of the Examples in the '556 Patent also adds to my materiality determination.   In and of itself, this misrepresentation may not necessarily be material.  However, added to the other misrepresentations or omissions, such would be part of the Examiner's rejection had the Examiner known the truth that the results were fabricated. The Examples are additional evidence of a willful disregard of the duty of candor.

As with the Examples, I find that the truth surrounding the Lipp Declaration, added to the other misrepresentations or omissions, would have resulted in the Examiner rejecting the '173 Application.  The Application had been rejected several times for the same reasons, but it was not until the incomplete Lipp Declaration was added to the rejection response (per Dr. Sherman's order) that the Examiner finally issued the '556 Patent.

Charlie Munger, Vice Chairman of Berkshire Hathaway, often says that many problems are best solved when they are addressed backwards.[46]  In measuring the "but for" test, it is useful to consider the effect that *truthful* statements would have had upon the PTO Examiner.  Here, if Dr. Sherman had told the Examiner that Apotex had tested Univasc, which turns out to be mostly moexipril magnesium, and it is not just combined, but reacts as disclosed in Gu, and, by the way, we never did any of the tests set forth in our Examples, is there any doubt that the '173 Application would have been rejected?  I find by a preponderance of the evidence that but for the false statements and omissions to the PTO Examiner, the '556 Patent would not have issued.

The '556 Patent is unenforceable due to inequitable conduct because Dr. Sherman withheld material information from and made material misrepresentations to the PTO with the specific intent to deceive, as evidenced by his entire pattern of conduct during the prosecution of the '556 Patent and my finding of Dr. Sherman's poor credibility.

3)    *Affirmative Egregious Misconduct*

Notwithstanding my finding of materiality, however, I find that this case is one of those exceptional cases where, as discussed above, a finding of materiality is not necessary.  Specifically, I find that Dr. Sherman engaged in affirmative and egregious misconduct throughout the '556 Patent prosecution.

Here, the direct and circumstantial evidence strongly supports that Dr. Sherman intended to deceive the PTO.  Despite having test results that contradicted his statements, Dr. Sherman made affirmative misrepresentations to the PTO with respect to the nature of the prior art and the Univasc tablet that had been sold in the United States for years before Dr. Sherman's purportedly

---

[46] Munger's inspiration for this approach was the German mathematician Carl Jacobi.  One of Jacobi's favorite maxims was *"invert, always invert."*  This expressed Jacobi's belief that the solutions to many hard problems could be deciphered by expressing them in inverse form.

invented his process.  In fact, as Apotex's own expert testified, Dr. Sherman's process merely requires the addition of more water to the '450 Patent's process.  But Dr. Sherman declined to share this information with the Examiner.

Nor did Dr. Sherman disclose that he had filed a second patent application regarding the stability of moexipril.  He also kept from the PTO the '560 PCT, which was cited in the second moexipril application and was the basis for the Examiner's rejection of the second application. Nevertheless, Dr. Sherman's statements were never withdrawn, corrected, or called to the attention of the PTO Examiners before the '556 Patent issued.  When the '556 Patent issued, Dr. Sherman immediately withdrew his second moexipril application.

Moreover, Dr. Sherman instructed Mr. Hughes to submit an expert declaration in support of his representations to the PTO.  Mr. Hughes hired Dr. Lipp, who had been an expert for Apotex in at least ten prior occasions.  Dr. Lipp's declaration mimics the previous statements submitted to the PTO, but fails to disclose his association with Apotex.  Further, Dr. Lipp testified that he was specifically asked to restrict his declaration to the material Apotex provided to him.  This material did not include any of their internal testing results, or the '560 PCT that was cited by Dr. Sherman as prior art in a different moexipril patent application.  Purposefully shielding an expert from relevant (and important) information is wrongful conduct, and challenges the integrity of the patent process.

Finally, the misconduct in this case extended beyond misrepresentations to the patent Examiner and constitutes an abuse of the patent system itself.  The practice of targeting a competitor's existing and widely available product and seeking to obtain a patent for the purpose of suing that competitor through a pattern of lies and deception should not be rewarded.  The '556 Patent should not be enforced.

B.     **Judicial Estoppel**

Judicial estoppel is an "equitable doctrine invoked at a court's discretion," and is designed to "protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *Burnes v. Pemco Aeroplex, Inc.*, 291 F.3d 1282, 1285 (11th Cir. 2002) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749-50 (2001)) (internal quotation marks omitted).[47]  In the Eleventh Circuit, courts generally consider two factors in the application of judicial estoppel.  "First, it must be shown that the allegedly inconsistent positions were made under oath in a prior proceeding. Second, such inconsistencies must be shown to have been calculated to make a mockery of the judicial system." *Id.* (quoting *Salomon Smith Barney, Inc. v. Harvey, M.D.*, 260 F.3d 1302, 1308 (11th Cir. 2001)).[48]  As noted by the Eleventh Circuit, these factors "are not inflexible or exhaustive; rather, courts must always give due consideration to all of the circumstances of a particular case when considering the applicability of this doctrine." *Id.* at 1286.

