**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 12-60706-CIV-MIDDLEBROOKS/BRANNON**

APOTEX, INC. and APOTEX CORP.,

                 Plaintiffs,

v.

UCB, INC. and KREMERS URBAN
PHARMACEUTICALS INC.,

                 Defendants.

**UCB'S VERIFIED MOTION FOR ATTORNEY FEES AND COSTS**

Defendants UCB, Inc. and Kremers Urban Pharmaceuticals Inc. (collectively, "UCB") submit this verified motion for attorney fees and expenses incurred in defending against the patent infringement lawsuit brought by Plaintiffs Apotex, Inc. and Apotex Corp. (collectively, "Apotex").

## INTRODUCTION

On September 6, 2013, the Court ruled that Apotex's claims for infringement of U.S. Patent No. 6,767,556 (the "'556 patent") are barred by various equitable defenses, that the patent is unenforceable due to inequitable conduct, and that the claims of the '556 patent are invalid as indefinite. Based on its findings of fact, the Court concluded that the '556 patent never should have issued and that Apotex should not have brought this lawsuit in the first place. The Court aptly summarized Apotex's conduct in obtaining the '556 patent and bringing this lawsuit as an "abuse of the patent system and mockery of the judicial system." (D.E. 222 at 50.)

The egregious nature of Apotex's conduct makes this an exceptional case under 35 U.S.C. § 285. Not only was the '556 patent obtained by fraud – an independent basis for finding this case exceptional under § 285 – but the entire lawsuit was frivolous from the start and maintained in bad faith. Moreover, Apotex engaged in litigation misconduct by filing frivolous motions, tampering with critical evidence, and ignoring the Local Rules of the Southern District of Florida ("Local Rules"). Such misconduct itself justifies the award of attorney fees. In view of these circumstances, the Court should exercise its discretion and award UCB all of its attorney fees and expenses under § 285. In addition, the Court should award UCB its expert witness fees in the exercise of its inherent authority.

## STATEMENT OF FACTS

On April 20, 2012, Apotex sued UCB alleging infringement of the '556 patent. (D.E. 1.) On July 29 through July 31, 2013, the Court held a bench trial on UCB's equitable defenses and on claim construction.

### The Court's September 6, 2013 Order

In its Opinion and Order of September 6, 2013 (the "Order"), this Court held that (1) the '556 patent is unenforceable due to inequitable conduct; (2) Apotex's infringement claims are barred by judicial estoppel; (3) the claims of the '556 patent are invalid as indefinite under 35 U.S.C. § 112; (4) during prosecution, Apotex disclaimed the Univasc® process from the scope of the '556 patent; and (5) Apotex is barred by laches from collecting any pre-filing damages.

(D.E. 222.)  The Court entered Final Judgment in favor of UCB on September 19, 2013.  (D.E. 226.)

In its Order, the Court described Apotex's behavior as "an orchestrated scheme to deceptively obtain a patent with respect to a competitor's product" and as "illustrative of inventive litigation, as opposed to the scientific discovery that the patent laws were designed to promote."  (D.E. 222 at 1.)  As to inequitable conduct, the Court held that Dr. Sherman, founder and chairman of Apotex, and inventor of the '556 patent, "did not invent any new process.  What he did was take the publicly available information for Univasc, combine this information with the teachings of the '450 patent, secretly conduct his own testing on the Univasc product, and then purposefully mislead the Examiner."  (*Id*. at 39.)  In particular, the Court found that during prosecution of the '556 patent, Dr. Sherman (i) materially misrepresented the contents of Univasc® as containing moexipril and magnesium oxide "unreacted but combined" while withholding Apotex's 2001 Study and Dr. Sherman's own knowledge that Univasc® contained moexipril magnesium; and (ii) withheld the material prior art '560 PCT reference.  (*Id*. at 43-46.)

The Court also held that Dr. Sherman "engaged in a pattern of deceptive practices" with the intent to mislead the PTO into allowing the '556 patent.  (*Id*. at 31.)  That Dr. Sherman intended to deceive the PTO:

> is the single most reasonable inference to be drawn from the evidence of his overall pattern of conduct during prosecution of the '556 Patent, including, but certainly not limited to, misrepresenting the prior art Univasc product, withholding the prior art '560 PCT application, misrepresenting the teachings of the '450 patent, misrepresenting the teachings of the Gu reference, withholding the 2001 study, drafting Examples in the past tense when they were never executed, and submitting an incomplete and misleading affidavit from an expert who was shielded from the true facts.

(*Id*. at 43.)

The Court found that Dr. Sherman was not a credible witness at trial (*id.* at 16 n.23, 22, 23, 37, 39, 43, 46), and that his "demeanor and evasive testimony at trial" was "instructive of his intent to deceive the PTO," (*id.* at 43).  Relevant to this determination, the Court noted that Dr. Sherman was "accused of doing *the exact same thing* in the *Merck* litigation," a case involving enalapril, a different ACE inhibitor, in which the district court found that Dr. Sherman "simply figured out the accused process and 'added water to the mix' in arriving at his claimed

invention." (*Id.* at 39 (emphasis in original) (quoting *Apotex Corp. v. Merck & Co., Inc.*, No. 96-C-7375, 2000 WL 97582 (N.D. Ill. Jan. 25, 2000) [hereinafter *Merck Litigation*]).)

The Court further concluded that "this case is one of those exceptional cases" under *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276 (Fed. Cir. 2011), where a finding of materiality is not necessary because Dr. Sherman had "engaged in affirmative and egregious misconduct" (*Id.* at 46.):

> [T]he misconduct in this case extended beyond the misrepresentation to the patent Examiner and constitutes an abuse of the patent system itself. The practice of targeting a competitor's existing and widely available product and seeking to obtain a patent for the purpose of suing that competitor through a pattern of lies and deception should not be rewarded.

(*Id.* at 47.)

The Court also held that Apotex was barred by judicial estoppel from asserting that the Univasc® process infringes. (*Id.* at 48-50.) The Court rejected Apotex's argument that Dr. Sherman only represented to the PTO what the prior art indicated about the Univasc® process, and not what the process actually was, finding that "Dr. Sherman's statements were phrased with certainty." (*Id.* at 49-50.) Moreover, the Court held that "the contradiction between the statements to the PTO and those to this Court is not simple error or inadvertence," (*id.* at 50), but that Dr. Sherman "intentionally misled the PTO by advancing arguments about Univasc that ran contrary to what he actually knew," (*id.* at 49). The Court concluded that "[t]his abuse of the patent system and mockery of the judicial system should not be countenanced" and that it was appropriate to invoke the doctrine of judicial estoppel to prevent Apotex's "improper use of judicial machinery." (*Id.* at 50 (quoting *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001)).)