The Eleventh Circuit applies judicial estoppel in cases involving "intentional contradictions, not simple error or inadvertence." *Robinson v. Tyson Foods, Inc.*, 595 F.3d 1269, 1275 (11th Cir. 2010) (quotations omitted).  The intent required to invoke judicial estoppel may be inferred from the record.  *Id.*  Further, courts in this Circuit have applied the doctrine when the party made the prior inconsistent statements in an administrative forum, including in patent proceedings, provided that the statements were made under oath. *See, e.g.*, *Solomon Techs., Inc. v. Toyota Motor Corp.*, No. 8:05-cv-1702-T-MAP, 2010 WL 715243, at *3 (M.D. Fla. Jan. 26,

---

[47] The application of judicial estoppel rests on regional circuit law.  *Source Search Techs., LLC v. Lending Tree, LLC*, 588 F.3d 1063, 1071 (Fed. Cir. 2009) (citing *Wang Labs., Inc. v. Applied Computer Scis., Inc.*, 958 F.2d 355, 358 (Fed. Cir. 1992)).

[48] While the Supreme Court has enumerated several factors to be considered in the judicial estoppel determination, the Eleventh Circuit's two-factor analysis is consistent with the Supreme Court's instructions. *Id.* at 1285-86.

2010) (applying judicial estoppel with regard to a claim construction argument that differed from the construction advanced in an administrative forum before the International Trade Commission); *Alabama v. Shalala*, 124 F. Supp. 2d 1250, 1266 (M.D. Ala. 2000) (applying judicial estoppel based on prior inconsistent statements made before an administrative body).

The record is clear that Dr. Sherman made statements under oath to the PTO during prosecution of the '556 Patent that Univasc is an example of a product produced by a prior art process wherein the moexipril hydrochloride and alkaline magnesium compound are "unreacted but combined," and therefore distinguishable from his invention. Dr. Sherman persuaded the PTO to accept his representations about Univasc during prosecution of the '556 Patent, and, relying on those representations, the PTO Examiner allowed the '556 Patent to issue. Thus, Dr. Sherman obtained the benefit of the '556 Patent based on his arguments that the Univasc process was completely different from his claimed process. Now, Dr. Sherman, through Apotex, takes the position that Univasc infringes the '556 Patent.

If the Univasc process is the same as the process claimed by the '556 Patent, as Apotex now contends in this Court, then Dr. Sherman's representations about the '450 Patent misled the PTO because either the '450 Patent's process did lead to conversion, or Univasc was not an example of the '450 Patent as Sherman swore it to be. I find that the evidence shows that Dr. Sherman intentionally misled the PTO by advancing arguments about Univasc that ran contrary to what he actually knew. Apotex asks this Court to accept those arguments as genuine at the time made, since Univasc's process was not publicly available. They also claim that Dr. Sherman only represented what the publicly available information indicated, not what the process *actually* was. This argument holds no water, as Dr. Sherman's statements were phrased

49

with certainty.  Further, Dr. Sherman's representations could not have been genuine at the time, since he knew his statements lacked veracity at the time they were made.

The contradiction between the statements to the PTO and those to this Court is not simple error or inadvertence.  Dr. Sherman has been the Chairman of Apotex since before 2000.  He has always taken the lead role in developing formulations, and he is responsible for guiding the overall direction of the company and its litigation.  Dr. Sherman drafted the application that resulted in the '556 Patent, and he made the ultimate decision to file suit against UCB for infringement.  Moreover, this is not the first time that this Plaintiff has targeted an existing product commercially available in the United States, obtained the ingredients from regulatory filings and product monographs, and applied for a process patent to ensnare its competition.  The '556 Patent was obtained by false statements to and omissions from the PTO only after the PTO was told under oath that the brand product was manufactured differently than the proposed patent's process.  The Plaintiff now claims that the brand product has always infringed its Patent. This exceptional abuse of the patent system and mockery of the judicial system should not be countenanced.

Accordingly, I find it appropriate to invoke the doctrine of judicial estoppel to prevent Apotex's "improper use of judicial machinery." *New Hampshire*, 532 U.S. at 750 (quotations omitted).  Apotex cannot now take the position that the Univasc and Uniretic processes infringe the '556 Patent, as such a position is unavoidably inconsistent with Dr. Sherman's sworn position under oath during the '556 Patent prosecution.

## C.    Indefiniteness

As noted above, there are three disputed terms in Claim 1 of the '556 Patent:   (1) "sufficient amount of solvent"; (2) "predetermined amount of time"; and (3) "controlled

manner." Because the asserted Claims in this case all depend on Claim 1, they are indefinite if Claim 1 is deemed to be indefinite.