The Court also held that the '556 patent is invalid as indefinite because the patent and its file history: (1) provide no guidance to a person of ordinary skill in the art on how much time and solvent, or what manner of control, is sufficient to achieve or avoid the claimed 80% conversion threshold; and (2) provide no objective test or measure to determine whether the "greater than 80%" conversion limitation is met. (*Id.* at 52.) The Court rejected Apotex's proposed constructions – that any amount of time or solvent would be "sufficient" and any process would be "controlled" if it results in greater than 80% conversion – as mimicking the logic of Lewis Carroll's Humpty Dumpty: "When I use a word . . . it means just what I choose it to mean – neither more nor less." (*Id.* at 54 (quoting Lewis Carroll, *Alice's Adventures in Wonderland and Through the Looking Glass* 219 (George Stade ed., 2004) (1871)).) The Court

also rejected Apotex's argument that the claim terms could be construed by looking at the falsified Examples.  (*Id.*)

The Court also held that Dr. Sherman disclaimed the Univasc® process during prosecution of the '556 patent, "each time describing it as an example of a product made by a prior art process over which his claimed invention is patentable."  (*Id*. at 58.)  The Court again rejected Apotex's argument that Dr. Sherman did not disclaim the "actual" process used to manufacture Univasc®, noting that "Dr. Sherman never once mentioned [to the PTO] that the process was unknown to the public and that his representation was solely based on the publicly available information."  (*Id*. at 59.)  Indeed, the Court found the statements regarding Univasc® to be "so clear as to show reasonable clarity and deliberateness and so unmistakable as to be unambiguous evidence of disclaimer." (*Id*.)

Finally, the Court held that Apotex unjustifiably delayed in bringing this lawsuit, causing material prejudice to UCB.  (*Id*. at 63.)  Even before it filed this lawsuit, Apotex was uniquely aware of internal testing dating back to 2001 in which Apotex and Dr. Sherman concluded that Univasc® was moexipril magnesium.  (*Id*. at 24-25.)  Nevertheless, Apotex did not sue UCB until 2012, eight years after the '556 patent issued.  Apotex evidently disregarded the overwhelming evidence of laches when it brought this lawsuit, and sought over $12 million in damages dating back to 2006.  (D.E. 187 at 26.)  The Court ultimately found that Apotex's knowledge and delay created a presumption of laches which Apotex failed to rebut at trial.  (D.E. 222 at 63.)

In light of these findings, the Court indicated that it was inclined to award attorney fees to UCB under 35 U.S.C. § 285, (*id.* at 67).  Accordingly, UCB submits this motion.

**UCB's Good Faith Attempts To Avoid Litigation**

UCB made several good faith attempts to save the parties the expense of an unnecessary and frivolous lawsuit.  Shortly after Apotex filed suit, UCB, through its attorneys, informed Apotex that Univasc® and Uniretic® were necessarily outside the scope of the '556 patent in view of Dr. Sherman's express arguments to the PTO Examiner during prosecution.  (*See* June 1, 2012 letter, attached as Exhibit 1 to the accompanying Declaration of Adam Gahtan dated November 12, 2013 ("Gahtan Declaration" or "Gahtan Decl.").)  UCB requested that Apotex withdraw its complaint, but Apotex declined.  (*Id.*)  Two weeks later, UCB informed Apotex that the Univasc® and Uniretic® processes had not changed since the 1990s, well before Apotex filed

the application that led to the '556 patent, and that UCB would seek attorney fees should Apotex persist in the lawsuit.  (*See* June 14, 2012 letter, attached as Exhibit 2 to Gahtan Decl.)  Apotex refused to withdraw its complaint, making the same arguments that this Court ultimately rejected.  (*See* June 22, 2012 letter, attached as Exhibit 3 to Gahtan Decl.; D.E. 222 at 25, 34-35.)

One week later, UCB moved to dismiss Apotex's complaint on grounds of prosecution disclaimer.  (D.E. 17.)  In support of that motion, UCB submitted the declaration of its Vice President of Manufacturing, Jeffrey Siefert, who declared that the processes for Univasc® and Uniretic® had not changed in any material way since those products were approved by the FDA in the 1990s.  (*Id*.)  Rather than withdrawing its complaint in light of this evidence, Apotex argued that none of the statements in the '556 patent and its file history related to the UCB's "actual" manufacturing process, and that Apotex was entitled to discovery of UCB's process before the Court ruled on UCB's motion to dismiss.  (D.E. 33 at 6-9.)

Accordingly, UCB provided Apotex with documents relating to its manufacturing processes beginning in late September 2012, and produced Mr. Siefert for deposition on October 17, 2012.  This discovery confirmed that UCB's formulation and manufacturing processes had not materially changed over time.  Nevertheless, Apotex pressed on.

On January 17, 2013, the Court denied UCB's motion to dismiss, noting that "without being able to test the accused processes, there is no way for this Court or Apotex to know with any level of certainty that the Univasc® and Uniretic® processes have not materially changed since the alleged disclaimer."  (D.E. 74 at 4.)  By that time, however, Apotex had ample discovery of UCB's manufacturing processes, including samples of Univasc® and Uniretic®, and knew that UCB's process had not materially changed.

## Apotex's Litigation Misconduct

### (a)  Apotex's Unreasonable Delay in Producing Critical Discovery

On August 16, 2012, UCB served its first set of document requests on Apotex.  (D.E. 106 at 3.)  Although Apotex was the plaintiff in this case (and four related cases in this District) and had eight years to prepare for it – and so should have been able to respond promptly to UCB's requests – Apotex did not produce the bulk of its documents (over 160,000 pages of Apotex's 200,000-plus page production) until *four months* later, fully *eight months* after Apotex filed suit. (*Id*.)  In fact, Apotex waited until December 18 to produce 78,000 pages and until December 21 – at 5:01 p.m. on the Friday before the Christmas holiday – to produce 88,000 pages.  (*Id*.)