UCB argues that the disputed claim terms are indefinite under 35 U.S.C. § 112, ¶ 2. This statute requires that the claims of a patent "particularly point[ ] out and distinctly claim[ ] the subject matter which the inventor [] regards as the invention." 35 U.S.C. § 112, ¶ 2. This requirement is satisfied where "one skilled in the art would understand the bounds of the claim when read in light of the specification . . . ." *Exxon Research & Eng'g Co. v. U.S.*, 265 F.3d 1371, 1375 (Fed. Cir. 2001) (citations omitted). "Because claims delineate the patentee's right to exclude, the patent statute requires that the scope of the claims be sufficiently definite to inform the public of the bounds of the protected invention, *i.e.*, what subject matter is covered by the exclusive rights of the patent." *Biosig Instruments, Inc. v. Nautilus, Inc.*, 715 F.3d 891, 897-98 (Fed. Cir. 2013) (quoting *Halliburton Energy Servs., Inc. v. M–I LLC*, 514 F.3d 1244, 1249 (Fed. Cir. 2008)).

A claim term is indefinite if a person of ordinary skill in the art could "not discern the boundaries of the claim based on the claim language, the specification, and the prosecution history, as well as her knowledge of the relevant art area." *Halliburton*, 514 F.3d at 1249-50. If a claim term is legally indefinite, the patent claim is invalid. *Id.* at 1376. A claim is indefinite only when it is "not amenable to construction" or is "insolubly ambiguous." *Biosig Instruments*, 715 F.3d at 898 (quoting *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005)). Additionally, "[w]hen a 'word of degree' is used, the court must determine whether the patent provides some standard for measuring that degree." *Id.* (internal quotations omitted).

"Indefiniteness is a matter of claim construction, and the same principles that generally govern claim construction are applicable to determining whether allegedly indefinite claim

language is subject to construction." *Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306, 1319 (Fed. Cir. 2008). Thus, this Court primarily considers the instrinsic evidence consisting of the claim language, the specification, and the prosecution history. *Biosig Instruments*, 715 F.3d at 898 (citations omitted). In addition, similar to claim construction, I may consider certain extrinsic evidence in resolving disputes regarding indefiniteness. *Id.*

The '556 Patent is invalid as indefinite because the Patent and its file history: (1) provide no guidance to a person of ordinary skill in the art on how much time, solvent, or what manner of control is sufficient to achieve or avoid the greater than 80% conversion threshold; and (2) provide no objective test or measure to determine whether the "greater than 80%" conversion limitation is met.

    1)    *The Patent Specification and File History Guidance*

Each Claim of the '556 Patent requires reacting moexipril or an acid addition salt thereof "in the presence of a sufficient amount of solvent," "for a predetermined amount of time" and "in a controlled manner," so as to convert greater than 80% of the moexipril to moexipril magnesium. (JTX-1; Trial Tr. Day 1 at 64:5-16, 68:5-69:3 (Cima)). However, the '556 Patent and its file history provide no guidance for a person of ordinary skill in the art in 2000 to determine how much solvent and time, and what manner of control, are required to achieve or avoid the claimed 80% conversion. (JTX-1; JTX-2; Trial Tr. Day 1 at 207:23 to 208:12 (Chyall)).

The disputed terms were added to the claims during prosecution of the '173 Application in order to overcome the Examiner's rejections of the claims as obvious over the prior art. (JTX-2 at AI-MOEX0000477, AI-MOEX0000521; Trial Tr. Day 1 at 205:12-206:2, 207:2-11 (Chyall)). Dr. Sherman's remarks accompanying the amendments in which he added these terms

do not provide any guidance to a person of ordinary skill in the art as to what constitutes a "sufficient amount of solvent," a "predetermined amount of time," or a "controlled manner" within the context of the '556 Patent's claims. (JTX-2 at AI-MOEX0000480-491, AI-MOEX0000506-520; Trial Tr. Day 1 at 206:3-9, 207:9-22 (Chyall)).

The term "predetermined amount of time" does not appear in the specification of the '556 patent, and there is no discussion of this term in the file history. (JTX-1; JTX-2 at AI-MOEX0000506-520; Trial Tr. Day 1 at 207:9-22 (Chyall)). Similarly, the term "controlled manner" is not defined or explained in the specification or the file history.

Nor does the specification or file history provide any guidance as to what "amount of solvent" would be "sufficient" to achieve greater than 80% conversion. The only amounts of solvent disclosed in the '556 Patent for wet granulation are in the fictitious Examples 2-4, in which Dr. Sherman claimed to have used 20% solvent (by weight). (JTX-1 cols. 5-6; JTX-2; Trial Tr. Day 1 at 203:3-6, 206:10-22 (Chyall)).[49]

Apotex proposes construction of these terms in the context of trying to achieve greater than 80% conversion of moexipril to moexipril magnesium during the manufacturing process. JTX-1; Trial Tr. Day 1 at 64:5-16 (Cima), 206:3-9, 207:12-16 (Chyall)). In other words, any amount of solvent or time would be "sufficient" and any process would be "controlled" if it results in conversion of greater than 80% of moexipril to moexipril magnesium during the manufacturing process. (Trial Tr. Day 1 at 207:23 to 208:12 (Chyall)).