Buried in that near-Christmas-Eve production of 88,000 pages were several studies on Univasc® performed by Apotex to determine the presence of moexipril magnesium. (*Id.* at 3-4.) In particular, Apotex produced a report dated April 30, 2001, entitled "Interim Report for Study of Moexipril Magnesium Salt" (the "2001 Study"), that concludes that the moexipril in Univasc® is "mainly present in the form of magnesium complex," the same compound that supposedly results from the '556 patent's claimed process. (*Id.*)  On January 25, 2013, the day before Dr. Sherman's deposition, Apotex produced another 5,000 pages of documents, including correspondence demonstrating Dr. Sherman's knowledge of the accused Univasc® process.[1] (*Id.* at 5.)

UCB also noticed Dr. Sherman's deposition for December 19, 2012, but Apotex refused to make him available on that date or any date earlier than January 17, 2013. (D.E. 106 at 5-6.) Even then, Apotex would only make Dr. Sherman available on January 17 or on January 29, but on no other date. (*Id.*)  UCB took Dr. Sherman's deposition on January 29, 2013, less than one month before the close of discovery and six days before expert reports were due. (*Id.*)

Upon reviewing Apotex's document production and taking Dr. Sherman's deposition, UCB learned *for the first time* that:

- Dr. Sherman knew at least as early as March 16, 2001 that Univasc® contained moexipril magnesium;

- Dr. Sherman authorized the 2001 Study and was aware of the results in 2001;

- even before he filed the application for the '556 patent, Dr. Sherman suspected that Univasc® tablets contained moexipril magnesium, and the 2001 Study confirmed that suspicion;

- Dr. Sherman never disclosed the results of the 2001 Study to the PTO, despite repeatedly representing to the PTO that Univasc® does *not* contain moexipril magnesium;

- Dr. Sherman wrote the entire application for the '556 patent himself; and

- the experiments described in Examples 1-4 in the '556 patent were never performed, despite having been written in the past tense and despite

---

[1] This production included DTX 89, a January 4, 2002 memo in which Dr. Sherman stated that "we have a U.S. patent pending on the conversion from HCl to Mg salt, which Teva will undoubtedly infringe, and a second patent application about to be filed, which Teva will probably also infringe."

> describing very specific results for the experiments, such as that Example 1 yielded 9.53 grams of moexipril magnesium.

(D.E. 106 at 6.)

Accordingly, on January 31, 2013, two days after the Sherman deposition, UCB timely filed its answer to the complaint and included a counterclaim for inequitable conduct and the affirmative defense of laches.[2]  (D.E. 78.)

**(b)**      **Apotex's Frivolous Motions**

In response to UCB's answer and counterclaims, Apotex moved to strike virtually all of UCB's defenses on grounds of untimeliness, despite its own unjustified delay in producing the relevant discovery and UCB's prompt responses in light of that discovery.  (D.E. 90; D.E. 106.) The Court denied Apotex's motion on March 6, 2013 (D.E. 118), and UCB ultimately prevailed on its defenses at trial.  (The frivolousness of Apotex's motion is described in detail in UCB's memorandum of law in opposition to Apotex's motion to strike (D.E. 106).)  Apotex has indicated that it will appeal the Court's denial of that motion.  (D.E. 226.)

In addition, Apotex filed several frivolous motions in limine, including a motion to exclude – from both the jury *and* the Court – evidence concerning Apotex's testing of Univasc® tablets in 2001, 2005, and 2006; and a motion to preclude the testimony of UCB's expert, Dr. Leonard Chyall, on the ground that he purportedly is not qualified.  The Court denied both motions, and the documents and testimony that Apotex sought to exclude were, of course, critical to the Court's findings on inequitable conduct.  (The frivolousness of these two motions is discussed in detail in UCB's opposition briefs (D.E. 157 and 159).)  Apotex has indicated that it will appeal the Court's denial of these motions as well.  (D.E. 226.)

**(c)**      **Apotex's Reliance on Its Ever-Changing Lab Notebook 953**

On February 4, 2013, Apotex produced a report from its expert, Dr. Cima.  That report indicated that Dr. Cima had relied on an "Executive Summary" of tests conducted by Chemir Analytical Services ("Chemir"), a third party lab retained by Apotex, and on a certain laboratory notebook – Notebook 953 – that purports to document Chemir's NMR tests performed for this case.  (The facts and circumstances surrounding the production and alteration of Notebook 953 are described in detail in UCB's Motion in Limine to Preclude Certain Testimony of Dr. Michael

---

[2] UCB's answer was timely filed 14 days after the Court's January 17, 2013 order denying UCB's motion to dismiss.  *See* Fed. R. Civ. P. 12(a)(4)(A).  UCB timely amended its answer and counterclaims on February 20, 2013 to add the affirmative defense of judicial estoppel.  (D.E. 89.)

J. Cima (D.E. 154).)  Then, on February 5, 2013, Apotex produced the Executive Summary and an un-redacted copy of Notebook 953.  (*Id*. at 5, Ex. 2.)  One week later, Apotex's counsel produced a redacted version of Notebook 953 and requested that UCB destroy the un-redacted version.  (*Id*., Ex. 9.)  Apotex's counsel asserted that portions of Notebook 953 were protected from disclosure as the work product of non-testifying experts, notwithstanding that Dr. Cima – their <u>testifying</u> expert – specifically identified Notebook 953 as a document upon which he relied.  (*Id*., Ex. 10.)  Apotex claimed that Dr. Cima had not, in fact, received or reviewed <u>any</u> Chemir laboratory notebooks, but had instead relied solely upon the data reported in the Executive Summary.  (*Id*.)  Apotex also refused to produce additional information regarding the redacted Chemir tests on grounds that it was similarly privileged and protected from disclosure.  (*Id*. at 4.)

On March 6, 2013, UCB's expert, Dr. Chyall, submitted a rebuttal expert report identifying a critical discrepancy between the Executive Summary and Notebook 953:  the Executive Summary reported that the Univasc® samples were diluted ten-fold, while Notebook 953 contained no evidence of such dilution.  (*Id*. at 5.)  In Dr. Chyall's opinion, if the samples were not diluted, the Chemir NMR tests would be essentially worthless.  (*Id*.)  Recognizing the significance of the error, Apotex's counsel produced a new – and now <u>third</u> – version of Notebook 953.  (*Id*.)  Curiously, in this new version, page 41 of Notebook 953 – which is dated January 3, 2013 and was witnessed on January 4, 2013 – now contained an additional, unwitnessed note dated January 8, 2013.  That note stated that the <u>same</u> samples identified by Dr. Chyall as the subject of the discrepancy <u>were</u> diluted ten-fold prior to analysis.  (*Id*. at 6.)  In other words, Apotex magically produced a third version of the same critical notebook page containing a new notation that, amazingly, addressed precisely the fatal discrepancy that Dr. Chyall identified one week earlier.  Apotex's counsel explained that this page "inadvertently" had never been produced – even though it had in fact been produced twice earlier, both times <u>without</u> the additional January 8 note.  Apotex also suggested that Dr. Chyall retract his criticism of Chemir's work in light of this "correction."  (*Id*. at 6-7.)