However, the amount of solvent and time used in wet granulation for a drug product varies considerably based on other parameters, such as the ingredients and equipment used, temperature, and drying parameters. (Trial Tr. Day 1 at 87:13-21, 93:19 to 94:7 (Cima)). For

---

[49] This amount of water is relatively large in comparison to other wet granulations. However, as discussed above, using this amount is consisting with the teachings of the prior art.

example, a particular amount of solvent may be "sufficient" under one set of conditions, but insufficient under other conditions. This is evident from a review of the '560 PCT, in which the amount of solvent necessary to carry out wet granulation for a particular ACE inhibitor drug varied greatly depending on the specific alkaline magnesium compound and other excipients used. (JTX-10; Trial Tr. Day 1 at 211:2 to 212:19 (Chyall); Trial Tr. Day 2 at 35:6-10 (Chyall)).

In sum, I see no reasonable way of construing Claim 1's terms. The plain language of the Claims provides no guidance, the specification provides no guidance, and the prosecution history provides no guidance. Apotex's proposed constructions seems to mimic the logic of Lewis Carroll's Humpty Dumpty: "When I use a word . . . it means just what I choose it to mean— neither more nor less." LEWIS CARROLL, ALICE'S ADVENTURES IN WONDERLAND AND THROUGH THE LOOKING GLASS 219 (George Stade ed., 2004) (1871) (emphasis omitted). Further, Apotex suggests construing these terms by looking to the Examples provided in the specification for guidance. However, as discussed above, not only are these Examples falsified, but also, in reality, they provide little guidance to one skilled in the art.

For these reasons, I find that the Claims of the '556 are invalid as indefinite under 35 U.S.C. § 112, ¶ 2, because they are not amenable to construction. *See Halliburton*, 514 F.3d at 1249.

    2)   *Testing for Greater than 80% Conversion*

Although each of the disputed claim terms are tied to greater than 80% conversion to moexipril magnesium, there is no analytical test, method, or other guidance in the '556 Patent or its file history for measuring the amount of moexipril magnesium in a resulting composition. (JTX-1; JTX-2; Trial Tr. Day 1 at 203:13-16 (Chyall)). There were also no analytical tests or methods in the scientific literature as of April 5, 2000, the date of the alleged invention, for

measuring the amount of moexipril magnesium in a composition. (Trial Tr. Day 1 at 206:23 to 207:1 (Chyall)). Even today, there are no published analytical tests or methods available to a person of ordinary skill in the art for determining whether greater than 80% of moexipril hydrochloride has been converted to moexipril magnesium during the process of manufacturing a moexipril composition. (Trial Tr. Day 1 at 195:2-7 (Chyall)).[50]

In fact, Dr. Sherman testified that he is not aware of any tests for moexipril magnesium that were available at the time of his alleged invention, or in 2006, when Apotex submitted its ANDA for moexipril tablets to the FDA. (Trial Tr. Day 2 at 151:16-24 (Sherman)). While Dr. Sherman testified that Apotex could have developed a test if it thought such was necessary, Dr. Chyall explained that a person of ordinary skill in the art likely would find it difficult to develop an analytical test or method for determining the precise amount of conversion to moexipril magnesium, and there would be no guarantee of success. (Trial Tr. Day 1 at 203:13 to 205:11 (Chyall)).[51]

Dr. Cima testified that a person of ordinary skill in the art would know if they had used enough solvent to get greater than 80% conversion by testing to see if they had produced a stable product. (Trial Tr. Day 1 at 117:23 to 118:4 (Cima)). According to Cima, if one wanted to determine exactly how much moexipril magnesium was created as a result of the claimed process, one would need to make a reference standard using Example 1 of the '556 Patent and use that to develop a method to measure it. (Trial Tr. Day 1 at 118:5-8 (Cima)). On cross

---

[50] Liquid chromatography is the most commonly used analytical test in the pharmaceutical industry. (Trial Tr. Day 1 at 58:19 to 59:2 (Cima)). However, this test is not capable of distinguishing between moexipril hydrochloride and moexipril magnesium. (Trial Tr. Day 1 at 188:22 to 190:7 (Chyall)).
[51] Even assuming such a test could be developed, it would require making pure moexipril magnesium as a reference standard, (Trial Tr. Day 1 at 117:23 to 118:8 (Cima); Trial Tr. Day 1 at 204:10 to 205:11 (Chyall)), something that is not set forth in the '556 Patent.

examination, however, Dr. Cima testified that one would only perform a "portion" of Example 1 to obtain the standard for use in developing the test. (Trial Tr. Day 1 at 143:22 to 144:14 (Cima)). Specifically, Dr. Cima admitted that one would just have to carry out the reaction, without the excipients that go into the final product, in order to produce the pure salt. (Trial Tr. Day 1 at 144:5-14 (Cima)).

Dr. Chyall does not agree with Dr. Cima's opinion that a test for percentage conversion to moexipril magnesium could be devised by a person of ordinary skill in the art using Example 1 of the '556 Patent. Based on his experience, Dr. Chyall's opinion is that distinguishing the salt form of a drug substance once it is formulated into a drug product is quite difficult. There are no reference standards for moexipril magnesium or moexipril free form. While there are a variety of techniques one could try to develop such a standard, there would be no guarantee of success. (Trial Tr. Day 1 at 203:17-204:9 (Chyall)). Also, Dr. Chyall noted that not even a portion of Example 1 discloses pure moexipril magnesium. If one completes the experiment described in Example 1 of the '556 Patent, the resulting product is not pure moexipril magnesium. (Trial Tr. Day 1 at 143:22-144:14 (Cima); 204:10-13 (Chyall)).