Solely as a result of this strange set of events concerning Apotex's key infringement evidence, UCB deposed Chemir scientist Michael Rogers, the author of the disputed January 8 note.  (*Id*. at 7.)  At his deposition, Rogers testified that his January 8 note was <u>itself</u> erroneous, and that it should be deleted.  (*Id*.)  According to Mr. Rogers, he had <u>never</u> diluted the samples,

notwithstanding that his note specifically identified the samples that had been diluted, the very ones at the heart of Dr. Chyall's criticism.  (*Id*.)  Apotex must have known the truth prior to the Rogers deposition, but it never informed UCB or attempted to spare UCB the unnecessary cost of that deposition, and it never withdrew the version of the page with the falsified note.  Thus, Dr. Chyall had been correct all along in his criticism of the sample concentrations used to analyze UCB's products.

      **(d)**      **Apotex's Repeated Violations of the Local Rules**
                       **and the Court's Scheduling Order**

Throughout the litigation, Apotex repeatedly flouted the Local Rules and this Court's Scheduling Order.  The Court's Scheduling Order (D.E. 63) set a deadline for dispositive motions of February 22, 2013.  Apotex filed its motion for summary judgment one day late, on February 23, 2013, without leave of court.  (D.E. 97.)  Moreover, Apotex's supporting memorandum of law exceeded the page limits imposed by the Local Rules by 19 pages (nearly 100%), again without leave of court.  (*Id*.; Local Rule 7.1.)

Furthermore, on February 21, 2013, Apotex filed a Motion To Exceed Page Limits for Motion for Summary Judgment (D.E. 94) in which Apotex asserted, falsely, that it had met and conferred with counsel for UCB pursuant to Local Rule 7.1(a)(3) and that UCB "stated that they do not oppose" the motion.  Apotex did not in fact meet and confer with UCB regarding the motion.  When asked to identify the basis for Apotex's certification that it had done so, counsel for Apotex stated that the certification was an "oversight."  (D.E. 104.)

Apotex continues to show little regard for the rules of this Court.  On September 27, 2013, Apotex filed a motion to stay the briefing and determination of UCB's motion for attorney fees, certifying that it had met and conferred with UCB regarding the motion pursuant to Local Rule 7.3(a)(3).  (D.E. 228 at 7.)  No such meet-and-confer occurred.[3]

**UCB's Estimated Fees and Costs**

UCB estimates that, from April 20, 2012 (the date of Apotex's complaint) through September 30, 2013, it has incurred approximately $4,242,034 in attorney fees.  A summary of the number of hours expended by each timekeeper, along with a brief description of their experience, hourly rates, and tasks performed, is provided in invoices to UCB, copies of which

---

[3] On September 16, 2013, Apotex's counsel contacted UCB's counsel regarding fees and the fee-application process.  The communication did not convey that Apotex would file a motion to stay, much less seek UCB's position as to one.

are attached as Exhibit 4 to the Gahtan Declaration.  UCB seeks to recover $518,364 in expert witness fees and $226,862 in additional costs and disbursements.  These expenses are summarized in Exhibits 10 and 5 to the Gahtan Declaration.  Copies of the corresponding invoices are also included.  (Gahtan Decl. Exs. 6-12.)  UCB continues to incur additional fees and expenses in connection with this motion and its opposition to Apotex's motion to stay.  In addition, UCB will seek pre-judgment and post-judgment interest.

## ARGUMENT

## I.     THE COURT SHOULD AWARD UCB ITS ATTORNEY FEES UNDER 35 U.S.C. § 285

A district court has discretion to award reasonable attorney fees to the prevailing party in a patent case if the court determines that the case is "exceptional."  35 U.S.C. § 285; *MarcTec, LLC v. Johnson & Johnson*, 664 F.3d 907, 915 (Fed. Cir. 2012).  The decision to award fees under § 285 is a two-step process: (1) determining whether the prevailing party has proved by clear and convincing evidence that the case is exceptional, and (2) if the case is deemed exceptional, determining whether an award of fees is justified, and if so, the amount of the award.  *MarcTec*, 664 F.3d at 915-16; *Highmark, Inc. v. Allcare Health Mgmt. Sys., Inc.*, 687 F.3d 1300, 1308 (Fed. Cir. 2012).

### A.     This Is an Exceptional Case

"[M]any forms of misconduct can support a district court's exceptional case finding, including inequitable conduct before the [PTO]; litigation misconduct; vexatious, unjustified, and otherwise bad faith litigation; a frivolous suit; or willful infringement."  *Monolithic Power Sys., Inc. v. O2 Micro Int'l Ltd.*, 726 F.3d 1359, 1366 (Fed. Cir. 2013) (citing *Brasseler, U.S.A. I, L.P. v. Stryker Sales Corp.,* 267 F.3d 1370, 1380 (Fed. Cir. 2001)).

This case is "exceptional" under 35 U.S.C. § 285 for at least the following reasons: (1) Dr. Sherman obtained the '556 patent through multiple acts of inequitable conduct, including affirmative egregious misconduct; (2) Apotex filed and maintained an objectively baseless lawsuit in bad faith; and (3) Apotex and its counsel committed litigation misconduct.  In light of the truly egregious nature of Apotex's conduct – both in obtaining the patent and in pursuing this litigation – the Court should exercise its discretion and award UCB all of its attorney fees and expenses incurred in defending this action.

**1.**   **Dr. Sherman's Inequitable Conduct**
**Warrants a Finding of Exceptional Case**

A finding of inequitable conduct is sufficient to form the basis for an award of attorney fees under § 285. *Nilssen v. Osram Sylvania, Inc.*, 528 F.3d 1352, 1358 (Fed. Cir. 2008); *Levenger Co. v. Jacobo*, 516 F. Supp. 2d 1272, 1294 (S.D. Fla. 2007) (awarding attorney fees to prevailing accused infringer where patent-in-suit was unenforceable due to inequitable conduct).