In Dr. Chyall's opinion, because there is no way to determine whether there is greater than 80% conversion, one cannot determine if one is infringing the claims of the '556 patent. (Trial Tr. Day 1 at 207:23 to 208:12 (Chyall)). Even today, Dr. Cima, Apotex's expert witness, testified that he knows of no test capable of distinguishing between 70% and 80% conversion to moexipril magnesium. (Trial Tr. Day 1 at 148:8 to 149:6 (Cima)). On these issues, I found Dr. Chyall to be the more credible witness.

Therefore, for these reasons, Claim 1 of the '556 Patent is indefinite because there is no test capable of measuring greater than 80% conversion to moexipril magnesium that is disclosed

in the '556 Patent or available to a person of ordinary skill in the art to determine whether Claim

1 is infringed.   *See Honeywell Int'l, Inc.*, 341 F.3d at 1339-40.   Moreover, because of the 80%

limitation in Claim 1, measuring the exact amount of moexipril that converted to moexipril

magnesium is necessary to practice or avoid infringement of the invention.   Without any sort of

measurement, the Claims are indefinite.

**D.**     **Disclaimer**

UCB also argues that Dr. Sherman disclaimed UCB's process from the scope of the '556

Patent's claims.   Specifically, UCB asserts that Dr. Sherman's statements of disavowal during

prosecution – namely, that Univasc was made by the prior art process of stabilizing moexipril by

combining it, but not reacting it, with an alkaline magnesium compound, while citing Univasc as

proof that prior art processes resulted in "unreacted" products – require a finding that the

Univasc and Uniretic processes fall outside the scope of the '556 Patent's claims.

Where the specification of a patent contains "an intentional disclaimer, or disavowal, of

claim scope by the inventor," the inventor's statement is dispositive and the patent cannot be

construed to cover the disclaimed subject matter.   *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316

(Fed. Cir. 2005).   Disclaimer "preclud[es] patentees from recapturing through claim

interpretation specific meanings disclaimed during prosecution." *Omega Eng'g, Inc. v. Raytek

Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003) (citing *Schriber-Schroth Co. v. Cleveland Trust Co.*,

311 U.S. 211 (1940)).

"[A]ll express representations made by or on behalf of the applicant to the examiner to

induce a patent grant limit the interpretation of the claims so as to exclude any interpretation that

may have been disclaimed or disavowed during prosecution in order to obtain claim allowance."

*Ecolab, Inc. v. Envirochem, Inc.*, 264 F.3d 1358, 1368 (Fed. Cir. 2001) (internal quotations

omitted).   An applicant's use of "words or expressions of manifest exclusion or restriction" constitutes a clear disavowal of claim scope. *Texas Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1204 (Fed. Cir. 2002).

In applying disclaimer, courts consider "the entire prosecution history, which includes amendments to claims and all arguments to overcome and distinguish references." *Seachange Int'l, Inc. v. C-COR Inc.*, 413 F.3d 1361, 1372 (Fed. Cir. 2005).   The sum of a patentee's arguments to the PTO during patent prosecution informs the disclaimer analysis. *Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1379 (Fed. Cir. 2008) (citations omitted). Further, disclaimer applies notwithstanding that the arguments were made without reference to a particular claim. *See, e.g., Revolution Eyewear, Inc. v. Aspex Eyewear, Inc.*, 175 F. App'x 350, 356 (Fed. Cir. 2006) (finding that although the claims did not mention "additional support," the patentee "disclaimed coverage of a device with additional support" by arguing repeatedly during prosecution that "in his invention, unlike the prior art, no additional support was needed").

During the '556 Patent's prosecution, Dr. Sherman repeatedly identified and distinguished Univasc from his purported invention, each time describing it as an example of a product made by a prior art process over which his claimed invention is patentable.  Dr. Sherman clearly represented to the PTO that practicing the prior art (particularly the processes disclosed in the '450 Patent and in the Gu reference) would result in a combination of moexipril hydrochloride and magnesium oxide acting as a stabilizer, "unreacted but combined."    Dr. Sherman represented that these prior art processes were not his invention, and that his invention was instead a reaction and conversion.  In fact, Dr. Sherman specifically identified Univasc as a product made by such prior art processes.  By the final iteration of the argument, a person of skill

58

in the art would have no doubt that Sherman disavowed processes such as those disclosed in the '450 Patent and in the Gu reference.

Moreover, because Sherman named Univasc in the specification, a person of ordinary skill in the art would understand that the Univasc process was an example of the disavowed prior art processes, and that it was specifically excluded. Also, because the Uniretic process (as it relates to moexipril) is identical to the Univasc process, a person of ordinary skill in the art would also understand the Uniretic process to be disclaimed as well.