After a bench trial during which the Court heard testimony from Dr. Sherman, as well as experts for both parties, the Court held that Apotex's '556 patent is unenforceable due to inequitable conduct under the more stringent standard recently articulated in *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276 (Fed. Cir. 2011). In fact, the Court found that "Dr. Sherman engaged in affirmative and egregious misconduct throughout the '556 Patent prosecution." (D.E. 222 at 46-47.) *See Therasense*, 649 F.3d at 1292 ("When a patentee has engaged in affirmative acts of egregious misconduct, such as the filing of an unmistakably false affidavit, the misconduct is material."). Dr. Sherman's misconduct was not limited to an isolated incident either. As the Court correctly found, he exhibited a "willful disregard of the duty of candor" and engaged in an "orchestrated scheme" to obtain the '556 patent through a "pattern of lies." (D.E. 222 at 1, 45, 47.) Thus, a finding of exceptional case based on inequitable conduct is particularly warranted here.

**2.**   **The Lawsuit Was Objectively Baseless**
**And Brought in Subjective Bad Faith**

Attorney fees under § 285 may also be imposed where a patentee brings a frivolous litigation if two criteria are satisfied: "(1) the litigation is brought in subjective bad faith, and (2) the litigation is objectively baseless." *Highmark,* 687 F.3d at 1308-09. "To be objectively baseless, the infringement allegations must be such that no reasonable litigant could reasonably expect success on the merits." *Id.* (quoting *Dominant Semiconductors Sdn. Bhd. v. ORSRAM GmbH,* 524 F.3d 1254, 1260 (Fed. Cir. 2008)). To prove subjective bad faith, "it must be shown that the lack of objective foundation of the claim 'was either known or so obvious that it should have been known' by the party asserting the claim." *Id.* (quoting *In re Seagate Tech., LLC,* 497 F.3d 1360, 1371 (Fed. Cir. 2007)).

As the Court correctly found, Apotex's lawsuit was objectively baseless from the start and never should have been brought. (D.E. 222 at 1.) Both for reasons clear to the public (prosecution disclaimer and indefiniteness) and, before discovery, known uniquely to Apotex

(inequitable conduct, judicial estoppel and laches), no reasonable litigant could have expected to succeed on the merits.  Indeed, Apotex's suit is particularly baseless because Apotex disclaimed the Univasc® process by name in language that was "clear," "deliberate[]," "unmistakable" and "unequivocal[]."  (*Id.* at 59.)  Apotex nevertheless accused the very same process of infringing the '556 patent.  Apotex clearly knew or should have known that its claims were barred by its disclaimer and judicial estoppel.  *See MarcTec*, 664 F.3d at 919 (litigation was objectively baseless where, among other things, patentee had disclaimed subject matter (stents) it later accused of infringement).  If Apotex had any hope of avoiding the consequences of its own disclaimer, those hopes were extinguished when, early in the litigation, UCB produced evidence that the Univasc® process had not changed since 1995.

Apotex's stated reason for its intransigence – that Dr. Sherman disclaimed the process described in the prior art and not the "actual" process – is disingenuous sophistry, and the Court properly rejected it.  Dr. Sherman knew that Univasc® was made according to his claimed process, as the Court correctly found, and he never informed the PTO of that fact, nor did he assert that the "actual" Univasc® process was secret.  (D.E. 222 at 22, 27.)  Moreover, as in the *Merck* litigation, "anyone with a fundamental knowledge of chemistry" would be able to figure out UCB's manufacturing process once he or she knew the ingredients and knew that the process involved "adding water to the mix."  (*Id.* at 8 (quoting *Merck Litigation,* 2000 WL 97582, at *8).)

Similarly, Apotex should have known from the start that its claims were indefinite.  Neither the '556 patent nor the prosecution history provide any guidance as to the amount of solvent and time, or the manner of control, required to achieve or avoid the 80% conversion threshold.  This fact was self-evident and did not require discovery from UCB.  Moreover, Apotex and Dr. Sherman should have been well aware that there was no available method to measure the amount of conversion, either in 2000 or today.  (*Id.* at 15.)  *See MarcTec*, 664 F.3d at 919 ("MarcTec's proposed claim construction was so lacking in any evidentiary support that assertion of this construction was unreasonable and reflects a lack of good faith."); *Eon–Net LP v. Flagstar Bancorp*, 653 F.3d 1314, 1326 (Fed. Cir. 2011) ("[B]ecause the written description clearly refutes Eon–Net's claim construction, the district court did not clearly err in finding that Eon–Net pursued objectively baseless infringement claims.").

Apotex also knew or should have known that any recovery of pre-filing damages was barred by laches.  The law is clear that a six-year delay creates a rebuttable presumption of laches.  *A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020, 1035-1036 (Fed. Cir. 1992).  Apotex waited for nearly *eight* years before filing suit, despite knowledge that Univasc® contained moexipril magnesium.  Yet Apotex presented absolutely no evidence to rebut the presumption of laches.  Significantly, much of the evidentiary prejudice arose from the supposed memory lapses of Apotex's own witnesses, including Dr. Sherman.[4]  Thus, Apotex knew from the start that its unjustified delay had resulted in a loss of evidence relevant to UCB's defenses.

The evidence also demonstrates that Apotex brought this suit in subjective bad faith.  Not only did Dr. Sherman obtain the '556 patent through "egregious misconduct" that exhibits a "willful disregard of the duty of candor," (D.E. 222 at 39, 45), but Apotex engaged in an "orchestrated scheme" of obtaining the patent for the purpose of suing UCB.  "The practice of targeting a competitor's existing and widely available product and seeking to obtain a patent for the purpose of suing that competitor through a pattern of lies and deception should not be rewarded."  (*Id.* at 47.)   Apotex's unjustifiable delay "is additional evidence that Apotex carefully chose its moment to sue UCB based on something other than its gathering of sufficient evidence with respect to Univasc and Uniretic."   (*Id.* at 64.)

### 3.  Apotex Engaged in Litigation Misconduct

"Litigation misconduct and unprofessional behavior may suffice, by themselves, to make a case exceptional under § 285."  *Eon-Net* LP, 653 F.3d at 1324 (quoting *Rambus Inc. v. Infineon Techs. AG,* 318 F.3d 1081, 1106 (Fed. Cir. 2003)).  "[M]any varieties of misconduct can support a district court's exceptional case finding, including lodging frivolous filings and engaging in vexatious or unjustified litigation."  *Id.* (affirming exceptional case finding based on patentee's "litigation misconduct and its filing a baseless infringement action in bad faith for an improper purpose").