Apotex essentially argues that Dr. Sherman's statements during prosecution and in the specification do not describe the *actual* Univasc process, but rather merely describe what the prior art taught about Univasc's process, which was not publicly available at the time. While Dr. Cima testified that a person of ordinary skill in the art reading Dr. Sherman's statements about Univasc would understand that they were based on the publicly available information at the time, I am not persuaded by this testimony.

First, despite repeatedly describing Univasc as containing magnesium oxide, unreacted but combined and functioning as a stabilizer, Dr. Sherman *never once* mentioned that the process was unknown to the public and that this representation was *solely* based on the publicly available information. Second, I find Dr. Sherman's statements to the PTO to be so clear as to show reasonable clarity and deliberateness and so unmistakable as to be unambiguous evidence of disclaimer. Notwithstanding Dr. Cima's testimony to the contrary, I find no indication in the prosecution history that Dr. Sherman was describing only what the publicly available information stated. Rather, he unequivocally told the PTO that Univasc is different from the claims of his purported invention because Univasc contained magnesium oxide, unreacted but combined.

Accordingly, I find that Dr. Sherman disclaimed the Univasc and Uniretic process from the scope of the '556 Patent's claims.

**E.**     **Laches**

UCB argues that Apotex is barred by laches from collecting pre-suit damages.  Laches is an equitable defense to patent infringement.  *A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020, 1028 (Fed. Cir. 1992).[52]  It is well settled that a defendant invoking the laches defense has the burden to prove two factors by a preponderance of the evidence: (1) "the plaintiff delayed filing suit for an unreasonable and inexcusable length of time from the time the plaintiff knew or reasonably should have known of its claim against the defendant"; and (2) "the delay operated to the prejudice or injury of the defendant."  *Id.* at 1032.  A "plaintiff is chargeable with such knowledge as he might have obtained upon inquiry, provided the facts already known by him were such as to put upon a man of ordinary intelligence the duty of inquiry."  *Wanless v. Gen. Elec. Co.,* 148 F.3d 1334, 1338 (Fed. Cir. 1998) (quotations omitted).

"The period of delay is measured from the time the plaintiff knew or reasonably should have known of the defendant's alleged infringing activities to the date of suit."  *A.C. Aukerman Co.*, 960 F.2d at 1032.  Further, where a patentee has delayed bringing suit for six years or longer, the Federal Circuit recognizes a rebuttable presumption of laches, and, if unrebutted, both unreasonable delay and material prejudice are established.  *Id.* at 1035-36.

Material prejudice can take the form of either evidentiary or economic prejudice.  *Id.* at 1033.  "Evidentiary, or 'defense' prejudice, may arise by reason of a defendant's inability to present a full and fair defense on the merits due to the loss of records, the death of a witness, or

---

[52] I note that "[t]he application of the defense of laches is committed to the sound discretion of the district court."  *Serdarevic v. Advanced Med. Optics, Inc.*, 532 F.3d 1352, 1358 (Fed. Cir. 2008).

the unreliability of memories of long past events, thereby undermining the court's ability to judge the facts." *Id.* (citations omitted). "Economic prejudice arises when a defendant and possibly others will suffer the loss of monetary investments or incur damages which likely would have been prevented by earlier suit." *Integrated Cards, L.L.C. v. McKillip Indus., Inc.*, No. 06 C 2071, 2009 WL 4043425, at *6 (N.D. Ill. Nov. 19, 2009) (internal quotations omitted). In evaluating economic prejudice, courts look for a change in the alleged infringer's economic position during the period of delay. *A.C. Aukerman*, 960 F.2d at 1033. A patentee may not "intentionally lie silently in wait watching damages escalate . . . particularly where an infringer, if he had had notice, could have switched to a noninfringing product." *A.C. Aukerman Co.*, 960 F.2d at 1033 (internal citations omitted).

    1)    *The Presumption of Laches*

The '556 Patent issued on July 27, 2004. Apotex filed this action nearly eight years later on April 20, 2012. Given the facts surrounding this case, I find that the presumption of laches applies. As previously concluded, Dr. Sherman knew that Univasc was made according to his claimed process as early as the day he filed his patent application. As if his "strong suspicion" and "belief" was not enough to impute knowledge – which I find it is – Dr. Sherman (and Apotex) had the results of the 2001 Study, which confirmed his knowledge that Univasc contained moexipril magnesium. At the very least, the 2001 Study was enough to put Apotex on notice of infringement, even if Apotex did not consider the tests to be "definitive."

Additionally, by February 2002, when Dr. Sherman filed his second patent application related to moexipril, it would have been clear to Dr. Sherman that Univasc was made by wet granulation. Dr. Sherman knew this based on the disclosure of gelatin as an ingredient in the Univasc Product Monograph and his knowledge that gelatin is used in wet granulation. This is

clearly evidenced by the disclosure in his second patent application.[53]  Dr. Sherman also knew that Univasc was made by wet granulation because of his conviction that stabilization is only achieved through use of a wet granulation process, and because of his own experimentations showing that Univasc is stable.