Here, in addition to Dr. Sherman's inequitable conduct and Apotex's filing and maintaining a frivolous lawsuit (see above), this case is exceptional because of Apotex's litigation misconduct.  First, Apotex filed a frivolous motion to strike virtually all of UCB's

---

[4] The Court correctly concluded that Dr. Sherman's purported memory lapses "must be taken with a grain of salt," (D.E. 222 at 66), but that, had Apotex sued UCB in 2004, he could not hide behind them.

defenses mid-way through the litigation, despite <u>Apotex's</u> inexcusable delay in producing the overwhelming majority of its documents, and its refusal to make Dr. Sherman available for deposition until <u>six days</u> before expert reports were due.  The Court denied Apotex's frivolous motion and ultimately ruled in favor of UCB on all of the defenses Apotex sought to strike. Apotex also filed two baseless motions in limine, one seeking to exclude the critical 2001 Study – not only from the jury, but from the Court as well – and a second to exclude Dr. Chyall on the utterly meritless ground that he is not a person of ordinary skill in the art.  Both motions were entirely baseless.  *See, e.g., Monolithic Power*, 726 F.3d at 1364 (affirming an exceptional case finding under 35 U.S.C. § 285 due to litigation misconduct, including filing three "baseless motions"); *FMT Corp. v. Nissei ASB Co.*, 1993 WL 588529, at *3 (N.D. Ga. Oct. 4, 1993) (finding the case "exceptional" under 35 U.S.C. § 285 based on litigation misconduct, including the filing of "unwarranted motions").

<u>Second</u>, Apotex relied on an improperly altered laboratory notebook.  When UCB's expert, Dr. Chyall, identified a critical discrepancy in the data reported by Chemir and relied upon by Dr. Cima, Apotex responded by producing "corrected" versions of Notebook 953 and suggested that Dr. Chyall reconsider his opinions.  These "corrections" – made after the notebook was signed and witnessed – forced UCB to take the deposition of Mr. Rogers, the Chemir scientist who authored the notebook.  At that deposition, UCB learned that Mr. Rogers' January 8 note was itself erroneous, but Apotex's attorneys – who presumably knew the truth before the deposition – never withdrew the doctored lab notebook.  Apotex's attempts to "correct" Notebook 953 in light of Dr. Chyall's criticisms are suspicious at best and fraudulent at worst.  *See Aptix Corp. v. Quickturn Design Sys., Inc.*, 269 F.3d 1369, 1374-75 (Fed. Cir. 2001) (affirming exceptional case finding and award of attorney fees based on litigation misconduct, including the submission of falsified engineering notebooks to the court).[5]

---

[5] Alternatively, Apotex's litigation misconduct justifies an award of attorney fees and expenses resulting from those offenses.  *See* 28 U.S.C. § 1927; *Highmark*, 687 F.3d at 1315-16.  An award of sanctions under § 1927 is appropriate where the attorney engaged in "unreasonable and vexatious" conduct that "multiplied the proceedings," and where the sanction does not exceed the "costs, expenses, and attorneys' fees reasonably incurred because of such conduct."  *Dorai v. Class Actions Servs., LLC*, 261 F.R.D. 678, 683 (S.D. Fla. 2009) (quoting *Amlong & Amlong, P.A. v. Denny's Inc.*, 500 F.3d 1230, 1239 (11th Cir. 2007)).  *See Malautea v. Suzuki Motor Co.*, 987 F.2d 1536, 1544-45 (11th Cir. 1993) (affirming costs and attorney fees awarded under 28 U.S.C. § 1927 based on counsel's abuse of the judicial process by covering up damaging

_Third_, Apotex repeatedly flouted the Local Rules and the Court's Scheduling Order by filing an untimely brief that exceeded the page limit by 19 pages, and by misrepresenting to the Court that they had met and conferred with UCB prior to filing two motions.

### B.    The Court Should Award UCB All of Its Fees and Expenses

"The only deterrent to the … improper bringing of clearly unwarranted suits on obviously invalid or unenforceable patents is Section 285.  No award under Section 285 can fully compensate a defendant subjected to bad faith litigation, e.g., for loss of executives' time and missed business opportunities.  Thus that defendant cannot be fully returned to 'the situation he would have occupied if the wrong had not been committed.'"  _Mathis v. Spears_, 857 F.2d 749, 856 (Fed. Cir. 1988) (quoting _Albemarle Paper Co. v. Moody,_ 422 U.S. 405, 418 (1975)).

In exercising its discretion to award fees, a district court may weigh factors such as degree of culpability, closeness of the questions, and litigation behavior.  _Nilssen_, 528 F.3d at 1359.  "[T]he most critical factor" in determining the amount of a fee award "is the degree of success obtained."  _Hensley v. Eckerhart_, 461 U.S. 424, 436 (1983).  "Where … a prevailing party has "obtained excellent results, his attorney should recover a fully compensatory fee. Normally this will encompass all hours reasonably expended on the litigation.'"  _Mathis_, 857 F.2d at 856 (quoting _Hensley,_ 461 U.S. at 435).  Importantly, a court has the flexibility to "adjust the fee upward or downward" in light of the results obtained.  _Hensley_, 461 U.S. at 434.

The Court should award UCB the entirety of its attorney fees and expenses incurred. Such an award is particularly appropriate in light of the circumstances and outcome of this case. The Court should consider at least the following factors:

- Dr. Sherman obtained the '556 patent through multiple instances of egregious misconduct;

- at trial, Dr. Sherman was "evasive" and "not a credible witness";

- Apotex repeatedly distinguished the accused product – by brand name – in order to obtain the '556 patent;

- after obtaining the '556 patent, Apotex waited for nearly eight years to file suit, despite Dr. Sherman's knowledge that UCB infringed;

- Apotex did not withdraw its complaint after receiving discovery confirming that UCB's manufacturing processes were unchanged;

---

evidence, failing to comply with discovery orders, objecting to requests for information, and "engaging in a campaign to obfuscate the truth").

- Apotex filed a frivolous motion to strike UCB's meritorious defenses as untimely, despite that Apotex itself substantially delayed in providing the relevant discovery that supports these defenses and despite that UCB asserted these defenses promptly after receiving that discovery;

- Apotex seemingly tampered with Notebook 953 in an attempt to rebut Dr. Chyall's criticisms of the Chemir tests;

- Apotex filed two frivolous motions in limine; and

- the Court ultimately found in favor of UCB on each defense raised at trial.

As summarized above, Apotex's complaint was based on an invalid and unenforceable patent, the allegations were objectively baseless from the outset, and Apotex's litigation tactics were unreasonable and vexatious.