According to Dr. Sherman, Apotex could not have brought suit against UCB until 2012, because, until then, it did not know how much moexipril magnesium was in Univasc and he did not want to bring "frivolous suits." (Trial Tr. Day 2 at 149:13-15, 153:12-16 (Sherman)).  The only information that Apotex had in 2012 that it did not have in 2004, according to Apotex, was test results that it now represents show that the Univasc process converts effectively to 100% moexipril magnesium.  At trial, Sherman professed not to know anything about the 2012 test results, other than that he was told they proved infringement.   While Apotex could have conducted additional, more definitive, tests at any time, including as early as 2000, Dr. Sherman agreed that Apotex theoretically could have sued as early as 2005. (Trial Tr. Day 2 at 102:25 to 103:11 (Sherman)).[54]  In fact, in an e-mail in 2005, Dr. Sherman proposed doing NMR tests on Univasc, but could not recall what tests were done, despite a response to the e-mail indicating that Dr. Sherman would receive such tests results the following day. (*See* DTX-068).

---

[53] Specifically, the second patent application disclosed that Univasc was made in accordance with the '450 Patent and the Gu reference.  The application previously disclosed Gu as teaching that wet granulation is the only process from which stabilization is accomplished. (*See* DTX-084 at 2-3).

[54] The only additional test that Apotex conducted in 2012, ostensibly to determine the amount of moexipril magnesium in Univasc, was NMR. (PTX-88, PTX-142).  Apotex offered no evidence at trial concerning how the 2012 tests were conducted or the results of those tests. (Trial Tr. Day 3 at 25:16 to 27:18 (Cima)).  Even crediting Apotex's claim that NMR was necessary to show that Univasc contained greater than 80% moexipril magnesium, Apotex has come up with no reason for its eight-year delay in conducting that test.  In fact, Dr. Cima testified that NMR testing is "not very hard," and that Apotex could "easily" have performed NMR testing on Univasc at any time, including in 2001.  But Apotex did not explain why this simple test was not conducted after the 2001 Study, when the Apotex scientists stated that such tests would be conducted.

Thus, Apotex's delay in filing suit for more than six years from the time it knew or should have known of the allegedly infringing activity gives rise to a rebuttable presumption that laches applies.

I also find that Apotex has failed to rebut the presumption of laches. To rebut the presumption of laches, Apotex must present evidence to show that the delay was justifiable or present evidence to place the evidentiary or economic prejudice in dispute. *A.C. Aukerman Co.*, 960 F.2d at 1038. However, Apotex has not presented evidence that justifies the delay or challenges the prejudice to UCB.

2)      *Apotex's Delay*

Dr. Sherman testified that Apotex "theoretically" could have sued UCB in 2004, but that "it wasn't a priority for [Apotex] because we weren't even selling the product yet." He also testified that, when the patent issued, Apotex did not have proof of infringement. (Trial Tr. Day 2 at 149:10-23 (Sherman)). However, the evidence shows that Apotex conducted additional MS testing on Univasc in 2005 and again in 2006. (*See* DTX-79; DTX-95). Those tests refer to the 2001 tests and confirm the results that Univasc tablets contain moexipril magnesium complexes. (Trial Tr. Day 2 at 138:7 to 140:14, 153:3-11 (Sherman)).[55]

Given that the "simple" NMR tests could have been performed in 2004, combined with Dr. Sherman's knowledge that Univasc contained moexipril magnesium, as well as the fact that Apotex provides no credible reason for their delay in testing the product or bringing the suit, Apotex's delay was not justifiable.

---

[55] The 2005 study (DTX-95) specifically refers to Apotex's findings in the 2001 Study and states that "the composition of the [moexipril-magnesium] complex was elucidated on the basis of the knowledge from previous study on the Moexipril-Magnesium complex." (DTX-95; Trial Tr. Day 2 at 138:4-139:7 (Sherman)).

Further, on April 20, 2012, Apotex filed suit in this District against Paddock Laboratories, Inc. and Perrigo Company for infringement of the '556 Patent. On that same day, Apotex also sued three other companies in this District for infringement of Sherman's nearly-identical quinapril patent, United States Patent No. 6,531,486. The timing of these lawsuits is additional evidence that Apotex carefully chose its moment to sue UCB based on something other than its gathering of sufficient evidence with respect to Univasc and Uniretic.

3)   *Prejudice to UCB*

I also find that the evidence demonstrates that UCB has been materially prejudiced by Apotex's delay, and Apotex has failed to introduce evidence to place the economic or evidentiary prejudice in dispute.

i)   *Economic Prejudice*

From July 2004 to April 2012, the period of Apotex's delay, UCB continued to sell and invest in the manufacturing of Univasc and Uniretic. (Trial Tr. Day 2 at 204:10-21 (Siefert)). UCB S.A. acquired Schwarz Pharma AG during the period of delay, and a pending infringement suit against Schwarz could have affected the terms of UCB S.A.'s acquisition of Schwarz. Also, during the period of delay, UCB entered into an agreement with Cobalt, a generic pharmaceutical manufacturer, pursuant to which UCB was obligated to manufacture generic versions of Univasc and Uniretic for sale by Cobalt. (Trial Tr. Day 2 at 205:16-21 (Siefert)). The Cobalt agreement, which was in effect from 2007 to 2011, required UCB to increase its production of moexipril tablets and purchase new tablet punches so that the tablets would indicate Cobalt as the source, as well as new labeling and product "outserts." (Trial Tr. Day 2 at 218:7-15 (Siefert)). Had UCB known at the time of the Cobalt Agreement that Apotex would later accuse it of

infringement for its supply of generic moexipril product to Cobalt, UCB might not have entered into the Cobalt Agreement in 2007.