### 1.   UCB's Attorney Fees Are Reasonable

UCB's fee estimate is based on the total number of hours reasonably spent by UCB's attorneys on the litigation, multiplied by their hourly rates, and adjusted by an agreed, limited discount.  (*See* Exhibit 4.)  As discussed below, the rates charged were reasonable and the hours expended were reasonably necessary to defend the litigation.

### (a)   The Rates Charged Were Reasonable

Although the general rule is that the prevailing market rates of the local community govern, there is an exception for complex litigation involving specialized areas of law.  *See Saint-Gobain Autover v. Xinyi Glass North America*, 707 F. Supp. 2d 737, 758 (N.D. Ohio 2010).  Attorneys who specialize in particular fields "such as admiralty law, patent law, or antitrust and other complex litigation," tend to charge more for their services and tend to be found in larger cities where the cost of litigation is more expensive.[6]  *Id.* at 759 (quoting *Chrapliwy v. Uniroyal, Inc.*, 670 F.2d 760, 769 (7th Cir. 1982) (emphasis added)); *see also Howes v. Medical Components, Inc.*, 761 F. Supp. 1193, 1195-97 (E.D. Pa. 1990) (rejecting argument that attorney fee rates for local community must be used where prevailing party employed a higher-price New York patent litigation specialty firm).  As this Court has ruled, in intellectual property cases "'a party should be entitled to retain the most competent counsel available' because the issues are difficult and require great skill and experience on the part of the

---

[6] An award based on higher rates from distant markets "is often based on the theory that the higher rates reflect a specialist's expertise that should reduce the overall costs of the representation."  3 *Attorney Fee Awards*, § 17:5 (3d ed.).  *See American Booksellers Ass'n, Inc. v. Hudnut,* 650 F. Supp. 324, 328 (S.D. Ind. 1986).

attorneys." *Nutrivida, Inc. v. Immuno Vital, Inc.,* 46 F. Supp. 2d 1310, 1318 (S.D. Fla. 1998) (quoting *Howes*, 751 F. Supp. at 1196) (trademark case; awarding fees based on New York rates).  Indeed, Apotex chose specialty patent counsel based in Chicago, a legal market with higher rates than Florida.

Because patent litigation is a specialized area of law – and <u>pharmaceutical</u> patent litigation is highly specialized, requiring education and experience in the chemical arts and the pharmaceutical industry, as well as a deep understanding of substantive patent law – the Court should apply the actual New York rates billed to the client, rather than local South Florida rates. The rates charged to UCB are customary for pharmaceutical patent litigators in the New York area.  According to the *AIPLA Report of the Economic Survey 2013* ["2013 AIPLA Survey"] (Gahtan Decl. Ex. 13), median rates for New York patent litigators generally are $563 for partners and $442 for associates, and rates at the third quartile[7] are $725 for partners and $568 for associates.  *2013 AIPLA Survey* at I-34, I-48; *see Mathis,* 857 F.2d at 755–56 (reliance on AIPLA surveys is proper).  The 2013 AIPLA Survey also shows that, nationwide, the rates charged by pharmaceutical patent litigators are higher than the rates charged for other IP technical specializations.  *Id.*  Such rates are especially appropriate in this case, which involved myriad complex legal and technical issues.  Moreover, UCB negotiated a discount which resulted in effective rates that were lower than those reported on the invoices.[8]  (Gahtan Decl. Ex. 4, Sept. 26, 2013 invoice.)

**(b)     The Hours Expended Were Reasonable**

Because this lawsuit should never have been brought (D.E. 222 at 2), UCB seeks fees for all hours billed from the filing of the lawsuit through trial, including post-trial briefing.  UCB is also entitled to attorney fees incurred in preparing the instant motion, as well as pre-judgment

---

[7] The third quartile represents the 75th percentile of the lawyer billing rates.  Thus, 25% of the reported New York patent attorney rates are higher than the third percentile rate.  *See 2013 AIPLA Survey* at 2.

[8] Although UCB has not requested an award of its counsel's full fees, which would include the discount, the Court would be justified in awarding it.  *See Junker v. Eddings,* 396 F.3d 1359, 1365 (Fed. Cir. 2005) ("Although the amount the client paid the attorney is one factor for the court to consider in determining a reasonable fee, it does not establish an absolute ceiling. The determination of a reasonable attorney fee requires the court to consider all relevant circumstances in a particular case.").

and post-judgment interest.  *See Mathis*, 857 F.2d at 856.  As of September 30, 2013, UCB incurred approximately $4,242,034 in attorney fees.  (*See* Gahtan Decl. Ex. 4.)

As reflected in invoices paid by UCB, the hours expended by UCB's counsel were reasonably necessary to defend the litigation.  Tasks included (i) preparing a motion to dismiss, (ii) document discovery that included over 200,000 pages produced by Apotex and about 45,000 pages produced by UCB; (iii) taking and defending 9 fact depositions and 6 expert depositions; (iv) preparing a motion for summary judgment; (v) preparing 3 motions in limine; (vi) opposing 4 Apotex motions in limine; (vii) preparing for and attending the three-day bench trial; and (viii) preparing post-trial briefs.  UCB also incurred significant expense preparing for a possible jury trial on invalidity, non-infringement and damages, a trial that could have occurred immediately following the bench trial.

The total amount of fees incurred by UCB is reasonable considering the amount of damages sought by Apotex.  *See 2013 AIPLA Survey* at I–142 (nationwide average total cost of Hatch Waxman[9] pharmaceutical patent infringement litigation in 2012 where $10-25 million is at risk was $4.5 million).  It is also reasonable in comparison to the fees awarded in other patent actions.  *See, e.g, Monolithic Power*, 726 F.3d at 1365 (affirming award of $8,419,429 in attorney fees and $663,151 in nontaxable costs); *Takeda Chem. Indus., Ltd. v. Mylan Labs., Inc.*, 549 F.3d 1381, 1390-91 (Fed. Cir. 2008) (pharmaceutical case; affirming an award of $16.8 million in attorney and expert fees and expenses in a litigation that lasted only two years); *Therasense, Inc. v. Becton, Dickinson & Co.*, 2012 WL 1877859 (N.D. Cal. May 22, 2012) (awarding $5,949,050 in fees and expenses); *Nilssen v. Osram Sylvania, Inc.,* No. 01 Civ. 03585 (N.D. Ill. April 3, 2007) (awarding defendant $5.6 million in attorney fees), *aff'd* 528 F.3d 1352, 1359–60 (Fed. Cir. 2008); *ICU Med., Inc. v. Alaris Med. Sys., Inc.,* No. 04-cv-689, 2007 WL 6137002 (C.D. Cal. June 28, 2007) (awarding defendant $4.7 million in attorney fees and expenses), *aff'd* 558 F.3d at 1380–81 (Fed. Cir. 2009).