Further, had Apotex filed suit in 2004, UCB could have attempted to design around the '556 Patent. (Trial Tr. Day 2 at 206:19 to 207:8 (Siefert)). Among other possibilities, UCB could have attempted design-arounds under SUPAC guidance from the FDA, which allows a pharmaceutical manufacturer to alter ingredients, ratios, and other process parameters by up to 5% without prior approval, provided that the manufacturer internally validates the change. Such changes can be accomplished in as little as 30 days. (Trial Tr. Day 2 at 200:21 to 202:7 (Siefert)).

In 2004, when Univasc and Uniretic did not face generic competition, attempting a design-around would have been worth the effort. But by 2012, when Apotex filed suit, Univasc and Uniretic had become "dying drugs" for which manufacturing volumes are "extremely low." Now, UCB has no real incentive to incur the expense of attempting even SUPAC-based design-arounds. (Trial Tr. Day 2 at 207:12-17 (Siefert)).

Thus, Apotex's delay caused UCB to suffer economic prejudice.

    ii)    *Evidentiary Prejudice*

With regard to evidentiary prejudice, UCB has shown that Dr. Emschermann, who developed the Univasc and Uniretic processes, died in 2004, and that his assistant, Dr. Mika, left UCB nearly ten years ago. As of the date of trial, UCB has been unable to locate Dr. Mika. If Dr. Emschermann were alive, he may have provided valuable testimony about the development of the Univasc and Uniretic manufacturing processes or about whether he or others in Germany ever publicly disclosed some or all elements of the Univasc or Uniretic processes. (Trial Tr. Day 2 at 202:24 to 203:1-20 (Siefert)).

Also, documents that could have shown whether Dr. Emschermann or others at Schwarz maintained the Univasc and Uniretic manufacturing processes as secrets may have been destroyed in accordance with document retention policies or otherwise lost to time. Retained samples of certain Univasc and Uniretic product batches manufactured or sold during the period of delay have been destroyed pursuant to an established sample retention policy. (Trial Tr. Day 2 at 203:3 to 204:9 (Siefert)). Apotex seeks a royalty for UCB's sales of those batches, but as a result of sample destruction, UCB cannot conduct tests to rebut Apotex's infringement case.

Moreover, witness' memories surely have faded with the passage of time. Even Dr. Sherman conceded that he did not remember many things about Apotex's testing due to the time passed, stating "it's been a long time." (Trial Tr. Day 2 at 148:24 to 149:9 (Sherman)). Dr. Sherman's lapsed memory, which must be taken with a grain of salt, also deprives UCB of valuable evidence in support of its defenses, particularly laches and inequitable conduct. Additionally, Dr. Lipp also appears to have lost memory of significant events with the passage of time.[56] Had Apotex sued UCB in 2004, neither Sherman nor Lipp could have hid behind their memory lapses to the extent seen at trial.

Because Apotex's delay in filing suit was unjustified, and because Apotex has failed to sufficiently challenge the evidentiary and economic prejudice resulting from its delay, Apotex has failed to rebut the presumption of laches. Accordingly, Apotex is barred by laches from recovering damages based on any sales of UCB's accused products prior to the filing of the Complaint on April 20, 2012.

---

[56] Dr. Lipp was unable to recall why he discussed Univasc in his declaration, let alone why he singled it out as a "particularly relevant" example of the prior art. (Trial Tr. Day 3 at 7:2 (Lipp Dep. at 223:2 to 225:1)).

## IV.    CONCLUSION

In conclusion, this case need not reach consideration by a jury given my findings set forth above.  To summarize, I find as follows: (1) the '556 Patent is unenforceable due to inequitable conduct; (2) Apotex is judicially estopped from arguing infringement of the '556 Patent by the Univasc and Uniretic processes; (3) the '556 Patent is invalid as indefinite under 35 U.S.C. § 112, ¶ 2; (4) Dr. Sherman disclaimed UCB's Univasc and Uniretic processes from the scope of the '556 Patent's claims; and (5) Apotex is barred by laches from recovering damages incurred prior to April 20, 2012.  Accordingly, final judgment is to be issued in favor of UCB and against Apotex.

Finally, in consideration of the findings set forth above, this case appears to meet the requirements of an "exceptional" case under 35 U.S.C. § 285, and I am inclined award attorney's fees to UCB.  However, in the interest of prudence, and to allow Apotex an opportunity to be heard, I will take the issue under consideration only upon a motion by UCB and after full briefing.

Final judgment shall issue by separate order.

**DONE AND ORDERED** in Chambers at West Palm Beach, Florida, this _6_ day of September, 2013.

DONALD M. MIDDLEBROOKS
UNITED STATES DISTRICT JUDGE

Copies to:      Counsel of Record