### 2.  UCB's Costs and Disbursements Were Reasonable

An award of attorney fees under § 285 also includes "those sums that the prevailing party incurs in the preparation for and performance of legal services related to the suit."  *Maxwell v.*

---

[9] Hatch Waxman, or ANDA, litigations typically involve a generic pharmaceutical company challenging the patent or patents covering a branded drug.  Like this case, Hatch Waxman cases are pharmaceutical patent cases tried to a judge.  Unlike this case, Hatch Waxman litigants do not need to prepare, simultaneously, for a jury trial.

*Angel-Etts of California, Inc.*, 53 F. App'x 561, 569 (Fed. Cir. 2003).  "The purpose of § 285 is . . . to compensate the prevailing party for its monetary outlays in the prosecution or defense of the suit."  *Central Soya Co. v. Geo A. Hormel & Co.*, 723 F.2d 1573, 1578 (Fed. Cir. 1983).

In addition to its fees, UCB seeks $226,862 in costs and disbursements, including vendor costs related to electronic discovery, trial preparation, and trial support services.  These expenses were reasonably necessary and typical of those incurred in patent litigations.  (*See* Exhibits 5-9.)  These expenses exclude UCB's taxable costs pursuant to Rule 54, which are the subject of UCB's bill of costs pursuant to 28 U.S.C. § 1920.  (D.E. 234.)

## II.    THE COURT SHOULD AWARD UCB ITS EXPERT WITNESS FEES

A district court has inherent authority to "impose sanctions in the form of reasonable expert fees in excess of what is provided by statute."  *MarcTec*, 664 F.3d at 921 (citing *Takeda*, 549 F.3d at 1391).  "[T]o support an award of expert fees as part of a costs award under the court's inherent authority, the court must find either fraud or abuse of judicial process."  *Powell v. Home Depot, U.S.A., Inc.*, 2010 WL 4116488, at *30 (S.D. Fla. Sept. 14, 2010); *see Mathis*, 857 F.2d at 759 ("full expert witness fees have been awarded, without specific statutory authorization, upon a finding of bad faith").

As discussed above, this Court has already found both fraud <u>and</u> abuse of the judicial process.  Not only did Apotex obtain the '556 patent through fraud, but it took a position before this Court that was flatly inconsistent with its arguments before the PTO.  Thus, Apotex "abuse[d] the patent system" and made a "mockery of the judicial system."  (D.E. 222 at 50.)  Apotex also maintained its lawsuit in bad faith even as it became abundantly clear that it could not prevail.  Moreover, Apotex has attempted to abuse the judicial process by filing similar lawsuits in this Court on a related patent, based on a strategy that has failed in the past.  In light of its findings, the Court should exercise its discretion and award UCB its expert witness fees in the amount of $518,364.

## CONCLUSION

For all of the foregoing reasons, the Court should award UCB its attorney fees and costs in the amount to be determined on the bases set forth herein.

## <u>LOCAL RULE 7.3(b) CERTIFICATION</u>

Pursuant to Local Rule 7.3(b), counsel for UCB certify that they served a draft of this motion on counsel for Apotex at least thirty days prior to the deadline for filing this motion. The parties subsequently met telephonically in a good faith effort to resolve issues by agreement. The parties were not able to agree on UCB's entitlement to its fees and expenses or the amount of such fees and expenses.

Dated:  November 12, 2013

/s/ Maria J. Beguiristain
Maria J. Beguiristain
Florida Bar No. 69851
mbeguiristain@whitecase.com
WHITE & CASE LLP
Southeast Financial Center
200 South Biscayne Boulevard
Suite 4900
Miami, Florida 33131
Tel: (305) 371-2700
Fax: (305) 358-5744

Dimitrios T. Drivas (*pro hac vice*)
ddrivas@whitecase.com
Adam Gahtan (*pro hac vice*)
agahtan@whitecase.com
Christopher J. Glancy (*pro hac vice*)
cglancy@whitecase.com
Amit H. Thakore (*pro hac vice*)
athakore@whitecase.com
Laura T. Moran (*pro hac vice*)
lmoran@whitecase.com
WHITE & CASE LLP
1155 Avenue of the Americas
New York, NY 10036
Tel: (212) 819-8200
Fax: (212) 354-8113

*Attorneys for Defendants UCB, Inc. and
Kremers Urban Pharmaceuticals Inc.*

## <u>VERIFICATION</u>

I, Adam Gahtan, verify under penalty of perjury that I have read the foregoing motion,

and the factual representations contained therein are true and correct.

Executed on this 12th day of November, 2013.


/s/ Adam Gahtan
Adam Gahtan

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on the 12th day of November, 2013, I filed the foregoing

document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document

is being served this day on all counsel of record or pro se parties on the attached Service List via

transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized

manner for those counsel or parties who are not authorized to receive Notices of Electronic

Filing.


By:  /s/ Maria J. Beguiristain
      Maria J. Beguiristain


## SERVICE LIST

Matthew Scott Nelles
mnelles@broadandcassel.com
BROAD AND CASSEL
One Financial Plaza
Suite 2700
Fort Lauderdale, FL 33394
Telephone: (954) 764-7060
Facsimile:  (954) 761-8135

*Counsel for Plaintiffs*

Brian J. Sodikoff
brian.sodikoff@kattenlaw.com
Dennis C. Lee
dennis.lee@kattenlaw.com
Eric C. Cohen
eric.cohen@kattenlaw.com
Martin S. Masar, III
martin.masar@kattenlaw.com
Robert Burton Breisblatt
Robert.Breisblatt@kattenlaw.com
Suresh B. Pillai
suresh.pillai@kattenlaw.com
KATTEN, MUCHIN, ROSWENMAN, LLP
525 W. Monroe Street
Chicago, IL 60661
Telephone: (312) 902-5200
Facsimile:  (312) 902-1061

*Counsel for Plaintiffs*

Christopher B. Ferenc
christopher.ferenc@kattenlaw.com
KATTEN, MUCHIN, ROSWENMAN, LLP
North Tower
2900 K Street NW
Suite 200
Washington, DC 2007
Telephone: (202) 625-3500
Facsimile: (202) 298-7570

*Counsel for Plaintiffs*